# Exhibit 4

UNITED STATES DISTRICT COURT DISTRICT OF OREGON

EUGENE DIVISION

CHET WILSON, individually and on behalf of all others similarly situated,

Plaintiff,

v. Case No.: 6:25-cv-00376

SKOPOS FINANCIAL, LLC d/b/a REPRISE FINANCIAL,

Defendant.

---

AND ALL RELATED CROSS-ACTIONS.

---

VIDEOCONFERENCE DEPOSITION OF CHET MICHAEL WILSON

FRIDAY, DECEMBER 12, 2025

9:02 AM

APPEARING REMOTELY FROM

EUGENE, OREGON

REPORTED BY:

Cheryl L. Haase
NCRA RPR No. 12443/WA CCR No. 3503
(541)409-2190 - cheryl.haase@gmail.com

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:

PELUSO LAW, LLC
865 Albion Street, Suite 250
Denver, Colorado 80220
(720) 805-2008

By: Patrick Peluso
ppeluso@pelusolawfirm.com
(Pro Hac Vice)

For Defendant Skopos Financial, LLC dba Reprise Financial:

BILES WILSON, PLLC
457 Laurence Drive, Suite 195
Heath, Texas 75032
(972) 345-2626

By: Dunham Biles
dunham@bileswilson.com
(Pro Hac Vice)

Also Present
Julia Coons, Paralegal

INDEX OF EXAMINATIONS


| | | |
|---|---|---|
| Exam | by Mr. Biles | 4 |


INDEX OF EXHIBITS


| | | |
|---|---|---|
| Exhibit 1 | Defendant's First Request for Production to Plaintiff | 17 |
| Exhibit 2 | Plaintiff's Responses and Objections to Defendant's First Set of Requests to Produce | 18 |
| Exhibit 3 | Class Action Complaint | 39 |
| Exhibit 4 | Screenshots | 44 |
| Exhibit 5 | Facebook Marketplace ad | 46 |
| Exhibit 6 | Conviction Table | 53 |
| Exhibit 7 | Chet Tank Wilson Facebook post | 66 |
| Exhibit 8 | Chet Tank Wilson Facebook Post dated December 12, 2022 | 66 |
| Exhibit 9 | Facebook post | 68 |
| Exhibit 10 | Chet Tank Wilson December 10, 2024 Facebook posts | 72 |
| Exhibit 11 | Chet Tank Wilson Facebook page dated 11/11/2024 | 77 |

REPORTED REMOTELY FROM LINN COUNTY, OREGON

FRIDAY, DECEMBER 12, 2025

9:02 AM

CHET MICHAEL WILSON,

called as a witness,

having been first duly affirmed,

was examined and testified as follows:

EXAMINATION

BY MR. BILES:

Q. Good morning, Mr. Wilson.

A. Good morning.

Q. Could you please state your full name for the record?

A. Chet Michael Wilson.

Q. And Mr. Wilson, have you ever had your deposition taken before?

A. Yes, sir.

Q. Okay. How many times?

A. For these matters, this will be the third time, I believe.

Q. And when you say "these matters," what do you mean?

A. The TCPA.

Q. When was the last time you had your deposition taken in a TCPA case?
A. Roughly a week ago.
Q. Okay. And what case was that?
A. It was -- I forget the exact name of the company, it was a mortgage company, I believe.
Q. Were you working with any other plaintiffs in that case?
A. I believe there was one other plaintiff on that case with me.
Q. Okay. Is that Sara Taylor?
A. Yes, sir.
Q. Who is Sara Taylor?
A. What's that?
Q. Who is Sara Taylor?
A. She was a co-plaintiff, if that's the correct wording for it.
Q. She's a co-plaintiff on several cases with you, right?
A. I am not certain. I deal --
Q. Sorry. Go ahead.
A. I deal with numerous of these cases, so it's hard to, you know, get the names exactly with them, so --
Q. Who is Antwane Johnson?
A. I know the name's really familiar, but I -- I'm

not certain.

Q. He's a co-plaintiff with you on cases, isn't that correct?

A. I just -- I recognize the name. I can't specify exactly.

Q. You have so many cases you don't recognize all the ones you have with Antwane, is that right?

A. Yeah, I have a lot going on, so --

Q. How many TCPA cases do you have going on?

A. I'm not sure which are pending or still active, but there's upwards of somewhere around 70, 69, 70, something like that.

Q. So that 70 would be ones, that's you think the grand total of number of cases you've ever filed under the TCPA including ones that are active and ones that are no longer active?

A. I believe that's fairly accurate, yes.

Q. Approximately how many of those are currently active?

A. I am not certain.

Q. When did you first file your TCPA case?

A. It was around a year ago, I think.

Q. So in a year you've filed approximately 70 TCPA cases as a plaintiff, is that correct?

A. I -- I think that's -- that's fairly accurate.

Q. Okay. How many of those have been concluded in one way or another?
A. I think somewhere around 20 or so. I don't have the exact number.
Q. And were those all concluded by settlement?
A. I -- I think there was a few that were dismissed, but yeah, that's -- that's correct.
Q. Approximately how many do you believe were settled?
A. Some in the 20 area, somewhere -- something like that.
Q. How much did you get paid?
MR. PELUSO: Objection. I'm going to object to the relevance of that, you know, a lot of these settlements obviously are going to be confidential.
BY MR. BILES:
Q. Sir, would you answer the question, please?
A. Will you repeat it so I get it accurately again?
Q. Yeah. How much have you received in settlement cases on TCPA cases?
MR. PELUSO: Same objection.
A. I am not certain to an accurate number, so --
BY MR. BILES:
Q. Is it more than a hundred thousand?
A. I don't believe so, no.

Q. Is it more than 10,000?
A. Yes.
Q. Okay. More than 50,000?
A. I think we're getting close to somewhere in there. I'm not certain.
Q. Okay. And what are the terms of the agreement with your counsel in this case should you -- should this case be concluded?
A. I -- I believe we're going off of the claim standards as far as TCPA actions, so I'm not certain the entirety of it, but --
Q. What does that mean to you?
A. From my understanding it's -- it's 500 per infringement, and then if it's -- if it's intentional, it's $1,500 per incident, so --
Q. What I -- well, let me ask you: Are you paying your attorney on an hourly basis?
A. No, sir.
Q. So it's a contingency fee, correct?
A. Yes. Yes. I -- yes.
Q. What percentage does your lawyer get?
MR. PELUSO: Objection to the relevancy. I -- I think we've turned over the retainer agreement, so you already have the terms.

MR. BILES: I don't think I have it, but --
MR. PELUSO: If not, I'm happy to turn it over.
MR. BILES: Okay. That will be sufficient.
BY MR. BILES:
Q. And, sir, just to back up and talk about depositions for a minute, you understand you're under oath today, correct?
A. Yes, sir.
Q. And what I'm going to ask of you for the benefit of our court reporter, actually, is that I will ask questions and if you would let me finish the question before you respond, and then you'll respond and I will do my best not to interrupt you.
Your -- your lawyer may object at some point, and the reason why we need to do this is our court reporter is trying to get literally every single word we say down.
And so if we speak over each other, we make our court reporter's job impossible and annoying. So can we agree to do our best not to speak over each other?
A. Yes, sir.
Q. And then I'd ask you that if I ask you a question and you don't understand it, will you let me know?
A. Yes, sir.
Q. If you don't say you don't understand it, can we

agree that that means you did understand the question?
A. Yes, sir.
Q. Okay. And then the way this works, of course, today is -- at any point if you'd like a break, just let me know. We all have to use the restroom, we all may need food, whatever.
Let me know and I'll do my best to grant it right then. The exceptions to that are like if I literally have a question pending to you, I'm going to need you to answer it before we take a break, and it may be a situation where I have a few more questions I want to finish in a line before I agree to take a break.
Does that work for you?
A. Yes, sir.
Q. Now, what if anything did you do to prepare for this deposition today?
A. I just -- I reviewed the documents with the texts again that were from the defendant and just previously went over things.
Q. What documents did you review?
A. The complaints, the dismissal, that paperwork that was overturned, and I believe that there's a few documents in there, I don't remember the exact titles of them, so --
Q. And when you say you briefly went over things, what did you mean?

A. Well, I briefly went over them with Mr. Peluso.

Q. Okay. Now, let's be -- let's be clear about this today. I may ask you if you met with your counselor, so forth, but there's almost no chance I want to know anything about what your counsel told you or what you told your counsel. So let's -- you understand?

A. Yes. Yes.

Q. When did you meet with Mr. Peluso --

A. I spoke --

Q. -- about the deposition?

A. I spoke with him briefly this morning.

Q. Did you otherwise speak with Mr. Peluso about your deposition before some time this morning?

A. We also had a brief conversation yesterday. Just basically going over the same stuff, just making sure I was --

Q. I don't -- I don't -- honestly, I promise you I don't need to know about your communications with your -- I'm just asking you when you met with him, and I'll ask you how long you met with him. I'm not going to ask you what you discussed with him. Okay?

A. Okay.

Q. That's -- I don't want to know.

A. Okay.

Q. Okay. So how long did you speak to Mr. Peluso

yesterday?
A. I'd say 15, 20 minutes, maybe.
Q. Okay. Did you speak with your attorney or anyone else in preparation for your deposition other than the conversation you had yesterday and the one you had this morning?
A. I don't believe so.
Q. Did you speak with any of your other lawyers who are not part of this case about this deposition?
A. I don't believe so.
Q. Of those 70 cases, does Mr. Peluso represent you in any of those other than this one?
A. I believe this is the first time I've worked with Mr. Peluso.
Q. How did you come to contact Mr. Peluso?
A. Excuse me?
Q. How did you come to contact Mr. Peluso about this case?
A. I was -- he was referred to do the litigation from my -- the law firm that I deal with, mostly, so Heidarpour.
Q. How do you get in contact with Heidarpour? I forget how to pronounce them, but that law firm initially?
A. I did a web search for TCPA and that's who it pulled up, so --
Q. Now, are they the law firm that you've given

access to your cell phone to go back five years and searched for all the text messages?

A. Sir, to be accurate, I have -- there's several attorneys that I deal with on these cases, so I just don't want to be inaccurate. I'm not certain who specifically I've dealt with on all these, but it's -- I have -- there's a group of attorneys that are all under the kind of same umbrella.

Q. Who are those attorneys under that umbrella?

A. So we have -- we have Anthony Paronich. We have Andrew Heidarpour. I know -- and then I'd -- I think there's a guy, Mr. Berrong that I was dealing with, too. Yeah, they're all underneath kind of the same group, they all work together, so --

Q. And do all of them have access to your Cloud account for your phone number (541) 999-9999?

A. I -- I'm not certain on how that works, so --

Q. Okay. Can you tell me every cell phone number you've had since January 1, 2024?

A. It's been this phone number.

Q. You don't have any other phone numbers?

A. No, sir.

Q. Where is that cell phone right now?

A. It is in my bathroom.

Q. When is the last time you called somebody on it?

A. I spoke with Mr. Peluso this morning.

Q. Is there a reason why you haven't given me your cell phone records so I could verify that you actually use that phone?

A. Is there a reason why I hadn't given it to you?

Q. Yeah. I've requested them, right?

Let me ask you this: Did you see the document request that I sent?

A. For my cell phone?

Q. For documents in this case, I sent what we call a Request for Production of Documents. Did you review that document?

A. I'm assuming so. I -- I didn't -- I don't remember that exact detail though so.

MR. BILES: Okay. Julia, will you pull that document up, please? Go ahead and give us Exhibit 1.

MS. COONS: Yes, sir. One moment.

BY MR. BILES:

Q. While she's doing that, sir, is it correct that you received something like 50 to 70 texts a day that you consider violations of the TCPA?

A. I can't --

MR. PELUSO: Objection to the extent it calls for a legal conclusion. Go ahead.

A. I can't answer to the exact number. You know,

because it varies. It's kind of random. But I'd say I get at least probably 15 to 20 a day and some serious days potentially upward of, you know, 50, 60, 70, you know. But I'd say that's more of a --

MR. BILES: Julia, you can hang on now. You can hang off. That's fine. We can have it up there.

BY MR. PELUSO:

Q. Let's just finish this question, then we'll put it up there. Okay. So when you receive one of those texts, as I understand it your lawyers already know about it, because they have access to your account just the same as you do, right?

MR. PELUSO: Objection to the form. It's leading, lacks foundation.

BY MR. BILES:

Q. You can answer, sir.

A. I -- I don't know the process of how that works exactly.

Q. Well, do you contact your lawyers and say, Look, I just received another text, sue somebody?

MR. PELUSO: Objection to the extent attorney-client privilege, you've already told him you don't want to hear what he says to his lawyers.

BY MR. BILES:

Q. I'll -- do you initiate contact with your

attorneys when you receive a text that you consider to violate the law?

A. Yes, I send screenshots of my -- of my messages.

Q. And in regards to -- let's make sure. I believe you -- you have sued over four texts in this case, correct?

A. Yes, sir. Well, I -- I believe at least four, yes.

Q. Out of more than four?

A. I'm not certain.

Q. Okay. There's no voicemails, though, right?

A. Not to my memory, no.

Q. There were no phone calls either, correct?

A. I can't speculate to that.

Q. Are you suing Reprise based on them having called you?

A. I don't believe so.

Q. You're suing them only because of the text messages that you've alleged in the lawsuit, correct?

A. From my understanding.

Q. Someone other than you have a better understanding of what you're claiming?

A. Well, I know at times I received more in the process of litigation, so at this time I'm not certain.

Q. Julia, why don't you put up the doc request now.

Okay. Mr. Wilson, this is, as you'll see

towards the top right, it says, "Defendant's First Request for Production to Plaintiff."

A. Yes.

MR. BILES: I will mark this as Exhibit 1.

(Deposition Exhibit No. 1 was marked for identification.)

BY MR. BILES:

Q. And I'm happy to have Julia walk you, scroll through this document. But my -- my question really is only have you ever seen this document?

A. Yes, it looks familiar.

Q. Okay. Do you have an issue with producing to me your phone records from September of 2024 to present?

MR. PELUSO: Objection to the form.

A. I leave -- I leave all, you know, legal stuff like that, I'd have to correspond with my representation (sic).

BY MR. BILES:

Q. Okay. What kind of -- who's your carrier currently? Your cell phone carrier, just to be clear?

A. Verizon.

Q. And who was your carrier at the time that you received the texts that this lawsuit is based on?

A. I've used Verizon as long as I can remember.

Q. And what type of account do you have with Verizon, by which I mean what do you, how are you being charged?

A. I have a prepaid account.

Q. Okay. What -- what does a prepaid account mean?

A. It's just without the contract. And it ends up, I think it's cheaper with the same benefits, so --

Q. And I assume like -- like me, you have unlimited text messaging?

A. Yes, sir.

Q. And you're not paying per phone call, right?

A. Nothing specifically, it's all included, all inclusive.

Q. And so you're not paying for each text message received, correct?

A. That's accurate.

MR. BILES: Julia, would you put up the -- what we'll mark as Exhibit 2, Plaintiff's Responses and Objections to Defendant's First Set of Requests to Produce.

(Deposition Exhibit No. 2 was marked for identification.)

MS. COONS: Yes, sir, one moment.

BY MR. BILES:

Q. All right, sir, can you see this document is titled "Plaintiff's Responses and Objections to Defendant's First Set of Requests to Produce"?

A. Yes. I'm reading it now.

Q. Yeah. Have you seen this document before today?

A. I believe so, yes. It looks familiar.

MR. BILES: Julia, if we go to Page 5 of that document -- can you go to Page 5 of that document, and can you make this big enough that everybody can read it?

And maybe they can, I don't know. I need to make mine bigger. Oh, now, I can. I had my screen too small.

BY MR. BILES:

Q. All right, sir. If we look at Request No. 7, it says, "All documents that evidence" -- whoa.

Okay. "All documents that evidence, refer or relate to any opt-out messages, (e.g., 'STOP'), consumer complaints, carrier complaints, or regulatory submissions made by Plaintiff regarding the alleged messages, and any responses or outcomes."

And then the response says, "Plaintiff possesses no responsive documents." Is it correct that you have no responsive documents?

A. To clarify, that would be of any action I had taken to opt out of the messages, is that correct?

Q. That is one of the things requested, yes.

A. And we're talking specifically about the Request No. 7, correct?

Q. We're -- and we're specifically talking about Reprise and Reprise -- we're only talking about this

lawsuit, not your other --

A. Yes.

Q. So is it correct that you did not respond to those messages at all?

A. Yes, that is true. And --

Q. Go ahead?

A. I -- I've found in the past that when I do respond it's more of click bait, and a lot of these companies, they'll wait until they find an actual person to respond, and then you get inundated with ten times as much stuff.

So, you know, from my past experience, it doesn't -- it's a very rare occasion when actually replying "Stop" works.

Q. Did you apply to Reprise, "Stop"?

A. If --

Q. Did you apply "Stop" to Reprise's text messages?

A. No, sir, I did not.

Q. And at that point in time how many TCPA lawsuits had you filed?

A. Once again, I'm not certain, exact number.

Q. Approximately how many?

A. Upwards of 70.

Q. Okay. Based on your knowledge, how many text messages would it take from Reprise before you could possibly sue them?

MR. PELUSO: Objection, calls for a legal conclusion.

MR. BILES: I'm just asking his -- his knowledge based on 70 cases.

A. I believe it's more than one.

BY MR. BILES:

Q. Okay. And you already told us this, but remind us again how statute damages are calculated in the TCPA case.

A. From my understanding is if they are intentional, it's $1,500. If they are found not intentional, it's 500.

Q. So if you'd applied "Stop" on the first text you received from Reprise, and if Reprise didn't send another text, you wouldn't have a lawsuit, would you?

MR. PELUSO: Objection, calls for a legal conclusion. Go ahead.

A. If -- if you're -- I mean, if it's actually how it works. You know, a lot of these companies I've seen completely the opposite, so I can't speculate on what would happen. So --

BY MR. BILES:

Q. And for each text they send you, you think you get more money, right?

A. Yes, depending on the terms.

Q. So to be clear, you didn't respond "Stop" because you wanted a lawsuit and you wanted more money, correct?

MR. PELUSO: Objection, mischaracterizes testimony, leading.

BY MR. BILES:

Q. You may answer, sir.

A. It's -- I don't believe that's accurate at all, because I've taken every step that I can to try to get rid of these telemarketer phone calls. And that's what has brought me here, prior to me knowing anything about TCPA action.

Q. You said you took every step possible to stop text messages from Reprise and other lenders, correct?

A. From anyone harassing me on my phone that's not -- that I'm not expecting to contact me, yes. This has been five years plus I've been dealing with this. And just now I've finally come to a situation where it's -- something's being done about it.

Q. What steps did you take to stop text messages that you are complaining of from coming in?

A. When I first received the phone, I started blocking every phone number that called me that wasn't somebody that I recognized, and I just got overwhelmed with that.

At that point, I -- I called, made sure that the phone number was on the Do Not Call registry and which it was and it still is.

And then after a matter of years of dealing with this, you know, feels like parasites harassing me all day long, every day, I can't answer phone calls, I can't text people, I can't listen to music without my phone going off.

So I did a web search, and -- and I think we went over this fact, it -- it led me to this law firm that's now helping me fix the situation, so to speak.

Q. You said when you received the phone. That's not really accurate, is it?

A. When I received the phone number, yes.

Q. Yeah. You bought it, right?

A. I --

MR. PELUSO: Objection to the form.

BY MR. BILES:

Q. Did you buy the phone number, sir?

A. I did not buy the phone number.

Q. You traded a title to a vehicle for it, correct?

A. Yes, because for one, it was probably the only way I'd ever get compensation for the vehicle, because there had been no payments made. And the specific person had a problem paying his bills is why I gave him the title for the number.

And I thought that it was a neat number that, you know, my friends, family and people in my life would be

able to recognize easily. So I was -- I was attracted to it for that reason.

Q. When did you acquire the number, sir?

A. On or about 2019, 2018, 2019, somewhere in there.

Q. And from whom did you acquire it?

A. It was an acquaintance of mine, a friend named Warren Brownlee.

Q. And where does Mr. Brownlee live?

A. I'm not certain, I haven't heard from him for years.

Q. Where did he live at the time?

A. He lived in Florence, Oregon, where I lived.

Q. Do you know Mr. Brownley's date of birth?

A. No, sir.

Q. Can you spell his name for the record, please?

A. I -- I believe this is correct, it's W-A-R-R-E-N, and last name is Brownlee, B-R-O-W-N-L-E-E.

Q. So when you say you -- well, let's back up. How exactly did you exchange title for the phone number? How did that transaction happen?

A. Okay. He called me. Actually the number showed up on my phone, I didn't have it in my contacts. And I almost didn't answer it, I thought it was fake. So I answered the phone and Warren was like, Hey, what's up, man?

And I said, What's going on with this phone

number? How are you calling me from this? Is it fake or what?

And he said, No, it's not fake, it just got generated to him. Because he didn't pay his bill, got a new phone. And so it got generated to him, so I was thinking about it.

I told him, I said, Hey, you owe me on the -- on the car. If you give me, if you port the number over to me, I'll just give you the title to that car that you owe me on and we can be done with this.

And he agreed and that was the end of it.

Q. How much did he owe you on the car?

A. It was somewhere around a thousand, I believe. Give or take.

Q. I'm sorry, what was your friend's last name?

A. Brownlee.

Q. Did Mr. Brownlee tell you anything about that phone number?

A. He didn't tell me anything, no.

Q. Did he complain about receiving solicitations?

A. No, sir.

Q. When did you register the (541) 999-9999 number on the Do Not Call Registry?

A. I -- I don't have a specific date. I'm not certain. I'd have to look back at the records. I think I

do have that information somewhere.

Q. What year?

A. I believe, I mean, it's between 2019 and 2021, so I'm not sure the exact time when, you know, how long I took after blocking all the numbers didn't work, so --

Q. When -- when did you -- when did you first become concerned that you were receiving text messages that you didn't want to receive?

A. Almost instantly.

Q. Since you acquired the phone number, approximately how many text messages do you think you receive on a daily basis, that you object to?

A. I'd say at the very least ten, so --

Q. So -- go ahead.

A. Anywhere from ten to, you know, 50, 60 a day, you know, so it varies.

Q. So those ten to 50 to 60 a day, you -- you find to be unauthorized solicitations, is that right?

A. That's accurate.

Q. So for approximately six years you've been receiving ten to 60 text messages a day that you consider inappropriate solicitations, correct?

A. That's accurate.

Q. And yet you didn't change your phone number, correct?

A. That's correct, for various reasons.
Q. Okay. What various reasons did you choose not to change your cell phone number for?
A. For one, my life is driven by networking and my -- my collection of people that -- and resources. So between that, my family, and everybody that's important to me, it's, you know, in a way it's a special phone number because all my family, my children, everybody can remember my phone number, without having to look it up.
And so that's, you know, the main benefit to me is, you know, I have this collection of people I care about that depend on access to me. Some of which I might not even have their contact, just in passing, and so I think that I'd -- yeah, at this point the number's a part of -- a part of my life, so --
Q. Any other reasons?
A. No, sir.
Q. Let's go back. You just mentioned networking is a part of your life, is that correct?
A. That's true.
Q. And you've been convicted of distribution of cocaine, correct?
MR. PELUSO: Objection to the relevance.
A. I believe everything is in documents that you've been provided.

BY MR. BILES:

Q. No, that would be incorrect. I -- I may have the documents, it's not because you gave them to me, you objected to them. But have you been convicted of a felony?

Well, in the last ten years have you been convicted of a felony?

A. No, sir.

Q. Have you been convicted of any crimes in the last ten years?

A. Just traffic.

MR. PELUSO: Objection again to the relevance.

BY MR. BILES:

Q. Go ahead, sir.

A. I don't know if it's considered a crime, but only traffic stuff.

Q. So you haven't been convicted of possession of marijuana?

A. In the last -- no, sir, in the last ten years? I don't believe so.

Q. How is networking part of your life today?

A. For one, I'm a holistic healer. I get people off pharmaceuticals, help them deal with cancer and all kinds of different things.

I know some world healers that have helped me

along that path of knowledge. I, yeah, just a lot of all my food is sourced through farms and through people that have ranches and I try to circumvent commercial food and sources. I just, yeah, there's a lot, lot of different reasons why networking is important, so I'm being self reliant, not depending on everybody else or anyone else for what I need, so --

Q. What if anything is your current job?

A. I do not have a current job. I have an online health food, health store. But that's more education than anything else, so I just -- I like sharing stuff with people, it's not about monetary.

Q. When is the last time you were employed?

A. I had -- I owned a moving company that I ended up dissolving around 2020.

Q. What was the name of the moving company?

A. It's called Barter Movers.

Q. And how long were you affiliated with Barter Movers?

A. I had -- it was about, I'd say about five years.

Q. Why did you dissolve it?

A. For one, the COVID thing messed up a lot of my work. And multiple injuries, it was hard for me to do that hard of manual labor so I got ride of my equipment.

Q. Where do I find your online health store? What's

the web site?
A. It is tank, T-A-N-K, dot, cultureforgood.com.
Q. And are you able to earn any money from that online health store?
A. I've say -- maybe made, I've made under a hundred dollars probably for the whole time. I usually just order the stuff and then just resell it to my friends personally, so --
Q. What does -- what does the term "tank" mean to you in the sense of why do you use "tank?"
A. A while back I bought a bunch of military stuff. I trade, barter and trade military equipment, like decommissioned military stuff, like auction stuff. And so everybody -- I'm a bigger guy and everybody just started calling me Tank, so --
Q. Where do you live currently?
A. I live in Eugene, Oregon.
Q. What's the address?
A. It is 29798 Willow Creek Road.
Q. Is that a house, apartment, condo?
A. Townhouse.
Q. Townhouse. And do you own the townhouse?
A. No, sir. I just rent.
Q. How much is your monthly rent?
A. Roughly 2600.

Q. And are you married?
A. No, sir.
Q. Do you have any kids?
A. I have six children.
Q. And do those six kids live with you?
A. I have three full time.
Q. And how old are the three?
A. Thirteen, eight and five.
Q. And the other three that you do not have full time, where are they?
A. One is 19 and then the other two are with their mothers.
Q. Are they with their mothers full time?
A. Yes, during the school year, yes. During the summer, I have them full time also.
Q. I assume you have to pay child support, correct?
A. Yes, I'm actually working with my ex right now, we're getting it all dissolved, so -- and, yeah.
Q. So how do you earn sufficient money to pay for your rent, children, your other needs?
A. I was --
MR. PELUSO: Objection to the relevance.
A. Yeah, I have -- I have, you know, multiple assets that I can liquidate at any time. Many resources that I've collected over the years and kind of squirreled away for

myself and so, yeah, I'm doing pretty well for myself.

BY MR. BILES:

Q. Do you have any income besides selling assets?

A. No, sir.

Q. When is the last time you had an income, other than from selling off assets?

A. The moving company.

Q. Okay. Before -- before the moving company, what was your last employment before that?

A. I had -- it's kind of always been the same thing, just networking, barter, trading. You know, I lived a lot of my life without needing any kind of money or anything because of my collection of people. I have everything I need at my fingertips, so --

Q. Between -- after you shut down the moving company, we know you generate money from selling assets, correct?

A. Yes.

Q. Settling TCPA cases?

A. Come again?

Q. You also generate income from settling TCPA cases, right?

A. If that's considered an income, I guess, yes.

Q. Okay. You -- you have money come in to you by selling assets and settling TCPA cases, correct?

A. Correct.

Q. Anything else?
A. No, sir.
Q. Let's go back and just do some basic background. Where did you go to high school?
A. Siuslaw, Florence, Oregon.
Q. Did you graduate?
A. Yes, sir.
Q. When did you graduate?
A. 2000.
Q. And what did you do after you graduated? Did you go to college, did you get a job, join the military, what?
A. I did -- I worked with concrete a lot, pumping concrete, forms, foundations, construction stuff.
Q. Okay. And how long did you do that for?
A. Maybe a couple years max.
Q. And then what did you do after that?
A. Then I started throwing events, charity events, festivals, gatherings. And I kind of got into the holistic medicine scene.
Q. How -- where is the money coming from for you to be able to throw events?
A. I -- I've always just kind of bartered and traded up so, you know, vehicles I trade for better stuff or, you know, so I've really done amazingly well, even in my younger years straight out of high school, just, you know, trading

vehicles and stuff like that, like the Barter Kings.

Q. You've mentioned holistic medicine a few times now. So do you have any degrees, certificates, other things that -- in regard to holistic medicine?

A. No, I think western medicine has missed -- missed the target for a long time now, and I've just done a lot of my own research and I know some world healers that have taught me a lot of stuff about the simplicity of how your body works, and how to escalate your level of existence so, with natural stuff.

Q. So I've asked you about sources of money, income, what have you. You haven't listed holistic medicine. Is that because you're not generating money from holistic medicine?

A. That's accurate.

Q. So in -- in what way are you practicing holistic medicine?

A. Through education. And giving folks the resource after they get the knowledge to make the choice on what kind of fuel they would like to put in their body to -- to, you know, get rid of deficiencies, which I believe are the basis of most disease is based on a deficiency.

Q. Are you charging for that?

A. No. My compensation is watching people be healed and learn about themselves.

Q. All right. So I'm just trying to get your work history. So from -- you graduated in 2000, for a couple years you did construction?

A. Yes.

Q. And then you got into throwing events, is that right?

A. Yes, sir.

Q. Did that financially support you in some way?

A. Yeah, I made -- I made some pretty good money doing that.

Q. What kind of -- okay. And how, for what period of time did you financially support yourself through throwing events?

A. I mean it's hit and miss because that's an industry you can't really depend on always making money on, but, you know, on and off for a decade after high school.

Q. I'm going to give you a chance to just -- because this is just background stuff, I'll give you a chance just to give me a narrative. Between 2000 when you graduated and today --

A. Mm-hmm.

Q. -- other than what we've covered, what jobs, professions, et cetera, were you involved in to earn a living?

A. Very few. I've always been dependent on myself,

followed a different route rather than the nine to five, and it's -- I don't know, it's set me up in a situation where I'm not dependent on the government. I'm not dependent on anyone else to provide for my family, because like I said before, it's -- my network provides everything for me. Just a phone call away.

Q. I understand being independent. But, I mean, there are many ways to be independent. You can own a business, you can -- what have you, but how are you generating the ability to take care of yourself other than there was a period of time where you did construction?

A. Yes.

Q. You did some events which is according to you hit and miss and whether that works out well.

A. Mm-hmm.

Q. Then you -- you're buying and selling collectibles or other things.

A. Yeah.

Q. And you settled some lawsuits. Is there anything else that you were doing to make money?

A. That's -- I think that's -- I'm sure there's more, but that's about -- that's all that I can think of.

Q. Okay. Are you on any medications today?

A. No, sir.

Q. Is there any reason that you would not be able to

testify truthfully today?
A. No, sir.
Q. Have you been diagnosed with any mental, emotional issues?
A. No, sir.
Q. Do you know Brian [redacted]?
A. I do not know Brian [redacted].
Q. Have you ever communicated with Brian [redacted]?
A. Absolutely not.
Q. Do you know anybody who does know Brian [redacted]?
A. Who does know Brian [redacted]? Nope, not to my knowledge.
Q. Because you paused for a minute when I asked you if you knew Brian [redacted]?
A. I don't -- I wasn't trying to, I think I didn't hear you correctly.
Q. Have you ever indirectly communicated with Mr. [redacted]?
A. No, sir.
Q. Do you know any of his family members?
A. No, sir.
Q. Do you have -- strike that.
A. I believe the first time I heard of Brian [redacted], the full name, was in -- yeah, in this situation, in this case, so --

Q. You said full name. Were you familiar with less than his full name prior to this case?
A. Whose full name?
Q. You said the first time you heard of Brian [redacted], you became familiar with his full name was in regard to this litigation. Did you somehow know of his name separate and apart of this litigation?
A. Well, in the text messages from the defendant, it stated Brian, so --
Q. So when you received those text messages you knew they weren't intended for you, correct?
A. Yes, sir.
Q. And you didn't respond "Stop," correct?
A. Like I said, I believed it was click bait.
Q. It was yes or no. Did you or did you not respond with "Stop"?
A. I did not respond with "Stop."
Q. Did you respond saying, Hey, you got the wrong person?
A. There was no response.
Q. And in this lawsuit you've alleged that Reprise is an auto lender, correct?
A. Reprise is an auto lender?
Q. Yeah.
A. I don't know if that's all that they lend, I'm not

certain.
Q. Do you know if they lend on autos at all?
A. I -- I'm not certain if what they -- what all they lend on.
Q. Did you review the complaint before it was filed?
A. Yes.
MR. BILES: Julia, let's go ahead and mark Exhibit 3 and let's go through some issues with the complaint.
(Deposition Exhibit No. 3 was marked for identification.)
BY MR. BILES:
Q. All right. Mr. Wilson, do you recognize this document?
A. Yes.
Q. And you reviewed it before it was filed?
A. Yes, sir.
Q. So if we go to Page 3, Paragraph 8, do you see that you allege that "Reprise is an auto-loan lender based in Texas"?
A. Yeah. Yes, sir.
Q. What's your basis for that assertion?
A. Well, it's -- I believe that -- was had to do with the investigation on my attorney's part.
Q. So you don't have any knowledge, personal

knowledge of what Reprise is in the business of doing, is that correct?

A. No, sir.

Q. This is the problem with double negatives. When you say, "No, sir," let me ask you, do you have personal knowledge about what Reprise is in the business of doing?

A. Just lending. I believe that's all.

Q. But you don't know what type of lending?

A. I think it's just one of those databases connected with like Lending Tree that connects with a bunch of different people to give a loan. I'm not certain what all they do loans for but, you know.

Q. Let's go down to Paragraph 11. I'm sorry, I got the wrong number. 14, please.

Sir, if you can look at Paragraph 14, I'll read it first, "Unfortunately for consumers, Defendant casts its marketing net too wide. That is, in an attempt to promote its business, Defendant conducted (and continues to conduct) a wide-scale telemarketing campaign that repeatedly sends unsolicited telemarketing text messages to consumers' cellular telephones, including to those whose numbers are on the National Do Not Call Registry who did not provide prior express invitation or permission to receive such messages."

A. Yes, sir.

Q. Did I read that correctly?

A. Yes, sir.
Q. What's the basis of your personal knowledge in regard to that paragraph?
A. That the process of the way the defendant uses had the telemarketing campaign is too broad to where it includes people that are not involved whatsoever with their company, or not requesting any kind of interaction.
Q. But what factual basis do you have to make that allegation? How do you know that?
A. Well, because I never -- I never contacted the business, and I never asked for this contact, and I'm the one that's forced to deal with it, so --
Q. But as far as you know, have personal knowledge of, you're the only person that happened to, right?
A. Yes, that's as far as my personal knowledge, but I would assume there's more.
Q. Okay. So it's just an assumption, correct?
A. That's correct.
Q. You're aware that Brian [redacted] consented to receive text messages, correct?
A. I'm not certain if he consented to text messages. I do understand that he was the one that -- that put my phone number into the database thinking it was fake.
Q. So why are you suing Reprise for Mr. [redacted] having entered your number?

A. Because I was the one that had my privacy violated because of it and -- yeah.

Q. Any other reasons for it?

A. It's -- it's just a hassle. You know, it's -- you know, hopefully in the end of this we can change the way that the defendant operates, and more people won't be bothered by similar situations.

MR. BILES: Okay. Well, Julia, why don't you pull up the four text messages with the Wilson Bates number on them.

We have a better copy, don't we? Or, yeah, maybe not. Maybe that's the right one. All right. I'm sorry, Court Reporter. I forget, are we now on Exhibit 4, I think?

MR. PELUSO: Yeah.

THE REPORTER: I can look.

MR. BILES: You're on mute.

THE REPORTER: Sorry. My automatic -- my automatic counter is not working, so --

MR. BILES: That's okay. I think -- I think Patrick and I agree we're on 4.

MR. PELUSO: Yeah, I think you're on -- you're on 4. You did sort of two versions of the request to produce, one that you served, one was the responses, then the complaint, now this, that's 4.

MS. COONS: And I'm on No. 4 as well.

MR. BILES: Julia, it's most important because you have to keep track of this, because you, after this is all over you have to send the court reporter the --

MS. COONS: Yes. Yes, sir, and Madam Court Reporter, if you wouldn't mind putting the email in the chat so I know where to send, at your earliest convenience. Thank you.

BY MR. BILES:

Q. All right. So, Mr. Wilson, this is a document that has a Bates label at the end that's Wilson a bunch of zeroes and then a six. Do you see that?

A. Yes.

Q. Do you understand that's a Bates label meaning that it was produced -- well, in this -- it was produced in this case?

A. For the court, right, or for this litigation here.

THE REPORTER: I can't hear you all of a sudden. Can you speak up, Mr. Wilson?

THE WITNESS: Yes. Can you hear me?

THE REPORTER: Yeah. You need to speak up. For some reason you went really quiet.

THE WITNESS: Okay. Yeah, I -- I just assumed that number is, you know, attached for litigation for the document.

BY MR. BILES:

Q. Yes. Mr. Wilson, do agree that these are the four text messages that you are suing over?

A. That looks accurate.

Q. Okay. Do you see that the very first one says, "TXT STOP to Stop messages from this number"?

A. I see that.

Q. And that's in the second text message as well?

A. Yes.

Q. Third text message as well?

A. Yes.

Q. And the fourth one?

A. Yes.

Q. Now, by the way, I showed you the document requests earlier and your responses. Can you tell me what if anything you did to locate documents to produce in this case?

(Deposition Exhibit No. 4 was marked for identification.)

A. I believe that's a screenshot from my phone that I sent, and I'm assuming I sent the link attached to it. I don't know if that answers --

BY MR. BILES:

Q. Well, you produced some other documents, and so what did you do to go try to find documents that you have

that were to be produced by you through your lawyer?
A. I usually -- I usually just when I find a text like that, I usually do a search on my phone to see what other interactions there are, and I produce all documents to the law firm.
Q. Okay. Did you -- did you -- did you search your emails for any communications with Brian [redacted]?
A. I don't know Brian [redacted]. No.
Q. Did you search your Facebook for any of your posts that were relevant to this case?
A. No, sir. I don't believe there's any relevant to this case.
Q. Okay. You did offer to sell your -- your cell phone number, correct?
MR. PELUSO: Objection to the form.
A. Yes, years ago there was a brief period of time I was in correspondence with someone interested in purchasing it.
BY MR. BILES:
Q. When was that?
A. I -- I can't remember the exact dates.
Q. It was on Facebook Marketplace, is that correct?
A. Yes, I did -- I did put it on Facebook Marketplace for a period of time.
Q. And you said you were willing to accept nothing

less than $20,000, correct?

A. I don't -- I'm not sure if that's the wording, but that's -- I was offered 20,000 but it never panned out.

MR. BILES: Julia, can you pull up that document, please.

BY MR. BILES:

Q. Mr. Wilson? You're Chet Wilson; right?

A. That is me.

Q. And that's your phone number, correct?

A. Correct.

MR. BILES: We'll mark this -- we'll mark this as Exhibit 5.

(Deposition Exhibit No. 5 was marked for identification.)

BY MR. BILES:

Q. And you posted this; correct?

A. Yes, sir.

Q. Okay. And you said it was "a once in a lifetime opportunity to own the coolest number ever," right?

A. Yes, sir.

Q. You said you "gave a car title up for the number," correct?

A. That's correct.

Q. We covered that, is that correct?

A. Yes.

Q. So you were owed about a thousand dollars on the car, so you swapped the debt and title in exchange for a number, for this number, correct?

A. Yes, I believed I would never get payment any other way, so that was -- yeah.

Q. And then you say, "I passed up 20,000 already so unless it sells over that, I'm in no hurry to part with it." Is that correct?

A. That's correct.

Q. And do you know what year this was?

A. It was not -- it wasn't long after I had acquired the number. Within the year probably. Yeah.

Q. Would you sell the number today?

A. Would I sell it?

Q. Yeah.

A. Well, at that point I hadn't connected that phone number with as many people, so it didn't have a personal value to me. But no, I -- I wouldn't sell it at this point. I have too many people connected to it.

Q. And you make too much money off of it, right?

MR. PELUSO: Objection to the form.

A. To tell you the truth, if -- if I could use my phone, I'm fine without this money. If I could use my phone without being harassed every day, I'd be more than happy to have a regular cell phone that's -- so, yeah, I don't think

that has any bearing on my keeping the phone number.
BY MR. BILES:
Q. Did you review your Facebook post before this deposition?
A. Yes, I believe those are attached in one of the documents.
Q. I have no idea what that means, attached to what documents?
A. I know that there's some Facebook posts. Well, I have, I believe there was a couple Facebook posts that were attached to this litigation.
Q. Attached to what in this litigation?
A. As part of the discovery? I don't know the legal stuff, but I remember seeing a couple pictures of my Facebook stuff attached, what I believe, I think it was this particular litigation. As you know, I have many.
Q. Yes, I do. Now, you keep -- let me ask you this: You don't actually call anybody based on memorizing their phone number these days, do you?
A. Very few.
Q. Because it's easier and faster to go to your phone and select the number, right?
A. Unless you have a phone number like mine.
Q. You think people just dial your number, don't go to their phone?

A. Yeah.
Q. With their contacts?
A. Lot of time.
Q. Mm-hmm. Wouldn't be very hard for the rest of us to call anyone else just using our phones right, we don't memorize phone numbers anymore?
A. No, I -- but like --
MR. PELUSO: Objection to the form.
A. You know, my --
BY MR. BILES:
Q. Go ahead.
A. I know there's a lot of times people don't have their phones with them, especially my children or family members or whatever, and it's been very helpful. I've, you know, I've encountered some situations where someone memorizing my number has helped them a great deal, so --
Q. How many phone numbers do you have memorized?
A. Maybe ten, 15 numbers.
Q. That's nine more than me, but, okay. Or 14 more than me.
A. That's how we used to have to do it all the time.
Q. I know, especially people my age. So for the -- for the fact that a few people have your number memorized, you wouldn't sell it for 20,000?
A. You know, money isn't as value to me as -- as

having those connections and, you know, like I said, I -- you know, I've lived my life without having to worry about exchanging cash, you know. A lot of my life surrounds just barter and trade and having people that I've helped out that are willing to help me out and vice versa.

It's just -- it's really nice not having to deal with the structured society a lot of the time.

Q. What social media accounts do you have, sir?

A. I have two Facebooks, an Instagram, and that's the majority, that's my social media.

Q. So what are the two Facebook pages?

A. It's the Chet Tank Wilson and there's another one that's Tank tha Dank, T-H-A --

Q. Wait. It's just T-I-N-K T-H-E T-A-N-K?

A. T-H-A is the Tank Tha Dank, with an A., not E.

Q. And what's your Instagram page?

A. Bunker Plot.

Q. Any other social media?

A. That's all I use.

Q. Do you communicate with other people about bringing TCPA suits besides your own lawyers?

A. No, I've referred some people towards the process. Other people that were being harassed. And with no details of any specific case or anything of that nature.

Q. And you've referred them to your own lawyers, is

that correct?
A. No, not -- just in general, the process. You know, so --
Q. Who if anybody have you spoken to about your lawsuit against Reprise besides your lawyers?
A. Absolutely no one.
Q. Not Sara -- it's not Sara Taylor?
A. I have no direct communication with Sara Taylor whatsoever.
Q. Ever?
A. Not that I --
Q. You have never heard of Sara Taylor in your life?
A. I don't believe so.
Q. You never communicated with Sara Taylor in your life?
A. Uh -- no, I don't think so.
Q. How about Antwane Johnson? You ever communicated with Antwane?
MR. PELUSO: Objection, the relevance of this. Neither one of those people is a plaintiff in this case.
BY MR. PELUSO:
Q. I might make them a witness depending on what Mr. Wilson told them. Those would be admissions.
A. I've never spoken to any one of those people

whatsoever about this case or any matter to my recollection.

Q. Never spoken to your own kids about your case?

A. I mean, there's no reason why I'd ever talk to them about details of this case. They wouldn't even be interested.

Q. Okay. So you've never spoken to anybody other than your lawyers in any way, and I see you -- let's back up.

You've never communicated with anybody, literally anybody besides your lawyers about your case against Reprise?

A. Not to my knowledge, no.

Q. How much money are you looking for from Reprise?

A. Whatever the statutes direct, you know, whatever the Judge thinks fair.

MR. BILES: Can we take like a ten-minute break? I've got to use the restroom.

MR. PELUSO: Sure.

(Recess.)

MR. BILES: Julia, would you put up D11?

MS. COONS: Yes. One moment. Which will be Exhibit 6. You said E11?

MR. BILES: The conviction table.

MS. COONS: Okay. Got It. Thank you. Yes, sir.

(Deposition Exhibit No. 6 was marked for identification.)

BY MR. BILES:

Q. All right. Mr. Wilson, I've gone through your criminal history and I've attempted to limit it down to actual convictions.

A. Okay.

Q. Can you review this and tell me, one, if there's any of these that is wrong, and then two, if there's any I left out.

MR. PELUSO: Just going to lodge a standing objection. I'm not going to keep jumping in every time with a relevance objection. It will be too choppy, but to all the questions related to criminal history, I object as to the relevance.

MR. BILES: Understood.

A. I mean, it looks all accurate.

BY MR. BILES:

Q. So --

A. I don't believe there's anything missing.

Q. So we go down below -- so we go to 6, we get, "Possession of Marijuana," correct?

A. Yes, sir.

Q. And then 7 is "Manufactured/delivery of a controlled substance, Schedule 1. Do you see that?

A. Yes.

Q. Can you tell me what that was?

A. I'm not sure what the exact thing was. This was all -- actually all that -- there was evidence planted on me for that one. I don't know if that's relevant. But, yeah, I don't know -- I don't now what the exact 7 or 8 are.

Q. Okay. For the items that are listed at 7 and 8, though, you were convicted, correct?

A. Correct.

Q. Do you agree that all 1 through 16 are things that you were convicted for?

A. Looks accurate.

Q. Okay. Now, Mr. Wilson, earlier we showed you the four text messages -- actually, Julia, why don't you just put those back up.

This has got to be Exhibit 3 if my recollection is right. No, it's -- well, it doesn't matter.

MS. COONS: I have it as Exhibit 4.

MR. BILES: As what?

MS. COONS: Exhibit 4.

MR. BILES: Yeah, that's what I thought. I had it wrong.

BY MR. BILES:

Q. All right. Mr. Wilson, I'm showing you again which is Exhibit 4, which is the four text messages at issue

with Bates label Wilson ending in 06. Do you see that?

A. Yes, sir.

Q. When the text at the top came in, did you even read it?

A. I don't recall if I read the first one or if I noticed after there was several or more than one.

Q. Did you read the second text at the time?

A. I've read -- I've read all the texts.

Q. I understand that. When that text came in, did you read it?

A. I don't recall if I did directly at that time or not.

Q. Did you read the third text, and we're numbering them from top to bottom, the third text, did you read that when it came in?

A. I don't recall.

Q. The fourth text, the bottom text, did you read that when it came in?

A. I don't recall. I just constantly have an inundation of similar messages, so hard to remember if I did at the exact time.

Q. And you didn't respond to any of those, right?

A. No, sir.

Q. So to the best of your recollection the first time you dealt with these texts, you took an image of it and sent

it to your lawyers; is that right?

MR. PELUSO: Objection to the form.

A. I don't recall.

BY MR. BILES:

Q. Before sending this to lawyers, how much of your life did this take up?

MR. PELUSO: Objection to the form again.

BY MR. BILES:

Q. None, right? You didn't even -- you don't even remember reading them?

A. I don't remember the time that I read them, but I do remember reading them, yes.

Q. Sure. You know that you read them when you took an image of it and sent it to your lawyers; right?

MR. PELUSO: Objection to the form.

A. At the very latest date. I assume I had read them earlier, too.

BY MR. BILES:

Q. How, if at all, do you claim receipt of those four texts hindered you?

MR. PELUSO: Objection. Calls for a legal conclusion.

A. I didn't even understand your question.

BY MR. BILES:

Q. Do you contend that you suffered an injury because

you received those four texts?
A. Absolutely. This added to my harassment that I deal with every day, so, yeah, it definitely did.
Q. Well, if you're receiving ten to 60 a day, it's not that much a big of a deal to receive one more, right?
MR. PELUSO: Object to form.
A. Every one -- honestly every one is a huge harassment to me. And, you know, it's all these together that cause a huge problem to me. And this is definitely, you, it's not helping the issue whatsoever.
BY MR. BILES:
Q. How did -- just tell me, how did the very first text skip all the others? How did that first text cause you to be harassed, if at all?
A. It's -- I mean, it's been a matter of time. I don't understand, I don't remember the exact frustration that I had in the moment that I had read those, but I don't -- I don't like any of these texts.
Q. That's not true, sir. But we'll get to that. But you love these?
MR. PELUSO: Objection.
BY MR. BILES:
Q. You said so on line, right, sir? You've said you love this.
MR. PELUSO: Objection, harassment, form,

relevance.
A. I don't -- I don't believe that's accurate at all.
BY MR. BILES:
Q. This is how you make money right, sir?
MR. PELUSO: Objection. Same objections, plus asked and answered. We've already extensively gone over them.
BY MR. BILES:
Q. Sir, you want these text messages -- sir, you want these text messages, don't you?
MR. PELUSO: Object to form. Objection. Harassment.
BY MR. BILES:
Q. You can answer.
A. We've -- we've been over this. I absolutely do not want these, as I stated earlier on the record under oath.
Q. How did receiving the first text -- well, do you, let's make sure I understand everything you're saying. You're claiming that you're injured because this harassed you, is that correct?
A. It's a huge -- it's a huge burden to me, yes.
Q. Anything else?
A. No.
Q. Okay. How is it a huge burden when you received

the first text that you didn't read or that you don't recall reading until after you sent it to your lawyers?

A. Oh, this is an ongoing burden that these text messages has led me to. You know, I had to go buy a computer so that I could do this, I had to sit here and do all this, I had to go over all these documents.

I'd rather just have not gotten the messages in the first place and never dealt with this, honestly. I don't need the money from it, but I'm going to hold these people accountable if I'm being harassed, because I guarantee I'm not the only person.

And that's my main goal here is to stop these and create a situation where these people can respect consumers and not harass them as a class, as for everybody. Not for myself only.

Q. You've never had a class certified, though, have you, sir?

A. Excuse me?

Q. You've never had a class certified, have you?

A. I'm not sure what that means.

Q. How many cases have you settled?

A. Upwards of 20. I don't know. I'm not certain exactly.

Q. Did anybody besides your -- you or your attorneys receive anything from those settlements?

A. I assume so, yeah. I think so.
Q. On what basis do you assume so, sir?
A. Well, I know there's at least one incidence where I've been a co-plaintiff and I believe the case was settled, so --
Q. Okay. Fair enough. Did anybody besides you, a named co-plaintiff, your attorney and any named co-plaintiffs receive any money?
A. I can't -- I can't speculate on how funds are disbursed, you know, but, yeah, I don't -- I don't know all the -- that's all -- my attorneys do all of that stuff, so --
Q. Did you ever get a class any relief whatsoever?
A. I don't understand the question.
Q. Sir, you've filed 70 potential class actions, right?
A. Somewhere around there.
Q. And you understand as a result there's a difference between you receiving money, and the class receiving money, correct?
A. I believe the same standards of compensation are for everybody. I don't -- I don't necessarily understand how that's distributed. And I -- I don't actually understand the -- how the difference, how the class -- I -- I don't understand all the little -- the verbiage as far as

how it goes.
     Q.   Okay.  Okay.  Do you know whether you ever got a class certified?
     A.   I don't believe that it's moved to a class certification on this case as of yet.  But I believe.
     Q.   How about the other cases?
     A.   I don't -- I don't recall exactly, no.
     Q.   You do, you recall that you have not had a class certified, don't you?
     A.   I don't know what the class certified, I don't know what that means.
     Q.   Sir, I think you'd remember if you got a class certified, don't you think so?
     A.   I don't -- I don't know -- I don't know what class certified, actually the --
     Q.   So you brought 70 class actions, you don't know what a class, getting a class certified is?
     A.   I've never been told that term directly like that, class certified, no.
     Q.   Okay.  Now, I understand that what you say is receiving all these texts from all these lenders in conglomeration, you say that's a burden, a huge burden.
          But that's not my question.  My question is how, if at all, do you claim that receiving the four texts that are currently up on the screen burdened you, or

otherwise harmed you in any way?
A. Every time I get a text it's -- it just irritates me. It's irritating, it's like a little gnat just bothering me. So every single time that I get one of these texts that's not meant for me, it upsets me, and I don't enjoy it and that's why we're here.
Q. Well, we're here because you want money, right, sir?
MR. PELUSO: Objection to the form. Objection, harassment.
A. I'd be -- oh, go ahead.
BY MR. BILES:
Q. Go ahead.
A. I'm -- I'm content without any money just as long as this stuff stops. I mean, I'd -- I don't -- you know, I think I should be compensated for what's been done so far, and I think the biggest thing to me is making sure that if anybody else is in this situation that they're compensated even over myself -- that's the least of my worries is my own personal compensation.
Q. Yet you care so much that you can't tell me whether you ever got a class certified, right?
MR. PELUSO: Objection, asked and answered.
A. I just don't know what that means. So it's not me avoiding anything, I just don't understand what that all

pertains to.

MR. BILES: Okay. Julia, can we go back to the complaint? Can we go to the prayer, Page 9?

BY MR. BILES:

Q. All right. Mr. Wilson, do you see Paragraph B there?

A. Yes.

Q. So you're asking for, An award of statutory damages in the amount of $500 for each violation, whichever is -- which is greater -- what -- oh, whichever is greater all to be paid into a common fund for the benefit of the plaintiff and the class members, correct?

A. Yes, sir.

Q. All right. So for you personally, how much money is that?

A. That would be $2,000 if -- as long as they weren't found to be intentional.

Q. Well, you haven't pleaded intentional, right?

A. What's that?

Q. You haven't requested the $1,500 version, correct?

MR. PELUSO: Objection to the extent it calls for a legal conclusion.

A. Yeah, I believe we're waiting on a legal conclusion before.

BY MR. BILES:
Q. Do you know why you haven't pleaded for $1,500 per violation?
A. I believe that's, you know, I give that to my attorneys to kind of find out what standards that -- yeah.
Q. Okay. So -- and to be frank, you also asked for attorney's fees if we went down -- Julia, scroll down. He's asking for attorney's fees, too.
And you want attorney's fees, correct?
A. I believe that's how it's written out in the statute.
Q. So on your best day you personally would get, according to you, $2000 plus attorney's fees, correct?
A. Uh --
MR. PELUSO: Objection. That mischaracterizes the testimony. Also calls for a legal conclusion.
A. Yeah, I don't understand if these have only been found to be nonintentional or if they -- more information is, could possibly change that, so I'm not certain.
BY MR. BILES:
Q. I'll help you out. You haven't pleaded intentional because then you could never get a class, and so you're not asking for $1,500 because then you're -- your lawyers have made -- made a decision about this that you've

agreed to. So how much is it that you want from my client to have this case go away?

A. I guess according to this, probably 2,000 and attorney fees, I'm assuming, at least.

Q. Would you settle on that?

A. I'm not certain I'd have to talk with my counsel.

Q. Okay. That's fair enough.

MR. BILES: Julia, let's start pulling the Facebook ones. Let's -- I'll tell you which one in a second, Julia.

MS. COONS: Okay.

BY MR. BILES:

Q. All right. Let's go with tab 10.

Mr. Wilson, I think you covered this already, but Chet Tank Wilson is one of your Facebook pages; right?

A. Mm-hmm.

Q. Did you make this post?

A. I did.

Q. Okay.

A. Yes. Shows my frustration in getting all these calls.

Q. You got no calls from Reprise, though, right?

A. I'm not certain at this point. That was quite some time ago.

Q. All right. So, and so, but you were saying you're

getting 30 to 70 telemarketer calls a day, is that correct?

A. I don't recall how accurate that is, but that seems to be the case.

Q. You wouldn't post something that was inaccurate, would you?

A. No, but it's five years ago, so hard to remember details.

Q. How do you know this was five years ago?

A. Because it says at the bottom. Five years ago. The screenshot or whatever it is.

Q. Oh, I see. Okay. Thank you.

MR. BILES: Julia, let's go with tab 9.

MS. COONS: Are we marking this one?

MR. BILES: Oh, I'm sorry, yeah. Let's mark this as Exhibit -- I think we're on 7 now.

MS. COONS: Yes, sir. Okay. And you said 9?

MR. BILES: 9.

(Deposition Exhibit No. 7 was marked for identification.)

(Deposition Exhibit No. 8 was marked for identification.)

BY MR. BILES:

Q. All right. So now we're at Exhibit 8.

Mr. Wilson, this is posted by you, is that correct?

A. Yes.
Q. Well, top one is posted by you and then there's other people communicating, and then we go down a little bit later and we get you responding to Liz Anderson, is that correct?
A. Yes, sir.
Q. So this post you originally posted on December -- well, 2022, right?
A. Yes, sir.
Q. And at that time you were receiving, what, 30 to 70 solicitations a day?
A. I mean, I'm sure there's a variance, but, you know, it's random, but, yes, somewhere in that vicinity.
Q. Okay. And then you tell Liz Anderson, "I literally got to say all the 9's. Definitely once in a lifetime. The universe loves me."
That's what you told her, right?
A. Yes. That's what I said.
Q. Okay.
A. I do think it's important you read the rest of that comment, though, because it's -- I'm an optimist, so I'm going to turn anything negative hopefully into something positive.
Q. Move to strike, nonresponsive.
MR. BILES: Let's go to tab 6, Julia, so this

will be the next exhibit, 8, I think.

(Deposition Exhibit No. 9 was marked for identification.)

BY MR. BILES:

Q. All right. So Mr. Wilson, do you see, first of all, you see where it says Chet Tank Wilson?

A. Yes, sir.

Q. And then you're responding to a Celeste Gable, is that correct?

A. Yes, sir.

Q. And did you in fact make this post?

A. Yes.

Q. Did you refer her to one of your attorneys?

A. I don't believe she ever followed through with anything, or we spoke anymore other than this post.

Q. And in this message you then -- you go on to say, "What I did is just gave her tech guy my iCloud and they stay on top of it. They are going back five years, the biggest thing is keeping all the voicemails." Did I read that correctly?

A. Yes, sir.

Q. And do you know when you posted this?

A. It says one year, but I'm not certain how long it's been. Yeah, probably, that's probably accurate because that's right about when I started learning about how to do

these cases, so, yeah.

So I didn't have the exact accurate details to give her, it was just kind of -- obviously I was in the introductory stages of learning this process.

Q. So you gave the tech guys at one of your law firms access to your iCloud so they could stay on top of the text messages you were receiving, is that right?

A. I don't believe -- it's not necessarily stay on top of it, but to -- I had five years of all this stuff gathered, and it was nearly impossible for me to go through all of it and get all the details and stuff without some kind of technical, somebody to help me go through it all.

Q. Okay. So you were -- you wanted to go back and find every lawsuit you could bring under TCPA, right?

A. Yeah, you know, after years of being harassed, I definitely wanted compensation for all that. I've spent so much of my personal time trying to resolve this situation, prior to them even acknowledging there was any kind of claim or TCPA action, you know.

And I, as in the last document you showed me, I said I'm going to keep this number and that's prior to me ever knowing there was money involved in it, so it just goes to show, and documents and supports everything I'm saying here, so, yeah.

Q. So I mean you've got to have help going back

through all your text messages because you didn't really pay that much attention to all of them, so now you got to go back and find the ones that you want to sue over, right?

MR. PELUSO: Object to the form.

A. I don't think that's accurate whatsoever. I believe that when you deal with such a volume of harassment, it's -- it's hard to decipher which is what.

So you have to, you know, you have to organize that to where you can acknowledge who's all at fault for all these period of years that I have been harassed. Before I knew there was any kind of compensation.

BY MR. BILES:

Q. And when you have a large volume of text messages coming in, you don't really read every one of them, right?

MR. PELUSO: Object to the form, leading.

A. I go through them all.

MR. BILES: Go ahead, sir. You may answer.

A. I usually go through the majority of my texts and calls, yes, I do.

BY MR. BILES:

Q. Every single text that comes in, as it comes in you read it?

A. Well, it pops up on my screen usually when I'm trying to do something else, and I get the -- I get the text message and I read it and then, you know, and then sometimes

I get multiple and then I'm like, Wow, okay. This person is really harassing me, so let me send this, so --

Q. So you're claiming that unbelievably, unlike the rest of us, you read the text messages that come in as they come in, every single one of them?

A. I did not say that.

Q. Even though you can tell -- even though you can tell the second you see it that it's not something you want to deal with.

MR. PELUSO: Objection to the form.

A. Well, when it -- when it pops up in a notification I'm forced to read it right there, usually, and so yes, I do, the majority of them while I'm awake anyways, I -- I -- I read them.

BY MR. BILES:

Q. Why?

A. To see what they're about.

Q. Why?

A. Because I have to weed through all this stuff to find out what has to do with me and what could be connected to something I'm doing, or if I have a bill or whatever because I do have a lot of different things attached to my private phone number. So if I'm getting something, I'm going to make sure it's not something important that I have to -- that I'm going to overlook.

Q. How long would that take you? Tenth of a second?
A. I mean it doesn't matter. When they all add up, it's a waste of my life.
Q. I didn't ask you that question. I asked you how long did it take per text?
A. Every text is different, sometimes there's links, so, you know, that's not -- that's not -- that's not something I can answer accurately.
MR. BILES: Julia, let's go to tab 5.
MS. COONS: Okay. We're marking this one as Exhibit 9, correct?
MR. BILES: Yes.
MS. COONS: Okay.
MR. BILES: Better mark this one that's coming up as the next exhibit.
MS. COONS: Okay. Tab five.
(Deposition Exhibit No. 10 was marked for identification.)
BY MR. BILES:
Q. Sir, this is a post you made on your Chet Tank Wilson Facebook account on -- I need my glasses -- on December 10th, 2024, correct?
A. Yes, sir.
Q. And on that day you said you had "36 class action lawsuits so far, and this is my first offer." Correct?

A. Yes, sir.
Q. How much was the offer?
A. I don't remember.
Q. Did you settle it?
A. I don't recall.
Q. What case was it?
A. I don't recall.
Q. You don't remember the very first time you got a settlement offer, you can't tell me what case it was in?
A. I don't know.
Q. I mean, you're a professional. You have 70 of these. You don't remember which one?
A. That's why I don't.
MR. PELUSO: Object to the form.
A. That's why I don't remember, because there's a lot of them.
BY MR. BILES:
Q. Too many to keep track of, right, sir?
A. Accurately, yes, without looking at documents.
Q. Because as you said right there, "I sign several new claims each week so looks like my phone number is gonna be another line of steady income for me," exclamation point. Correct, sir?
A. That's what I wrote.
Q. So these lawsuits including the lawsuit against

Reprise under the TCPA are a line of steady income for you, correct, sir?

A. Yes, that's what I wrote.

Q. And it' true?

A. Yes, that's true because after all this harassment it's like a light at the end of the tunnel, I was excited. Yeah, I was excited that I'm finally going to be compensated for all this time that I've wasted in my life dealing with people that I don't even know.

Q. And you kind of enjoy these lawsuits, right?

A. I don't --

MR. PELUSO: Objection to the form.

A. I don't enjoy any part of this, to tell you the truth.

BY MR. BILES:

Q. You're out there posting telling other people how to do it, right?

A. To help other people. Just why I'm -- why I'm trying to bring these class actions. Exactly.

Q. Um-hmm. Do you know how -- I'm going to ask you this again: Do you know how much you've received in settlement under TCPA?

A. I thought we went over this.

Q. Do you know if your lawyers in other cases have settled for six figures?

A. On larger cases I believe that wouldn't be that far off.

Q. So how much did you get?

A. Without looking at documents, I can't --

Q. What documents would we need to see in order for us to determine how steady of a line of income this is for you, sir?

A. Will you repeat that one more time?

Q. What documents would I need to review in order to determine how steady of a line of income TCPA lawsuits are for you?

A. It would have to be something that you'd received from my attorneys, or, you know, I mean, I sign every document, so I don't know.

Q. So I asked for every document in every lawsuit, right, you saw that in the doc requests?

A. Yes, I believe so.

Q. And you know that you said that that was overly burdensome and too hard for you to do, right?

MR. PELUSO: Objection. Calls for a legal conclusion and these were legal objections.

A. This is all -- this is all things that I would refer to my attorneys to produce. I'm not very tech savvy.

BY MR. BILES:

Q. You don't have to be, but in order to say it's

harass -- it's too much for you to do you'd have to know that it's too much for you to do. How hard is it for you to produce the files that your lawyers have, sir?

A. Accurately without missing anything, I wouldn't feel comfortable that I'm good enough at doing computer work and stuff.

Q. Wouldn't be hard for them to produce the settlement agreements, though. You'd agree with that, right?

A. I'm not certain. That's a question for them.

Q. That's a question for you, then, you could produce them, is that right?

A. So --

MR. PELUSO: Objection to form.

A. I try not to add any more burden to this than I have to. That's why I have attorneys.

BY MR. BILES:

Q. Yeah, so you get to sue people and add burden to them, but you won't produce basic documents, sir. Is that your position?

MR. PELUSO: Objection to form. Harassing.

A. It's -- I don't know how that's in my hands. That's why I have attorneys.

MR. BILES: Oh. Julia, let's go to tab four which we'll mark as the next exhibit number, which -- what

are we on, 11 now? It will be 11?

MS. COONS: It will be 11. Tab 4.

(Deposition Exhibit No. 11 was marked for identification.)

BY MR. BILES:

Q. Sir, do you recognize -- can you just tell us what this is?

A. This is my Facebook account.

Q. And a post that's down there under Chet Tank Wilson, you posted that, right?

A. Yes, I did.

Q. So in there you claim you got -- started getting blown up years ago with robot calls and prerecorded nonsense, right?

A. Will you repeat that? I was read -- I was trying to read it.

Q. It says, "I've been getting blown up for years with robot calls and prerecorded nonsense." Did I read that portion of that sentence correctly?

A. Yes.

Q. And when did you make that post?

A. I'm not certain. There should be a date on it, but it doesn't, it was just -- I don't know. Within the last year.

Q. How do you know it's within the last year?

A. Because I just started the TCPA actions, I just got knowledge of the TCPA actions a year ago when I contacted the law firm to help me decipher all this.

Q. So you contacted --

A. So has to be within the year.

Q. Okay. So in a year you filed 70 lawsuits?

A. Roughly.

Q. And do you see there you just -- it says, "I just signed two more class actions this morning and I have been signing 1 - 3 per day since I started a month ago."

A. Yes, sir. Lots of work to be done.

Q. And you've mentioned there at that point you had brought 30 suits so far, is that correct?

A. That looks accurate. I'm sure I wasn't exaggerating. I think this outlines my stance from the get-go is that, you know, I was finally excited that this burden is actually bringing me some compensation, because I'd been frustrated for years.

It's absolutely, yeah, it's insane for what I've had to go through to get to this point.

Q. Just to be clear, for years you were being, receiving 30 to 70 text messages a day you thought were violations of the TCPA, right?

A. Yes, sir.

Q. Okay. And not one time did you respond to any of

those with "Stop," correct?

A. Yeah, I did with multiple, and I told you earlier in the previous comments that I believe I found it's click bait. And the majority of the time when you do respond in any form whether its "Stop" or what have you, it just entices them to realize there's somebody real on the other end and it makes it worse.

Q. When is the last time you responded "Stop"?

A. I'd have to look back through my texts, but at least, you know, it's -- I just had -- I just had some the other day that I found that I pushed "Stop" and it was, there were multiple messages afterwards.

Then I said "Stop" again and there's more multiple messages, and so, yeah, I do have documents but it would take me some time to track them down.

Q. So you did -- okay.

A. I have proof of when I typed "Stop," it's not working. So at least, you know, at least one occasion that is in my memory. So --

Q. You didn't give Reprise that chance, though, right?

A. After over and over and not working, it -- yeah, there's -- I mean it just seems like it could make that situation worse, so it's just more time I'd have to invest in something that would never come to fruition.

Q. But just to be clear, you did not send "Stop" in response to Reprise text messages, right?

A. I did not because I thought it would be detrimental.

Q. Earlier you said you had to invest in doing these lawsuits and you bought a computer, is that right?

A. I'd invested, yeah, I had to buy a computer and then -- I mean, my time is far more valuable than that.

Q. So why did you buy a computer to do these lawsuits?

A. Because it was my understanding I needed an actual PC rather than my iPad that I already had, and I believe it was at the request of the defendant, so that's -- that's why. Otherwise I wouldn't spend a penny on this.

Q. What were you using -- what are you using the computer to do in regard to the lawsuits?

A. I believe it was the connection with the Zoom and having a steady camera, and that's my understanding. I don't -- I don't -- I'm absolutely the least technical savvy person you'll ever meet. So I just, yeah, I was told that that's what's needed, so I went and got a computer. And here I am.

Q. What else have you done to invest in these lawsuits?

A. Mostly my time, you know, it takes a lot of time

and, yeah, you know, I've -- I've learned a lot over the last year.

Q. How much time do you -- how much time do you invest in this on a weekly basis?

A. I don't know. Maybe five to ten hours, depending on how -- how much harassment I get a week. And that's just on -- actually more than that because -- I don't know, I'd say potentially upwards of 20 hours a week.

Q. And what are you doing for those 20 hours you invest into litigation?

A. Gathering information, sending documents that I think would pertain to TCPA actions, forwarding voicemails, transcripts of voicemails, you know, going through documents, preparing for depositions.

Just paperwork and paperwork and paperwork, all, you know, looking in my emails all the time. There's -- it's a lot to it. It's, you know, it's a -- it's a job. A job I never -- I never asked for, so --

Q. Well, no one is making you file these lawsuits, right?

A. Nobody's making me.

Q. And I assume the law firm didn't ask you to file them, you went to the law firm, right?

A. Yes, sir.

Q. Are you sure you found the law firm you're using,

not Mr. Peluso, the law firm that referred you to Mr. Mr. Peluso by Googling them?

A. Yes. I believe in a previous discovery we even produced that. My search -- not with this case in particular, but I believe the search, there is search history of me looking for representation.

Q. They're not the easiest firm to find on the internet, are they?

A. I believe I clicked one of the first options so I had never heard of them prior, that's for sure.

MR. BILES: I'm pretty much done, so we'll take a five-minute break and then I'll make sure we're done?

MR. PELUSO: Okay.

(Recess taken.)

BY MR. BILES:

Q. Mr. Wilson, I just want to understand one issue. You say in order to make ends meet you're doing that by selling things. What are you selling?

A. I have multiple pieces of equipment. I collect decommissioned military equipment, semi-trucks, transport buses, Unimogs, 6 by 6 cranes, you know, many different military things. And, you know, cars, trucks, what have you.

And I do a lot of bartering and trading and it works really well. I'm really good at it.

Q. In order to barter or trade, you have to already own stuff which requires money. I'm still trying to figure out where the money is coming from for these lawsuits. So you haven't had an income in forever, right?
A. About five years.
Q. Okay.
A. I made really good money moving people with my moving company that I owned.
Q. How much did you make?
A. I'm not certain exactly, but --
Q. Well, you're the one who said really good money, so what does really good money mean to you?
A. Well, a lot of the things is barter movers, so to put into clarification, a lot of these elderly people that are moving into retirement facilities, they'd give me basically all their assets that wouldn't fit in their place, in trade for doing the move.
So then I'd, in return I'd put them online or, you know, sell whatever kind of stuff that I get out of it, furniture, what have you. And, you know, so I had an accumulation of many, many things that I acquired while doing this moving, and, you know.
So I'd say a lot of my assets come from like kind of a residual based on the work I put in years ago. So, you know.

Q. Okay. Well, how much were those items of the estates -- that's not right, they're still alive, but of the materials, equipment, stuff they gave you, how much was it worth at the time because you'd have to know that in order to fill out your tax returns?

A. I had a CPA so he handled all that stuff. I mean it would be something I'd have to like go back into documents about, so, yeah. I always have different little, facets of, you know, things trickling in because of my network and, you know, I just -- it's kind of neat.

MR. BILES: Okay. I'll pass the witness.

MR. PELUSO: I don't have anything.

THE REPORTER: Are you going to order, Mr. Biles?

MR. BILES: Yes, I am.

THE REPORTER: Did you want to order, Mr. Peluso?

MR. PELUSO: Yes, please.

THE REPORTER: Do you want him to read and sign?

MR. PELUSO: Yeah, we'll read.

THE REPORTER: And you'll handle that?

MR. PELUSO: Yes.

(Whereupon the deposition concluded at 11:27 AM)

E-R-R-A-T-A

Deponent: CHET MICHAEL WILSON
Case: Wilson v. Skopos Financial
Date Taken: December 12, 2025

Page / Line Correction

________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________
________________________________________

I declare under penalty of perjury that the foregoing 84 pages are true and correct except for such corrections as I may have noted above.

Executed this _______ day of ____________, 2025.

____________________________
CHET MICHAEL WILSON

C-E-R-T-I-F-I-C-A-T-E

I, CHERYL L. HAASE, a NCRA Registered Professional Reporter and Certified Court Reporter for the State of Washington, do hereby certify that the above and named witness, CHET MICHAEL WILSON, was first duly affirmed to testify the truth; that said witness did thereupon testify as is set forth; that the answers of said witness to the oral interrogatories propounded by counsel were taken by me in stenotype and thereafter reduced to typewriting under my personal direction and supervision.

I further certify that the facts stated in the caption hereto are true; and that all of the proceedings in the course of the hearing of said deposition are correctly and accurately set forth herein.

I further certify that I am not counsel, attorney or relative of either party, nor financially or otherwise interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand as such Registered Professional Reporter on this the 16th day of December, 2025, at Lebanon, Oregon.

Cheryl L. Haase, RPR, CCR
NCRA RPR No. 12443/WA CCR No. 3503

Exhibits


**EX 0001 Chet Michael Wilson 121225**
3:5 14:16 17:4,5

**EX 0002 Chet Michael Wilson 121225**
3:6 18:15,17

**EX 0003 Chet Michael Wilson 121225**
3:8 39:8,10 54:16

**EX 0004 Chet Michael Wilson 121225**
3:9 42:13 44:18 54:18, 20,25

**EX 0005 Chet Michael Wilson 121225**
3:10 46:12, 13

**EX 0006 Chet Michael Wilson 121225**
3:11 52:22 53:1

**EX 0007 Chet Michael Wilson 121225**
3:12 66:18

**EX 0008 Chet Michael Wilson 121225**
3:13 66:20, 23

**EX 0009 Chet Michael Wilson 121225**
3:15 68:2 72:11

**EX 0010 Chet Michael Wilson 121225**
3:16 72:17

**EX 0011 Chet Michael Wilson 121225**
3:17 77:3

**$**

**$1,500**
8:15 21:10 63:20 64:2, 24

**$2,000**
63:16

**$20,000**
46:1

**$2000**
64:13

**$500**
63:9

**0**

**06**
55:1

**1**

**1**
13:19 14:16 17:4,5 53:25 54:10 78:10

**10**
65:13 72:17

**10,000**
8:1

**10th**
72:22

**11**
40:13 77:1, 2,3

**11:27**
84:25

**12**
4:2

**14**
40:14,15 49:19

**15**
12:2 15:2 49:18

**16**
54:10

**19**
31:11

**2**

**2**
18:15,17

**2,000**
65:3

**20**
7:3,10 12:2 15:2 59:22 81:8,9

**20,000**
46:3 47:6 49:24

**2000**
33:9 35:2,19

**2018**
24:4

**2019**
24:4 26:3

**2020**
29:15

**2021**
26:3

**2022**
67:8

**2024**
13:19 17:13 72:22

**2025**
4:2

**2600**
30:25

**29798**
30:19

**3**

**3**
39:8,10,18 54:16 78:10

**30**
66:1 67:10 78:13,22

**36**
72:24

**4**

**4**
42:13,21,23, 25 43:1 44:18 54:18, 20,25 77:2

**5**

**5**
19:2,3 46:12,13 72:9

**50**
14:20 15:3 26:15,17

**50,000**
8:3

**500**
8:13 21:10

**541 999-9999**
13:16 25:22

**6**

**6**
52:22 53:1, 21 67:25 82:21

**60**
15:3 26:15, 17,21 57:4

**69**
6:11

**7**

**7**
19:9,23 53:24 54:6,7 66:15,18
**70**
6:11,13,23 12:11 14:20 15:3 20:22 21:4 60:15 61:16 66:1 67:11 73:11 78:6,22

**8**

**8**
39:18 54:6,7 66:20,23 68:1

**9**

**9**
63:3 66:12, 16,17 68:2 72:11
**9's**
67:15
**9:02**
4:3

**A**

**ability**
36:10
**able**
24:1 30:3 33:21 36:25
**absolutely**
37:9 51:6 57:2 58:15 78:19 80:19
**accept**
45:25
**access**
13:1,15 15:11 27:12 69:6
**account**
13:16 15:11 17:24 18:1,2 72:21 77:8
**accountable**
59:10
**accounts**
50:8
**accumulation**
83:21
**accurate**
6:17,25 7:22 13:3 18:13 22:5 23:10 26:19,23 34:15 44:4 53:17 54:12 58:2 66:2 68:24 69:2 70:5 78:14
**accurately**
7:18 72:8 73:19 76:4
**acknowledge**
70:9
**acknowledging**
69:18
**acquaintance**
24:6
**acquire**
24:3,5
**acquired**
26:10 47:11 83:21
**action**
19:19 22:9 69:19 72:24
**actions**
8:10 60:15 61:16 74:19 78:1,2,9
81:12
**active**
6:10,15,16, 19
**actual**
20:9 53:6 80:11
**add**
72:2 76:15, 18
**added**
57:2
**address**
30:18
**admissions**
51:24
**affiliated**
29:18
**affirmed**
4:7
**afterwards**
79:12
**age**
49:22
**ago**
5:3 6:22 45:16 65:24 66:6,8,9 77:13 78:2, 10 83:24
**agree**
9:20 10:1,12 42:21 44:2 54:10 76:8
**agreed**
25:11 65:1
**agreement**
8:6,23
**agreements**
76:8
**ahead**
5:21 14:16, 24 20:6 21:15 26:14 28:14 39:7 49:11 62:11, 13 70:17
**alive**
84:2
**allegation**
41:9
**allege**
39:19
**alleged**
16:18 19:14 38:21
**amazingly**
33:24
**amount**
63:9
**Anderson**
67:4,14
**Andrew**
13:11
**annoying**
9:19
**answer**
7:17 10:10 14:25 15:16 22:4 23:3 24:23 58:14 70:17 72:8
**answered**
24:24 58:6 62:23
**answers**
44:22
**Anthony**
13:10
**Antwane**
5:24 6:7 51:17,18
**anybody**
37:10 48:18 51:4 52:6,9, 10 59:24 60:6 62:18
**anymore**
49:6 68:15
**anyone**
12:3 22:12 29:6 36:4 49:5

**apart** 38:7
**apartment** 30:20
**applied** 21:11
**apply** 20:14,16
**approximately** 6:18,23 7:8 20:21 26:10, 20
**area** 7:10
**around** 6:11,22 7:3 25:13 29:15 60:17
**asked** 34:11 37:13 41:11 58:6 62:23 64:6 72:4 75:15 81:18
**asking** 11:19 21:3 63:8 64:8,24
**assertion** 39:22
**assets** 31:23 32:3, 6,16,24 83:16,23
**assume** 18:5 31:16 41:16 56:16 60:1,2 81:22
**assumed** 43:24
**assuming** 14:13 44:21 65:4
**assumption** 41:17
**attached** 43:24 44:21 48:5,7,11, 12,15 71:22
**attempt** 40:17
**attempted** 53:5
**attention** 70:2
**attorney** 8:17 12:3 60:7 65:4
**attorney's** 39:24 64:7, 8,9,13
**attorney-client** 15:22
**attorneys** 13:4,7,9 16:1 59:24 60:11 64:5 68:13 75:13, 23 76:16,23
**attracted** 24:1
**auction** 30:13
**auto** 38:22,23
**auto-loan** 39:19
**automatic** 42:18,19
**autos** 39:2
**avoiding** 62:25
**awake** 71:13
**award** 63:8
**aware** 41:19

**B**

**B-R-O-W-N-L-E-E** 24:17
**back** 9:6 13:1 24:18 25:25 27:18 30:11 33:3 52:7 54:15 63:2 68:18 69:13, 25 70:3 79:9 84:7
**background** 33:3 35:18
**bait** 20:8 38:14 79:4
**barter** 29:17,18 30:12 32:11 34:1 50:4 83:1,13
**bartered** 33:22
**bartering** 82:24
**based** 16:14 17:22 20:23 21:4 34:22 39:19 48:18 83:24
**basic** 33:3 76:19
**basically** 11:15 83:16
**basis** 8:17 26:12 34:21 39:22 41:2,8 60:2 81:4
**Bates** 42:9 43:11, 14 55:1
**bathroom** 13:24
**bearing** 48:1
**believe** 4:22 5:6,9 6:17 7:8,25 8:9 10:22 12:7,10,13 16:4,6,16 19:1 21:5 22:5 24:16 25:13 26:3 27:24 28:20 34:21 37:23 39:23 40:7 44:20 45:11 48:5,10,15 51:13 53:20 58:2 60:4,21 61:4,5 63:23 64:4,10 68:14 69:8 70:6 75:1,17 79:3 80:12, 17 82:3,5,9
**believed** 38:14 47:4
**below** 53:21
**benefit** 9:10 27:10 63:11
**benefits** 18:4
**Berrong** 13:12
**besides** 32:3 50:21 51:5 52:10 59:24 60:6
**best** 9:13,20 10:7 55:24 64:12
**better** 16:20 33:23 42:11 72:14

**big**
19:4 57:5
**bigger**
19:6 30:14
**biggest**
62:17 68:19
**Biles**
4:11 7:16,23 9:1,4,5 14:15,18 15:5,15,24 17:4,7,17 18:14,20 19:2,8 21:3, 6,20 22:3 23:15 28:1, 13 32:2 39:7,12 42:8,17,20 43:2,9 44:1, 23 45:19 46:4,6,11,15 48:2 49:10 52:16,20,23 53:3,16,18 54:19,21,23 56:4,8,18,24 57:11,22 58:3,8,13 62:12 63:2,4 64:1,21 65:8,12 66:12,14,17, 22 67:25 68:4 70:12, 17,20 71:15 72:9,12,14, 19 73:17 74:15 75:24 76:17,24 77:5 82:11, 15 84:11,14, 15
**bill**
25:4 71:21
**bills**
23:22
**birth**
24:13
**bit**
67:3
**blocking**
22:20 26:5
**blown**
77:13,17
**body**
34:9,20
**bothered**
42:7
**bothering**
62:3
**bottom**
55:14,17 66:9
**bought**
23:12 30:11 80:6
**break**
10:4,10,12 52:17 82:12
**Brian**
37:6,7,8,10, 11,14,23 38:4,9 41:19 45:7,8
**brief**
11:14 45:16
**briefly**
10:24 11:1, 11
**bring**
69:14 74:19
**bringing**
50:21 78:17
**broad**
41:5
**brought**
22:8 61:16 78:13
**Brownlee**
24:7,8,17 25:16,17
**Brownley's**
24:13
**bunch**
30:11 40:10 43:11
**Bunker**
50:17
**burden**
58:22,25 59:3 61:22 76:15,18 78:17
**burdened**
61:25
**burdensome**
75:19
**buses**
82:21
**business**
36:9 40:1,6, 18 41:11
**buy**
23:16,17 59:4 80:7,9
**buying**
36:16

**C**

**calculated**
21:8
**call**
14:10 18:8 22:24 25:23 36:6 40:22 48:18 49:5
**called**
4:6 13:25 16:14 22:20, 23 24:21 29:17
**calling**
25:1 30:15
**calls**
14:23 16:12 21:1,14 22:7 23:3 56:21 63:21 64:16 65:21,22
66:1 70:19 75:20 77:13, 18
**camera**
80:18
**campaign**
40:19 41:5
**cancer**
28:23
**car**
25:8,9,12 46:21 47:2
**care**
27:11 36:10 62:21
**carrier**
17:18,19,21 19:13
**cars**
82:22
**case**
5:2,4,8,10 6:21 8:7,8 12:9,18 14:10 16:5 21:8 37:25 38:2 43:16 44:17 45:10, 12 50:24 51:21 52:1, 2,4,10 60:4 61:5 65:2 66:3 73:6,9 82:4
**cases**
5:18,22 6:2, 6,9,14,24 7:20 12:11 13:4 21:4 32:18,20,24 59:21 61:6 69:1 74:24 75:1
**cash**
50:3
**casts**
40:16

**Celeste**
68:8
**cell**
13:1,18,23 14:3,9 17:19 27:3 45:13 47:25
**cellular**
40:21
**certain**
5:20 6:1,20 7:22 8:5,10 13:5,17 16:9,23 20:20 24:9 25:25 39:1,3 40:11 41:21 59:22 64:20 65:6,23 68:23 76:10 77:22 83:10
**certificates**
34:3
**certification**
61:5
**certified**
59:16,19 61:3,9,10, 13,15,17,19 62:22
**cetera**
35:23
**chance**
11:4 35:17, 18 79:20
**change**
26:24 27:3 42:5 64:20
**charged**
17:25
**charging**
34:23
**charity**
33:17
**chat**
43:6
**cheaper**
18:4
**Chet**
4:5,16 46:7 50:12 65:15 68:6 72:20 77:9
**child**
31:16
**children**
27:8 31:4,20 49:13
**choice**
34:19
**choose**
27:2
**choppy**
53:13
**circumvent**
29:3
**claim**
8:9 56:19 61:24 69:18 77:12
**claiming**
16:21 58:20 71:3
**claims**
73:21
**clarification**
83:14
**clarify**
19:19
**class**
59:14,16,19 60:13,15,19, 24 61:3,4,8, 10,12,14,16, 17,19 62:22 63:12 64:23 72:24 74:19 78:9
**clear**
11:2 17:19 21:24 78:21 80:1
**click**
20:8 38:14 79:3
**clicked**
82:9
**client**
65:1
**close**
8:4
**Cloud**
13:15
**co-plaintiff**
5:16,18 6:2 60:4,7
**co-plaintiffs**
60:8
**cocaine**
27:22
**collect**
82:19
**collected**
31:25
**collectibles**
36:16
**collection**
27:5,11 32:13
**college**
33:11
**come**
12:15,17 22:15 32:19, 23 71:4,5 79:25 83:23
**comes**
70:21
**comfortable**
76:5
**comment**
67:21
**comments**
79:3
**commercial**
29:3
**common**
63:11
**communicate**
50:20
**communicated**
37:8,17 51:14,17 52:9
**communicating**
67:3
**communication**
51:8
**communications**
11:18 45:7
**companies**
20:8 21:17
**company**
5:5,6 29:14, 16 32:7,8,15 41:6 83:8
**compensated**
62:16,18 74:7
**compensation**
23:20 34:24 60:21 62:20 69:16 70:11 78:17
**complain**
25:20
**complaining**
22:18
**complaint**
39:5,9 42:25 63:3
**complaints**
10:21 19:13
**completely**
21:18
**computer**
59:5 76:5 80:6,7,9,16, 21
**concerned**
26:7
**concluded**
7:1,5 8:8 84:24

**conclusion**
14:24 21:2, 15 56:22 63:22,24 64:17 75:21
**concrete**
33:12,13
**condo**
30:20
**conduct**
40:19
**conducted**
40:18
**confidential**
7:15
**conglomeration**
61:22
**connected**
40:9 47:16, 19 71:20
**connection**
80:17
**connections**
50:1
**connects**
40:10
**consented**
41:19,21
**consider**
14:21 16:1 26:21
**considered**
28:15 32:22
**constantly**
55:19
**construction**
33:13 35:3 36:11
**consumer**
19:12
**consumers**
40:16 59:14
**consumers'**
40:20
**contact**
12:15,17,21 15:19,25 22:13 27:13 41:11
**contacted**
41:10 78:3,4
**contacts**
24:22 49:2
**contend**
56:25
**content**
62:14
**contingency**
8:19
**continues**
40:18
**contract**
18:3
**controlled**
53:25
**convenience**
43:7
**conversation**
11:14 12:5
**convicted**
27:21 28:4, 6,8,17 54:8, 11
**conviction**
52:23
**convictions**
53:6
**coolest**
46:19
**COONS**
14:17 18:19 43:1,5 52:21,24 54:18,20 65:11 66:13, 16 72:10,13, 16 77:2
**copy**
42:11
**correct**
5:16 6:3,24 7:7 8:19 9:8 14:19 16:5, 12,18 18:12 19:17,20,23 20:3 21:25 22:11 23:18 24:16 26:22, 25 27:1,19, 22 31:16 32:16,24,25 38:11,13,22 40:2 41:17, 18,20 45:14, 22 46:1,9, 10,16,22,23, 24 47:3,8,9 51:1 53:22 54:8,9 58:21 60:20 63:12, 20 64:9,13 66:1,25 67:5 68:9 72:11, 22,25 73:23 74:2 78:13 79:1
**correctly**
37:16 40:25 68:20 77:19
**correspond**
17:16
**correspondence**
45:17
**counsel**
8:7 11:5,6 65:6
**counselor**
11:3
**counter**
42:19
**COUNTY**
4:1
**couple**
33:15 35:2 48:10,14
**course**
10:3
**court**
9:11,16,19 42:13 43:4, 5,17
**covered**
35:22 46:24 65:14
**COVID**
29:22
**CPA**
84:6
**cranes**
82:21
**create**
59:13
**Creek**
30:19
**crime**
28:15
**crimes**
28:8
**criminal**
53:5,14
**cultureforgood.com.**
30:2
**current**
29:8,9

**D**

**D11**
52:20
**daily**
26:11
**damages**
21:8 63:9
**Dank**
50:13,15
**database**
41:23
**databases**
40:9
**date**
24:13 25:24 56:16 77:22
**dates**
45:21

**day**
14:20 15:2 23:3 26:15, 17,21 47:24 57:3,4 64:12 66:1 67:11 72:24 78:10, 22 79:11
**days**
15:2 48:19
**deal**
5:20,22 12:20 13:4 28:23 41:12 49:16 50:7 57:3,5 70:6 71:9
**dealing**
13:12 22:14 23:1 74:8
**dealt**
13:6 55:25 59:8
**debt**
47:2
**decade**
35:16
**December**
4:2 67:7 72:22
**decipher**
70:7 78:3
**decision**
64:25
**decommissioned**
30:13 82:20
**defendant**
10:18 38:8 40:16,18 41:4 42:6 80:13
**Defendant's**
17:1 18:16, 22
**deficiencies**
34:21
**deficiency**
34:22
**definitely**
57:3,9 67:15 69:16
**degrees**
34:3
**depend**
27:12 35:15
**dependent**
35:25 36:3
**depending**
21:23 29:6 51:23 81:5
**deposition**
4:17 5:1 10:16 11:10, 13 12:4,9 17:5 18:17 39:10 44:18 46:13 48:4 53:1 66:18, 20 68:2 72:17 77:3 84:24
**depositions**
9:7 81:14
**detail**
14:14
**details**
50:23 52:4 66:7 69:2,11
**determine**
75:6,10
**detrimental**
80:4
**diagnosed**
37:3
**dial**
48:24
**difference**
60:19,24
**different**
28:24 29:4 36:1 40:11 71:22 72:6 82:21 84:8
**direct**
51:8 52:14
**directly**
55:11 61:18
**disbursed**
60:10
**discovery**
48:13 82:3
**discussed**
11:21
**disease**
34:22
**dismissal**
10:21
**dismissed**
7:6
**dissolve**
29:21
**dissolved**
31:18
**dissolving**
29:15
**distributed**
60:23
**distribution**
27:21
**doc**
16:24 75:16
**document**
14:8,12,16 17:9,10 18:21,25 19:3 39:14 43:10,25 44:14 46:5 69:20 75:14, 15
**documents**
10:17,20,22 14:10,11 19:10,11,17, 18 27:24 28:3 44:16, 24,25 45:4 48:6,8 59:6 69:23 73:19 75:4,5,9
76:19 79:14 81:11,14 84:8
**doing**
14:19 32:1 35:10 36:20 40:1,6 71:21 76:5 80:5 81:9 82:17 83:17,22
**dollars**
30:6 47:1
**dot**
30:2
**double**
40:4
**driven**
27:4
**duly**
4:7

**E**

**e.g**
19:12
**E11**
52:22
**earlier**
44:15 54:13 56:17 58:16 79:2 80:5
**earliest**
43:7
**earn**
30:3 31:19 35:23
**easier**
48:21
**easiest**
82:7
**easily**
24:1
**education**
29:10 34:18
**eight**
31:8

**either**
16:12
**elderly**
83:14
**email**
43:6
**emails**
45:7 81:16
**emotional**
37:3
**employed**
29:13
**employment**
32:9
**encountered**
49:15
**end**
25:11 42:5 43:11 74:6 79:7
**ended**
29:14
**ending**
55:1
**ends**
18:3 82:17
**enjoy**
62:5 74:10, 13
**entered**
41:25
**entices**
79:6
**entirety**
8:11
**equipment**
29:24 30:12 82:19,20 84:3
**escalate**
34:9
**estates**
84:2
**et**
35:23
**Eugene**
30:17
**events**
33:17,21 35:5,13 36:13
**everybody**
19:4 27:6,8 29:6 30:14 59:14 60:22
**evidence**
19:10,11 54:4
**ex**
31:17
**exact**
5:5 7:4 10:23 14:14, 25 20:20 26:4 45:21 54:3,6 55:21 57:16 69:2
**exactly**
5:23 6:5 15:18 24:19 59:23 61:7 74:19 83:10
**exaggerating**
78:15
**EXAMINATION**
4:10
**examined**
4:8
**exceptions**
10:8
**exchange**
24:19 47:2
**exchanging**
50:3
**excited**
74:6,7 78:16
**exclamation**
73:22
**Excuse**
12:16 59:18
**exhibit**
14:16 17:4,5 18:15,17 39:8,10 42:13 44:18 46:12,13 52:22 53:1 54:16,18,20, 25 66:15,18, 20,23 68:1,2 72:11,15,17 76:25 77:3
**existence**
34:9
**expecting**
22:13
**experience**
20:11
**express**
40:23
**extensively**
58:6
**extent**
14:23 15:21 63:21

**F**

**Facebook**
45:9,22,23 48:3,9,10,15 50:11 65:9, 15 72:21 77:8
**Facebooks**
50:9
**facets**
84:9
**facilities**
83:15
**fact**
23:7 49:23 68:11
**factual**
41:8
**fair**
52:15 60:6 65:7
**fairly**
6:17,25
**fake**
24:23 25:1,3 41:23
**familiar**
5:25 17:11 19:1 38:1,5
**family**
23:25 27:6,8 36:4 37:20 49:13
**far**
8:10 41:13, 15 60:25 62:16 72:25 75:2 78:13 80:8
**farms**
29:2
**faster**
48:21
**fault**
70:10
**fee**
8:19
**feel**
76:5
**feels**
23:2
**fees**
64:7,8,9,13 65:4
**felony**
28:4,6
**festivals**
33:18
**figure**
83:2
**figures**
74:25
**file**
6:21 81:19, 22
**filed**
6:14,23 20:19 39:5, 16 60:15 78:6

**files** 76:3
**fill** 84:5
**finally** 22:15 74:7 78:16
**financially** 35:8,12
**find** 20:9 26:17 29:25 44:25 45:2 64:5 69:14 70:3 71:20 82:7
**fine** 15:6 47:23
**fingertips** 32:14
**finish** 9:12 10:11 15:8
**firm** 12:20,22,25 23:7 45:5 78:3 81:22, 23,25 82:1,7
**firms** 69:5
**first** 4:7 6:21 12:13 17:1 18:16,23 21:11 22:19 26:6 37:23 38:4 40:16 44:5 55:5,24 57:12,13 58:18 59:1,8 68:5 72:25 73:8 82:9
**fit** 83:16
**five** 13:1 22:14 29:20 31:8 36:1 66:6,8, 9 68:18 69:9 72:16 81:5 83:5
**five-minute** 82:12
**fix** 23:8
**Florence** 24:12 33:5
**folks** 34:18
**followed** 36:1 68:14
**follows** 4:8
**food** 10:6 29:2,3, 10
**forced** 41:12 71:12
**forever** 83:4
**forget** 5:5 12:22 42:13
**form** 15:13 17:14 23:14 45:15 47:21 49:8 56:2,7,15 57:6,25 58:11 62:9 70:4,15 71:10 73:14 74:12 76:14, 21 79:5
**forms** 33:13
**forth** 11:4
**forwarding** 81:12
**found** 20:7 21:10 63:17 64:19 79:3,11 81:25
**foundation** 15:14
**foundations** 33:13
**four** 16:5,6,8 42:9 44:2 54:14,25 56:19 57:1 61:24 76:24
**fourth** 44:12 55:17
**frank** 64:6
**FRIDAY** 4:2
**friend** 24:6
**friend's** 25:15
**friends** 23:25 30:7
**fruition** 79:25
**frustrated** 78:18
**frustration** 57:16 65:20
**fuel** 34:20
**full** 4:14 31:6, 10,13,15 37:24 38:1, 2,3,5
**fund** 63:11
**funds** 60:9
**furniture** 83:20

**G**

**Gable** 68:8
**gathered** 69:10
**Gathering** 81:11
**gatherings** 33:18
**gave** 23:22 28:3 46:21 68:17 69:5 84:3
**general** 51:2
**generate** 32:16,20
**generated** 25:4,5
**generating** 34:13 36:10
**get all** 69:11
**get-go** 78:16
**getting** 8:4 31:18 61:17 65:20 66:1 71:23 77:12,17
**give** 14:16 25:8, 9,14 35:17, 18,19 40:11 64:4 69:3 79:20 83:15
**given** 12:25 14:2,5
**giving** 34:18
**glasses** 72:21
**gnat** 62:3
**goal** 59:12
**goes** 61:1 69:22
**going** 6:8,9 7:13,

15 8:9 9:10 10:9 11:15, 20 23:4 24:25 35:17 53:11,12 59:9 67:22 68:18 69:21, 25 71:24,25 74:7,20 81:13 84:13
**good** 4:12,13 35:9 76:5 82:25 83:7,11,12
**Googling** 82:2
**government** 36:3
**graduate** 33:6,8
**graduated** 33:10 35:2, 19
**grand** 6:14
**grant** 10:7
**great** 49:16
**greater** 63:10
**group** 13:7,13
**guarantee** 59:11
**guess** 32:22 65:3
**guy** 13:12 30:14 68:17
**guys** 69:5

**H**

**handle** 84:22
**handled** 84:6
**hands** 76:22
**hang** 15:5,6
**happen** 21:19 24:20
**happened** 41:14
**happy** 9:2 17:8 47:24
**harass** 59:14 76:1
**harassed** 47:24 50:23 57:14 58:20 59:10 69:15 70:11
**harassing** 22:12 23:2 71:2 76:21
**harassment** 57:2,8,25 58:12 62:10 70:6 74:5 81:6
**hard** 5:22 29:23, 24 49:4 55:20 66:6 70:7 75:19 76:2,7
**harmed** 62:1
**hassle** 42:4
**healed** 34:24
**healer** 28:22
**healers** 28:25 34:7
**health** 29:10,25 30:4
**hear** 15:23 37:16 43:18,20
**heard** 24:9 37:23 38:4 51:12 82:10
**Heidarpour** 12:20,21 13:11
**help** 28:23 50:5 64:22 69:12, 25 74:18 78:3
**helped** 28:25 49:16 50:4
**helpful** 49:14
**helping** 23:8 57:10
**Hey** 24:24 25:7 38:18
**high** 33:4,25 35:16
**hindered** 56:20
**history** 35:2 53:5,14 82:6
**hit** 35:14 36:13
**hold** 59:9
**holistic** 28:22 33:18 34:2,4,12, 13,16
**honestly** 11:17 57:7 59:8
**hourly** 8:17
**hours** 81:5,8,9
**house** 30:20
**huge** 57:7,9 58:22,25 61:22
**hundred** 7:24 30:5
**hurry** 47:7

**I**

**icloud** 68:17 69:6
**idea** 48:7
**identification** 17:6 18:18 39:11 44:19 46:14 53:2 66:19,21 68:3 72:18 77:4
**image** 55:25 56:14
**important** 27:6 29:5 43:2 67:20 71:24
**impossible** 9:19 69:10
**inaccurate** 13:5 66:4
**inappropriate** 26:22
**incidence** 60:3
**incident** 8:15
**included** 18:9
**includes** 41:5

**including** 6:15 40:21 73:25
**inclusive** 18:10
**income** 32:3,5,20,22 34:11 73:22 74:1 75:6,10 83:4
**incorrect** 28:2
**independent** 36:7,8
**indirectly** 37:17
**industry** 35:15
**information** 26:1 64:19 81:11
**infringement** 8:14
**initially** 12:22
**initiate** 15:25
**injured** 58:20
**injuries** 29:23
**injury** 56:25
**insane** 78:19
**Instagram** 50:9,16
**instantly** 26:9
**intended** 38:11
**intentional** 8:14 21:9,10 63:17,18 64:23
**interaction** 41:7
**interactions** 45:4
**interested** 45:17 52:5
**internet** 82:8
**interrupt** 9:14
**introductory** 69:4
**inundated** 20:10
**inundation** 55:20
**invest** 79:24 80:5,23 81:4,10
**invested** 80:7
**investigation** 39:24
**invitation** 40:23
**involved** 35:23 41:6 69:22
**ipad** 80:12
**irritates** 62:2
**irritating** 62:3
**issue** 17:12 54:25 57:10 82:16
**issues** 37:4 39:8
**it'** 74:4
**items** 54:7 84:1

**J**

**January** 13:19
**job** 9:19 29:8,9 33:11 81:18
**jobs** 35:22
**Johnson** 5:24 51:17
**join** 33:11
**Judge** 52:15
**Julia** 14:15 15:5 16:24 17:8 18:14 19:2 39:7 42:8 43:2 46:4 52:20 54:14 63:2 64:7 65:8,10 66:12 67:25 72:9 76:24
**jumping** 53:12

**K**

**keep** 43:3 48:17 53:12 69:21 73:18
**keeping** 48:1 68:19
**kids** 31:3,5 52:2
**kind** 13:7,13 15:1 17:18 31:25 32:10,12 33:18,22 34:19 35:11 41:7 64:5 69:3,12,18 70:11 74:10 83:19,24 84:10
**kinds** 28:23
**Kings** 34:1
**knew** 37:14 38:10 70:11
**know** 5:23,25 7:14 9:23 10:5,7 11:4,18,23 13:11 14:25 15:3,10,17 16:22 17:15 19:5 20:11 21:17 23:2,25 24:13 26:4,15,16 27:7,10,11 28:15,25 31:23 32:11,16 33:23,24,25 34:7,21 35:16 36:2 37:6,7,10,11,20 38:6,25 39:2 40:8,12 41:9,13 42:4,5 43:7,24 44:22 45:8 47:10 48:9,13,16 49:9,12,15,22,25 50:1,2,3 51:3 52:14 54:5,6 56:13 57:8 59:4,22 60:3,10 61:2,10,11,14,16 62:15,24 64:2,4 66:8 67:13 68:22 69:15,19 70:8,25 72:7 73:10 74:9,20,21,

24 75:13,14, 18 76:1,22 77:23,25 78:16 79:10, 18 80:25 81:1,5,7,13, 16,17 82:21, 22 83:19,20, 22,25 84:4, 9,10
**knowing** 22:8 69:22
**knowledge** 20:23 21:4 29:1 34:19 37:12 39:25 40:1,6 41:2, 13,15 52:12 78:2

**L**

**label** 43:11,14 55:1
**labor** 29:24
**lacks** 15:14
**large** 70:13
**larger** 75:1
**latest** 56:16
**law** 12:20,22,25 16:2 23:7 45:5 69:5 78:3 81:22, 23,25 82:1
**lawsuit** 16:18 17:22 20:1 21:13, 25 38:21 51:5 69:14 73:25 75:15
**lawsuits** 20:18 36:19 72:25 73:25 74:10 75:10 78:6 80:6, 10,16,24 81:19 83:3
**lawyer** 8:21 9:15 45:1
**lawyers** 12:8 15:10, 19,23 50:21, 25 51:5 52:7,10 56:1,5,14 59:2 64:25 74:24 76:3
**leading** 15:14 22:2 70:15
**learn** 34:25
**learned** 81:1
**learning** 68:25 69:4
**leave** 17:15
**led** 23:7 59:4
**left** 53:10
**legal** 14:24 17:15 21:1,14 48:13 56:21 63:22,23 64:16 75:20, 21
**lend** 38:25 39:2,4
**lender** 38:22,23 39:19
**lenders** 22:11 61:21
**lending** 40:7,8,10
**level** 34:9
**life** 23:25 27:4, 15,19 28:21 32:12 50:2,3 51:12,15 56:6 72:3 74:8
**lifetime** 46:18 67:16
**light** 74:6
**limit** 53:5
**line** 10:11 57:23 73:22 74:1 75:6,10
**link** 44:21
**links** 72:6
**LINN** 4:1
**liquidate** 31:24
**listed** 34:12 54:7
**listen** 23:4
**literally** 9:17 10:8 52:10 67:15
**litigation** 12:19 16:23 38:6,7 43:17,24 48:11,12,16 81:10
**little** 60:25 62:3 67:3 84:8
**live** 24:8,11
30:16,17 31:5
**lived** 24:12 32:11 50:2
**living** 35:24
**Liz** 67:4,14
**loan** 40:11
**loans** 40:12
**locate** 44:16
**lodge** 53:11
**long** 11:20,25 17:23 23:3 26:4 29:18 33:14 34:6 47:11 62:14 63:16 68:23 72:1,5
**longer** 6:16
**look** 15:19 19:9 25:25 27:9 40:15 42:16 79:9
**looking** 52:13 73:19 75:4 81:16 82:6
**looks** 17:11 19:1 44:4 53:17 54:12 73:21 78:14
**lot** 6:8 7:14 20:8 21:17 29:1,4,22 32:11 33:12 34:6,8 49:3,

12 50:3,7 71:22 73:15 80:25 81:1, 17 82:24 83:13,14,23
**Lots** 78:11
**love** 57:20,24
**loves** 67:16

**M**

**Madam** 43:5
**made** 19:14 22:23 23:21 30:5 35:9 64:25 72:20 83:7
**main** 27:10 59:12
**majority** 50:10 70:18 71:13 79:4
**make** 9:18 16:4 19:4,6 34:19 36:20 41:8 47:20 51:23 58:4,19 65:17 68:11 71:24 77:21 79:23 82:12, 17 83:9
**makes** 79:7
**making** 11:15 35:15 62:17 81:19, 21
**man** 24:24
**manual** 29:24
**Manufactured/ delivery** 53:24
**marijuana** 28:18 53:22
**mark** 17:4 18:15 39:7 46:11 66:14 72:14 76:25
**marked** 17:6 18:18 39:11 44:19 46:14 53:2 66:19,21 68:3 72:18 77:4
**marketing** 40:17
**Marketplace** 45:22,23
**marking** 66:13 72:10
**married** 31:1
**materials** 84:3
**matter** 23:1 52:1 54:17 57:15 72:2
**matters** 4:21,23
**max** 33:15
**mean** 4:24 8:12 10:25 17:25 18:2 21:16 26:3 30:9 35:14 36:7 52:3 53:17 57:15 62:15 67:12 69:25 72:2 73:11 75:13 79:23 80:8 83:12
84:6
**meaning** 43:14
**means** 10:1 48:7 59:20 61:11 62:24
**meant** 62:5
**media** 50:8,10,18
**medications** 36:23
**medicine** 33:19 34:2, 4,5,12,14,17
**meet** 11:8 80:20 82:17
**members** 37:20 49:14 63:12
**memorize** 49:6
**memorized** 49:17,23
**memorizing** 48:18 49:16
**memory** 16:11 79:19
**mental** 37:3
**mentioned** 27:18 34:2 78:12
**message** 18:11 44:8, 10 68:16 70:25
**messages** 13:2 16:3,18 19:12,14,20 20:4,16,24 22:11,17 26:7,11,21 38:8,10 40:20,23
41:20,21 42:9 44:3,6 54:14,25 55:20 58:9, 10 59:4,7 69:7 70:1,13 71:4 78:22 79:12,14 80:2
**messaging** 18:6
**messed** 29:22
**met** 11:3,19,20
**Michael** 4:5,16
**military** 30:11,12,13 33:11 82:20, 22
**mind** 43:6
**mine** 19:6 24:6 48:23
**minute** 9:7 37:13
**minutes** 12:2
**mischaracterizes** 22:1 64:16
**missed** 34:5
**missing** 53:20 76:4
**Mm-hmm** 35:21 36:15 49:4 65:16
**moment** 14:17 18:19 52:21 57:17
**monetary** 29:12
**money** 21:22,25

30:3 31:19 32:12,16,23 33:20 34:11, 13 35:9,15 36:20 47:20, 23 49:25 52:13 58:4 59:9 60:8, 19,20 62:7, 14 63:14 69:22 83:2, 3,7,11,12
**month** 78:10
**monthly** 30:24
**morning** 4:12,13 11:11,13 12:6 14:1 78:9
**mortgage** 5:6
**mothers** 31:12,13
**move** 67:24 83:17
**moved** 61:4
**movers** 29:17,19 83:13
**moving** 29:14,16 32:7,8,15 83:7,8,15,22
**multiple** 29:23 31:23 71:1 79:2, 12,14 82:19
**music** 23:4
**mute** 42:17

**N**

**name** 4:14 5:5 6:4 24:15,17 25:15 29:16 37:24 38:1, 2,3,5,6
**name's** 5:25
**named** 24:6 60:7
**names** 5:23
**narrative** 35:19
**National** 40:22
**natural** 34:10
**nature** 50:24
**neat** 23:24 84:10
**necessarily** 60:22 69:8
**need** 9:16 10:5,9 11:18 19:5 29:6 32:14 43:21 59:9 72:21 75:5,9
**needed** 80:11,21
**needing** 32:12
**needs** 31:20
**negative** 67:22
**negatives** 40:4
**net** 40:17
**network** 36:5 84:10
**networking** 27:4,18 28:21 29:5 32:11
**never** 41:10,11 46:3 47:4 51:12,14,25 52:2,6,9 59:8,16,19 61:18 64:23 79:25 81:18 82:10
**nice** 50:6
**nine** 36:1 49:19
**Nobody's** 81:21
**nonintentional** 64:19
**nonresponsive** 67:24
**nonsense** 77:14,18
**noticed** 55:6
**notification** 71:11
**number** 6:14 7:4,22 13:16,18,20 14:25 20:20 22:20,24 23:11,16,17, 23,24 24:3, 19,21 25:1, 8,18,22 26:10,24 27:3,7,9 40:14 41:23, 25 42:9 43:24 44:6 45:14 46:9, 19,21 47:3, 12,13,17 48:1,19,22, 23,24 49:16, 23 69:21 71:23 73:21 76:25
**number's** 27:14
**numbering** 55:13
**numbers** 13:21 26:5 40:21 49:6, 17,18
**numerous** 5:22

**O**

**oath** 9:7 58:17
**object** 7:13 9:15 26:12 53:14 57:6 58:11 70:4,15 73:14
**objected** 28:4
**objection** 7:13,21 8:22 14:23 15:13, 21 17:14 21:1,14 22:1 23:14 27:23 28:11 31:22 45:15 47:21 49:8 51:19 53:12,13 56:2,7,15,21 57:21,25 58:5,11 62:9,10,23 63:21 64:15 71:10 74:12 75:20 76:14, 21
**objections** 18:16,22

58:5 75:21
**obviously**
7:15 69:3
**occasion**
20:12 79:18
**offer**
45:13 72:25 73:2,9
**offered**
46:3
**okay**
4:20 5:4,11 7:1 8:3,6 9:4 10:3 11:2,21,22, 24,25 12:3 13:18 14:15 15:9 16:10, 25 17:12,18 18:2 19:11 20:23 21:7 24:21 27:2 32:8,23 33:14 35:11 36:23 41:17 42:8,20 43:23 44:5 45:6,13 46:18 49:19 52:6,24 53:7 54:7,13 58:25 60:6 61:2,20 63:2 64:6 65:7, 11,19 66:11, 16 67:14,19 69:13 71:1 72:10,13,16 78:6,25 79:16 82:13 83:6 84:1,11
**once**
20:20 46:18 67:15
**one**
5:9 7:2 12:5,12 14:17 15:9 18:19 19:21 21:5 23:19 27:4 28:22 29:22 31:11 40:9 41:12, 22 42:1,12, 24 44:5,12 48:5 50:12 51:6,20,25 52:21 53:8 54:5 55:5,6 57:5,7 60:3 62:4 65:9,15 66:13 67:2 68:13,23 69:5 70:14 71:5 72:10, 14 73:12 75:8 78:25 79:18 81:19 82:9,16 83:11
**ones**
6:7,13,15 65:9 70:3
**ongoing**
59:3
**online**
29:9,25 30:4 83:18
**operates**
42:6
**opportunity**
46:19
**opposite**
21:18
**opt**
19:20
**opt-out**
19:12
**optimist**
67:21
**options**
82:9
**order**
30:6 75:5,9, 25 82:17 83:1 84:4, 13,16
**Oregon**
4:1 24:12 30:17 33:5
**organize**
70:9
**originally**
67:7
**outcomes**
19:15
**outlines**
78:15
**overlook**
71:25
**overly**
75:18
**overturned**
10:22
**overwhelmed**
22:21
**owe**
25:7,9,12
**owed**
47:1
**owned**
29:14 83:8

**P**

**page**
19:2,3 39:18 50:16 63:3
**pages**
50:11 65:15
**paid**
7:12 63:11
**panned**
46:3
**paperwork**
10:21 81:15
**paragraph**
39:18 40:13, 15 41:3 63:5
**parasites**
23:2
**Paronich**
13:10
**part**
12:9 27:14, 15,19 28:21 39:24 47:7 48:13 74:13
**particular**
48:16 82:5
**pass**
84:11
**passed**
47:6
**passing**
27:13
**past**
20:7,11
**path**
29:1
**Patrick**
42:21
**paused**
37:13
**pay**
25:4 31:16, 19 70:1
**paying**
8:16 18:8,11 23:22
**payment**
47:4
**payments**
23:21
**PC**
80:12
**Peluso**
7:13,21 8:22 9:2 11:1,8, 12,25 12:11, 14,15,17 14:1,23 15:7,13,21 17:14 21:1, 14 22:1 23:14 27:23 28:11 31:22 42:15,22

45:15 47:21 49:8 51:19, 22 52:18 53:11 56:2, 7,15,21 57:6,21,25 58:5,11 62:9,23 63:21 64:15 70:4,15 71:10 73:14 74:12 75:20 76:14,21 82:1,2,13 84:12,17,18, 21,23

**pending** 6:10 10:9

**penny** 80:14

**people** 23:4,25 27:5,11 28:22 29:2, 12 32:13 34:24 40:11 41:6 42:6 47:17,19 48:24 49:12, 22,23 50:4, 20,22,23 51:20,25 59:10,13 67:3 74:9, 16,18 76:18 83:7,14

**percentage** 8:21

**period** 35:11 36:11 45:16,24 70:10

**permission** 40:23

**person** 20:9 23:21 38:19 41:14 59:11 71:1 80:20

**personal** 39:25 40:5 41:2,13,15 47:17 62:20 69:17

**personally** 30:7 63:14 64:12

**pertain** 81:12

**pertains** 63:1

**pharmaceuticals** 28:23

**phone** 13:1,16,18, 20,21,23 14:3,4,9 16:12 17:13, 19 18:8 22:7,12,19, 20,24 23:3, 4,9,11,16,17 24:19,22,24, 25 25:5,18 26:10,24 27:3,7,8 36:6 41:23 44:20 45:3, 14 46:9 47:16,23,25 48:1,19,21, 23,25 49:6, 17 71:23 73:21

**phones** 49:5,13

**pictures** 48:14

**pieces** 82:19

**place** 59:8 83:16

**plaintiff** 5:9 6:24 17:2 19:14, 16 51:20 63:12

**Plaintiff's** 18:15,22

**plaintiffs** 5:7

**planted** 54:4

**pleaded** 63:18 64:2, 22

**please** 4:14 7:17 14:16 24:15 40:14 46:5 84:18

**Plot** 50:17

**point** 9:15 10:4 20:18 22:23 27:14 47:16, 18 65:23 73:22 78:12, 20

**pops** 70:23 71:11

**port** 25:8

**portion** 77:19

**position** 76:20

**positive** 67:23

**possesses** 19:17

**possession** 28:17 53:22

**possible** 22:10

**possibly** 20:25 64:20

**post** 48:3 65:17 66:4 67:7 68:11,15 72:20 77:9, 21

**posted** 46:16 66:24 67:2,7 68:22 77:10

**posting** 74:16

**posts** 45:9 48:9,10

**potential** 60:15

**potentially** 15:3 81:8

[redacted] 37:6,7,8,10, 11,14,18,23 38:4 41:19, 24 45:7,8

**practicing** 34:16

**prayer** 63:3

**prepaid** 18:1,2

**preparation** 12:4

**prepare** 10:15

**preparing** 81:14

**prerecorded** 77:13,18

**present** 17:13

**pretty** 32:1 35:9 82:11

**previous** 79:3 82:3

**previously** 10:18

**prior** 22:8 38:2 40:22 69:18, 21 82:10

**privacy** 42:1
**private** 71:23
**privilege** 15:22
**probably** 15:2 23:19 30:6 47:12 65:3 68:24
**problem** 23:22 40:4 57:9
**process** 15:17 16:23 41:4 50:22 51:2 69:4
**produce** 18:16,23 42:24 44:16 45:4 75:23 76:3,7,11,19
**produced** 43:15 44:24 45:1 82:4
**producing** 17:12
**Production** 14:11 17:2
**professional** 73:11
**professions** 35:23
**promise** 11:17
**promote** 40:18
**pronounce** 12:22
**proof** 79:17
**provide** 36:4 40:22
**provided** 27:25
**provides** 36:5
**pull** 14:15 42:9 46:4
**pulled** 12:24
**pulling** 65:8
**pumping** 33:12
**purchasing** 45:17
**pushed** 79:11
**put** 15:8 16:24 18:14 34:20 41:22 45:23 52:20 54:15 83:14,18,24
**putting** 43:6

**Q**

**question** 7:17 9:12,22 10:1,9 15:8 17:9 56:23 60:14 61:23 72:4 76:10, 11
**questions** 9:12 10:11 53:14
**quiet** 43:22
**quite** 65:23

**R**

**ranches** 29:3
**random** 15:1 67:13
**rare** 20:12
**read** 19:4 40:16, 25 55:4,5,7, 8,10,13,14, 17 56:11,13, 16 57:17 59:1 67:20 68:19 70:14, 22,25 71:4, 12,14 77:15, 16,18 84:19, 21
**reading** 18:24 56:10, 12 59:2
**real** 79:6
**realize** 79:6
**reason** 9:16 14:2,5 24:2 36:25 43:22 52:3
**reasons** 27:1,2,16 29:4 42:3
**recall** 55:5,11,16, 19 56:3 59:1 61:7,8 66:2 73:5,7
**receipt** 56:19
**receive** 15:9 16:1 26:8,11 40:23 41:20 57:5 59:25 60:8
**received** 7:19 14:20 15:20 16:22 17:22 18:12 21:12 22:19 23:9,11 38:10 57:1 58:25 74:21 75:12
**receiving** 25:20 26:7, 21 57:4 58:18 60:19, 20 61:21,24 67:10 69:7 78:22
**recess** 52:19 82:14
**recognize** 6:4,6 24:1 39:13 77:6
**recognized** 22:21
**recollection** 52:1 54:17 55:24
**record** 4:15 24:15 58:16
**records** 14:3 17:13 25:25
**refer** 19:11 68:13 75:23
**referred** 12:19 50:22, 25 82:1
**regard** 34:4 38:5 41:3 80:16
**regarding** 19:14
**register** 25:22
**registry** 22:24 25:23 40:22
**regular** 47:25
**regulatory** 19:13
**relate** 19:12
**related** 53:14

**relevance** 7:14 27:23 28:12 31:22 51:19 53:13, 15 58:1
**relevancy** 8:22
**relevant** 45:10,11 54:5
**reliant** 29:5
**relief** 60:13
**remember** 10:23 14:14 17:23 27:8 45:21 48:14 55:20 56:10, 11,12 57:16 61:12 66:6 73:3,8,12,15
**remind** 21:7
**REMOTELY** 4:1
**rent** 30:23,24 31:20
**repeat** 7:18 75:8 77:15
**repeatedly** 40:19
**replying** 20:12
**REPORTED** 4:1
**reporter** 9:11,16 42:13,16,18 43:4,6,18,21 84:13,16,19, 22
**reporter's** 9:19
**represent** 12:11
**representation** 17:16 82:6
**Reprise** 16:14 19:25 20:14,24 21:12 22:11 38:21,23 39:19 40:1,6 41:24 51:5 52:11,13 65:22 74:1 79:20 80:2
**Reprise's** 20:16
**request** 14:8,11 16:24 17:1 19:9,22 42:23 80:13
**requested** 14:6 19:21 63:20
**requesting** 41:7
**requests** 18:16,23 44:15 75:16
**requires** 83:2
**research** 34:7
**resell** 30:7
**residual** 83:24
**resolve** 69:17
**resource** 34:18
**resources** 27:5 31:24
**respect** 59:13
**respond** 9:13 20:3,7, 9 21:24 38:13,15,17, 18 55:22 78:25 79:4
**responded** 79:8
**responding** 67:4 68:8
**response** 19:16 38:20 80:2
**responses** 18:15,22 19:15 42:24 44:15
**responsive** 19:17,18
**rest** 49:4 67:20 71:4
**restroom** 10:5 52:17
**result** 60:18
**retainer** 8:23
**retirement** 83:15
**return** 83:18
**returns** 84:5
**review** 10:20 14:11 39:5 48:3 53:8 75:9
**reviewed** 10:17 39:16
**rid** 22:6 34:21
**ride** 29:24
**right** 5:19 6:7 10:8 13:23 14:6 15:12 16:10 17:1 18:8,21 19:9 21:22 23:12 26:18 31:17 32:21 35:1,6 39:13 41:14 42:12 43:10, 17 46:7,19 47:20 48:22 49:5 53:4 54:17,24 55:22 56:1, 9,14 57:5,23 58:4 60:16 62:7,22 63:5,14,18 65:13,15,22, 25 66:23 67:8,17 68:5,25 69:7,14 70:3,14 71:12 73:18, 20 74:10,17 75:16,19 76:9,12 77:10,14 78:23 79:21 80:2,6 81:20,23 83:4 84:2
**Road** 30:19
**robot** 77:13,18
**Roughly** 5:3 30:25 78:7
**route** 36:1

**S**

**Sara** 5:11,13,15 51:7,8,12,14

**savvy**
75:23 80:19
**saying**
38:18 58:19
65:25 69:23
**says**
15:23 17:1
19:10,16
44:5 66:9
68:6,23
77:17 78:8
**scene**
33:19
**Schedule**
53:25
**school**
31:14 33:4,
25 35:16
**screen**
19:6 61:25
70:23
**screenshot**
44:20 66:10
**screenshots**
16:3
**scroll**
17:8 64:7
**search**
12:23 23:6
45:3,6,9
82:4,5
**searched**
13:1
**second**
44:8 55:7
65:10 71:8
72:1
**see**
14:7 16:25
18:21 39:18
43:12 44:5,7
45:3 52:7
53:25 55:1
63:5 66:11
68:5,6 71:8,
17 75:5 78:8
**seeing**
48:14
**select**
48:22
**sell**
45:13 47:13,
14,18 49:24
83:19
**selling**
32:3,6,16,24
36:16 82:18
**sells**
47:7
**semi-trucks**
82:20
**send**
16:3 21:12,
21 43:4,7
71:2 80:1
**sending**
56:5 81:11
**sends**
40:20
**sense**
30:10
**sentence**
77:19
**separate**
38:6
**September**
17:13
**serious**
15:2
**served**
42:24
**set**
18:16,23
36:2
**settle**
65:5 73:4
**settled**
7:9 36:19
59:21 60:4
74:25
**settlement**
7:5,19 73:9
74:22 76:8
**settlements**
7:15 59:25
**settling**
32:18,20,24
**several**
5:18 13:3
55:6 73:20
**sharing**
29:11
**show**
69:23
**showed**
24:21 44:14
54:13 69:20
**showing**
54:24
**Shows**
65:20
**shut**
32:15
**sic**
17:16
**sign**
73:20 75:13
84:20
**signed**
78:9
**signing**
78:10
**similar**
42:7 55:20
**simplicity**
34:8
**single**
9:17 62:4
70:21 71:5
**sir**
4:19 5:12
7:17 8:18
9:6,9,21,24
10:2,14
13:3,22
14:17,19
15:16 16:6
18:7,19,21
19:9 20:17
22:4 23:16
24:3,14
25:21 27:17
28:7,14,19
30:23 31:2
32:4 33:2,7
35:7 36:24
37:2,5,19,21
38:12 39:17,
21 40:3,5,
15,24 41:1
43:5 45:11
46:17,20
50:8 52:25
53:23 55:2,
23 57:19,23
58:4,9 59:17
60:2,15
61:12 62:8
63:13 66:16
67:6,9 68:7,
10,21 70:17
72:20,23
73:1,18,23
74:2 75:7
76:3,19 77:6
78:11,24
81:24
**sit**
59:5
**site**
30:1
**situation**
10:10 22:15
23:8 36:2
37:24 59:13
62:18 69:17
79:24
**situations**
42:7 49:15
**Siuslaw**
33:5
**skip**
57:13
**small**
19:7
**social**
50:8,10,18

**society** 50:7
**solicitations** 25:20 26:18, 22 67:11
**something's** 22:15
**sort** 42:23
**sourced** 29:2
**sources** 29:3 34:11
**speak** 9:18,20 11:12,25 12:3,8 23:8 43:19,21
**special** 27:7
**specific** 23:21 25:24 50:24
**specifically** 13:5 18:9 19:22,24
**specify** 6:4
**speculate** 16:13 21:18 60:9
**spell** 24:15
**spend** 80:14
**spent** 69:16
**spoke** 11:9,11 14:1 68:15
**spoken** 51:4,25 52:2,6
**squirreled** 31:25
**stages** 69:4
**stance** 78:15
**standards** 8:10 60:21 64:5
**standing** 53:11
**start** 65:8
**started** 22:19 30:14 33:17 68:25 77:12 78:1, 10
**state** 4:14
**stated** 38:9 58:16
**statute** 21:8 64:11
**statutes** 52:14
**statutory** 63:8
**stay** 68:18 69:6,8
**steady** 73:22 74:1 75:6,10 80:18
**step** 22:6,10
**steps** 22:17
**stop** 20:13,14,16 21:11,24 22:10,17 38:13,16,17 44:6 59:12 79:1,5,8,11, 13,17 80:1
**STOP'** 19:12
**stops** 62:15
**store** 29:10,25 30:4
**straight** 33:25
**strike** 37:22 67:24
**structured** 50:7
**stuff** 11:15 17:15 20:10 28:16 29:11 30:7, 11,13 33:13, 23 34:1,8,10 35:18 48:14, 15 60:11 62:15 69:9, 11 71:19 76:6 83:2,19 84:3,6
**submissions** 19:13
**substance** 53:25
**sudden** 43:19
**sue** 15:20 20:25 70:3 76:18
**sued** 16:5
**suffered** 56:25
**sufficient** 9:4 31:19
**suing** 16:14,17 41:24 44:3
**suits** 50:21 78:13
**summer** 31:15
**support** 31:16 35:8, 12
**supports** 69:23
**sure** 6:10 11:15 16:4 22:23 26:4 36:21 46:2 52:18 54:3 56:13 58:19 59:20 62:17 67:12 71:24 78:14 81:25 82:10, 12
**surrounds** 50:3
**swapped** 47:2

**T**

**T-A-N-K** 30:2 50:14
**T-H-A** 50:13,15
**T-H-E** 50:14
**T-I-N-K** 50:14
**tab** 65:13 66:12 67:25 72:9, 16 76:24 77:2
**table** 52:23
**take** 10:10,12 20:24 22:17 25:14 36:10 52:16 56:6 72:1,5 79:15 82:12
**taken** 4:18 5:2 19:20 22:6 82:14

**takes**
80:25
**talk**
9:6 52:3 65:6
**talking**
19:22,24,25
**tank**
30:2,9,10,15 50:12,13,15 65:15 68:6 72:20 77:9
**target**
34:6
**taught**
34:8
**tax**
84:5
**Taylor**
5:11,13,15 51:7,8,12,14
**TCPA**
4:25 5:2 6:9,15,21,23 7:20 8:10 12:23 14:21 20:18 21:8 22:8 32:18, 20,24 50:21 69:14,19 74:1,22 75:10 78:1, 2,23 81:12
**tech**
68:17 69:5 75:23
**technical**
69:12 80:19
**telemarketer**
22:7 66:1
**telemarketing**
40:19,20 41:5
**telephones**
40:21
**tell**
13:18 25:17, 19 44:15 47:22 53:8 54:2 57:12 62:21 65:9 67:14 71:7,8 73:9 74:13 77:6
**telling**
74:16
**ten**
20:10 26:13, 15,17,21 28:5,9,19 49:18 57:4 81:5
**ten-minute**
52:16
**Tenth**
72:1
**term**
30:9 61:18
**terms**
8:6,24 21:23
**testified**
4:8
**testify**
37:1
**testimony**
22:2 64:16
**Texas**
39:20
**text**
13:2 15:20 16:1,17 18:6,11 20:16,23 21:11,13,21 22:10,17 23:4 26:7, 11,21 38:8, 10 40:20 41:20,21 42:9 44:3,8, 10 45:2 54:14,25 55:3,7,9,13, 14,17 57:13 58:9,10,18 59:1,3 62:2 69:6 70:1, 13,21,24 71:4 72:5,6 78:22 80:2
**texts**
10:17 14:20 15:9 16:5 17:22 55:8, 25 56:20 57:1,18 61:21,24 62:4 70:18 79:9
**tha**
50:13,15
**Thank**
43:8 52:24 66:11
**thing**
29:22 32:10 54:3 62:17 68:19
**things**
10:19,24 19:21 28:24 34:3 36:17 54:10 71:22 75:22 82:18, 22 83:13,21 84:9
**think**
6:13,22,25 7:3,6 8:4,23 9:1 13:11 18:4 21:21 23:6 25:25 26:11 27:13 34:5 36:21, 22 37:15 40:9 42:14, 20,22 47:25 48:15,24 51:16 60:1 61:12,13 62:16,17 65:14 66:15 67:20 68:1 70:5 78:15 81:12
**thinking**
25:5 41:23
**thinks**
52:15
**third**
4:21 44:10 55:13,14
**Thirteen**
31:8
**thought**
23:24 24:23 54:21 74:23 78:22 80:3
**thousand**
7:24 25:13 47:1
**three**
31:6,7,9
**throw**
33:21
**throwing**
33:17 35:5, 12
**time**
4:21 5:1 11:13 12:13 13:25 16:23 17:21 20:18 24:11 26:4 29:13 30:6 31:6,10,13, 15,24 32:5 34:6 35:12 36:11 37:23 38:4 45:16, 24 49:3,21 50:7 53:12 55:7,11,21, 24 56:11 57:15 62:2,4 65:24 67:10 69:17 73:8 74:8 75:8 78:25 79:4, 8,15,24

80:8,25 81:3,16 84:4
**times** 4:20 16:22 20:10 34:2 49:12
**title** 23:18,22 24:19 25:9 46:21 47:2
**titled** 18:22
**titles** 10:23
**today** 9:8 10:4,16 11:3 18:25 28:21 35:20 36:23 37:1 47:13
**told** 11:5 15:22 21:7 25:7 51:24 61:18 67:17 79:2 80:20
**top** 17:1 55:3,14 67:2 68:18 69:6,9
**total** 6:14
**townhouse** 30:21,22
**track** 43:3 73:18 79:15
**trade** 30:12 33:23 50:4 83:1,17
**traded** 23:18 33:22
**trading** 32:11 33:25 82:24
**traffic** 28:10,16
**transaction** 24:20
**transcripts** 81:13
**transport** 82:20
**Tree** 40:10
**trickling** 84:9
**trucks** 82:22
**true** 20:5 27:20 57:19 74:4,5
**truth** 47:22 74:14
**truthfully** 37:1
**try** 22:6 29:3 44:25 76:15
**trying** 9:17 35:1 37:15 69:17 70:24 74:19 77:15 83:2
**tunnel** 74:6
**turn** 9:2 67:22
**turned** 8:23
**two** 31:11 42:23 50:9,11 53:9 78:9
**TXT** 44:6
**type** 17:24 40:8
**typed** 79:17

**U**

**Uh** 51:16 64:14
**Um-hmm** 74:20
**umbrella** 13:8,9
**unauthorized** 26:18
**unbelievably** 71:3
**underneath** 13:13
**understand** 9:7,23,25 10:1 11:6 15:10 36:7 41:22 43:14 55:9 56:23 57:16 58:19 60:14,18,22, 24,25 61:20 62:25 64:18 82:16
**understanding** 8:13 16:19, 20 21:9 80:11,18
**Understood** 53:16
**Unimogs** 82:21
**universe** 67:16
**unlike** 71:3
**unlimited** 18:5
**unsolicited** 40:20
**upsets** 62:5
**upward** 15:3
**upwards** 6:11 20:22 59:22 81:8

**V**

**valuable** 80:8
**value** 47:18 49:25
**variance** 67:12
**varies** 15:1 26:16
**various** 27:1,2
**vehicle** 23:18,20
**vehicles** 33:23 34:1
**verbiage** 60:25
**verify** 14:3
**Verizon** 17:20,23,24
**versa** 50:5
**version** 63:20
**versions** 42:23
**vice** 50:5
**vicinity** 67:13
**violate** 16:2
**violated** 42:1
**violation** 63:9 64:3
**violations** 14:21 78:23
**voicemails** 16:10 68:19

81:12,13
**volume**
70:6,13

**W**

**W-A-R-R-E-N**
24:16
**wait**
20:9 50:14
**waiting**
63:23
**walk**
17:8
**want**
10:11 11:4, 23 13:5 15:23 26:8 58:9,16 62:7 64:9 65:1 70:3 71:8 82:16 84:16, 19
**wanted**
21:25 69:13, 16
**Warren**
24:7,24
**waste**
72:3
**wasted**
74:8
**watching**
34:24
**way**
7:2 10:3 23:19 27:7 34:16 35:8 41:4 42:5 44:14 47:5 52:7 62:1
**ways**
36:8
**web**
12:23 23:6 30:1
**weed**
71:19
**week**
5:3 73:21 81:6,8
**weekly**
81:4
**went**
10:18,24 11:1 23:7 43:22 64:7 74:23 80:21 81:23
**western**
34:5
**whatsoever**
41:6 51:9 52:1 57:10 60:13 70:5
**whichever**
63:9,10
**whoa**
19:10
**wide**
40:17
**wide-scale**
40:19
**Willow**
30:19
**Wilson**
4:5,12,16,17 16:25 39:13 42:9 43:10, 11,19 44:2 46:7 50:12 51:24 53:4 54:13,24 55:1 63:5 65:14,15 66:24 68:5,6 72:21 77:10 82:16
**witness**
4:6 43:20,23 51:23 84:11
**word**
9:17
**wording**
5:17 46:2
**work**
10:13 13:14 26:5 29:23 35:1 76:5 78:11 83:24
**worked**
12:13 33:12
**working**
5:7 31:17 42:19 79:18, 22
**works**
10:3 13:17 15:17 20:13 21:17 34:9 36:14 82:25
**world**
28:25 34:7
**worries**
62:19
**worry**
50:2
**worse**
79:7,24
**worth**
84:4
**Wow**
71:1
**written**
64:10
**wrong**
38:18 40:14 53:9 54:22
**wrote**
73:24 74:3

**Y**

**yeah**
6:8 7:7,19 13:13 14:6 18:25 23:12 27:14 29:1,4 31:18,23 32:1 35:9 36:18 37:24 38:24 39:21 42:2,11,15, 22 43:21,23 47:5,12,15, 25 49:1 54:5,21 57:3 60:1,10 63:23 64:5, 18 66:14 68:24 69:1, 15,24 74:7 76:18 78:19 79:2,14,22 80:7,20 81:1 84:8,21
**year**
6:22,23 26:2 31:14 47:10, 12 68:23 77:24,25 78:2,5,6 81:2
**years**
13:1 22:14 23:1 24:10 26:20 28:5, 9,19 29:20 31:25 33:15, 25 35:3 45:16 66:6, 8,9 68:18 69:9,15 70:10 77:13, 17 78:18,21 83:5,24
**yesterday**
11:14 12:1,5
**younger**
33:24

**Z**

**zeroes**
43:12
**Zoom**
80:17