Ryan D. Watstein (*Pro Hac Vice*)
ryan@wtlaw.com
James M. Ruley (*Pro Hac Vice*)
jruley@wtlaw.com
Rebecca Rhym (*Pro Hac Vice*)
rrhym@wtlaw.com
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

Timothy J. Fransen, OSB No. 073938
tfransen@cosgravelaw.com
**COSGRAVE VERGEER KESTER LLP**
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: (503) 323-9000

*Attorneys for Defendant Freeway Insurance Services of America, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION**

| | |
|---|---|
| *In re* SUBPOENA TO HEIDARPOUR LAW FIRM, PLLC. | Case No. 6:26-mc-00830-MC |
| CHET MICHAEL WILSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FREEWAY INSURANCE SERVICES OF AMERICA, LLC,<br><br>Defendant. | **FREEWAY'S NOTICE OF NEW EVIDENCE**<br><br>**[REDACTED VERSION]** |

Freeway seeks no relief through this notice. It files it because Wilson's thirteen other cases before this Court remain stayed while the discovery the Court ordered on August 19 proceeds, and the Court deserves to know where that discovery stands, what it has shown, what remains, and when this will be over. That is what this notice covers.

When HLF moved to quash Freeway's subpoena, it called Freeway's position "a campaign of serious but baseless accusations." ECF No. 1, Mem. at 3. It told the Court "[t]here is no evidence of fraud." ECF No. 21 at 3. It disclaimed a real role, claiming that when its demands failed to resolve claims pre-suit, it simply "referred Mr. Wilson to other attorneys." ECF No. 1, Mem. at 2. The Court ordered production, noting its relevance to "any future motion for sanctions against HLF, should the discovery confirm Freeway's suspicions." ECF No. 28 at 6. HLF then said it would produce "forensic data reinforcing that it did not manufacture claims." ECF No. 33 at 4.

HLF has done the opposite, producing the minimum and stymying discovery at every turn. Even so, what it could not avoid producing, together with Freeway's own investigation, has confirmed what Freeway said and more, and contradicted what HLF and Wilson told the Court. To summarize:

- Wilson's counsel (including HLF and referral counsel) used the class mechanism to extract around ***$8 million*** in individual settlements, almost double the $4 million Freeway estimated in August, and the lawyers got nearly 96%. That is approximately ***80 times*** the damages permitted under the statute. And Wilson had to release all claims against his own counsel to get his small share, in every settlement statement Freeway has received.

- The engagement letters tell clients that fees track the lawyers' hourly work. Neither HLF nor referral counsel will produce a single document showing that they do, and the numbers, compiled by Freeway below, show they do not.

- As Freeway predicted, Wilson's claims bear strong signs of fraud, particularly after the HLF relationship began. For example, he signed his HLF retainers from the *same IP address* that signed his number up for the texts he sued over in a case before this Court.

- The first third party to respond to Freeway's subpoenas (which HLF seeks to block) has produced records that corroborate how Freeway has always said the fraud in HLF-

generated cases works. Before Wilson contacted HLF in October 2024, there were a steady number of sign-ups under his number. After he retained HLF and began filing lawsuits, ***that rate nearly doubled***. After Freeway filed its motion, it fell back to where it started.

- The third-party data shows the same pattern for his co-plaintiff and HLF client Sara Taylor's phone number, with the rate of opt-ins ***doubling*** while she was filing suits.

- Wilson's former roommate brought the same kind of claims through the same lawyers before this Court, told the same story about his number, and dismissed his case with prejudice after Your Honor allowed forensic evaluation of his devices and, less than two weeks before the dismissal, permitted the deposition of the purported lead submitter to proceed. Phone records show that, throughout that fight, Wilson spoke with him dozens of times, despite denying any written communications with other TCPA plaintiffs in discovery.

- Last month, a federal court defaulted two other HLF clients on fraud counterclaims after recordings showed someone signing up their numbers under fake names and their sworn denials of knowing each other proved false. The judge indicated from the bench that she would refer the lawyers involved, including Heidarpour, to the Florida Bar. Asked about that in discovery, HLF says only that it "is aware of the Court's remarks in *Rashley v. Boost Health Insurance Agency, LLC*, 25-cv-21690-KMW (S.D. Fla.), which speak for themselves."

- Wilson's point of contact at HLF is Farideh Heidarpour, a non-lawyer who, HLF says, [redacted]," and who served federal prison time after admitting to defrauding federal agencies by billing for medical services that were never performed. Ruley Decl. Ex. E, Resp. to Req. 6; Wilson ECF No. 19 at 11–12. HLF has never disputed that. She [redacted] Watstein Decl. ¶ 22; Ruley Decl. ¶¶ 14–15 & Ex. H.

- Since Freeway raised its fraud concerns with referral counsel, filed its motion, and the Court ruled, filings for HLF claimants have plummeted by ***almost 90%.*** A moneymaking scheme of this magnitude does not grind to a halt based on "baseless allegations."

Below, Freeway summarizes in more detail (I) what discovery has shown about the money, (II) the evidence of lead fraud in HLF's portfolio and Wilson's own claims, (III) how Wilson, HLF, and referral counsel have tried to keep the rest from coming out, and (IV) Freeway's next steps and the timeline for them: bringing discovery disputes to the Court so it can get the discovery it needs; taking approximately three depositions; and then moving for sanctions in January.

## I. HLF's Records Confirm Use of the Class Mechanism to Extract Extortionately Large Individual Settlements, on a Far Larger Scale Than Freeway Estimated

In its motion to deny class certification, Freeway described how the model works. HLF sends a demand. If the company does not pay, referral counsel files a putative class action. The class allegations serve as *in terrorem* leverage, the defendant pays an individual settlement to avoid the threatened expense, and the case is dismissed once the lawyers extract a handsome individual settlement. Wilson ECF No. 19 at 1, 7–10, 21–23. In August, working from documents HLF produced in another case, *Robertson v. Plain-English Media, LLC*, No. 3:24-cv-429 (D. Nev.), Freeway estimated that Wilson's filed and threatened "class actions" had generated "around $4 million," with nothing for any class. Wilson ECF No. 42 at 3. Freeway called that number conservative. *Id.* at 3 n.2. It was significantly so.

HLF has now produced [redacted] settlement agreements and statements for Wilson's claims. Together they total more than $6.3 million. Despite this Court's order requiring their production, three settlements are still outstanding because HLF made Freeway, at great expense, go to each defendant to negotiate for permission. The three unproduced agreements total [redacted] so the final figure is likely to approach $8 million. Watstein Decl. ¶¶ 10–11. Wilson received less than 4% of that money. HLF and referral counsel kept the rest. No putative class member received a cent.

The individual settlements show the exact "extortion premium" scheme Freeway detailed in its prior filings. The TCPA caps damages at $500 per violation and does not shift fees. 47 U.S.C. § 227(c)(5).[1] Yet one defendant paid [redacted] on a claim that alleged a handful of calls to Wilson.

[1] Courts may award up to $1,500 for "willful" violations. 47 U.S.C. § 227(c)(5). Of course, by Wilson's own theory, he was called by accident because "someone else" typed his number in a lead form. So willful damages were never on the table in his cases.

Wilson received [redacted] and his counsel kept the rest, a [redacted] ***contingency***. Two other defendants paid [redacted] between them on claims worth a tiny fraction of that. Watstein Decl. ¶¶ 7, 11. And three more paid over [redacted] each. Watstein Decl. ¶ 8.

Measured against what Wilson could recover, the premium is enormous. Counsel says that Wilson's share of any settlement is the full statutory damages and no more. Aug. 19, 2026 Hr'g Tr. 47:16–19, 54:13–16; Wilson ECF No. 29 ¶ 22. Everything above that share is the extortion premium that goes to counsel. Across the [redacted] settlements HLF has produced, that premium was, in the aggregate, **nearly 80 *times*** statutory damages. Watstein Decl. ¶ 6. On the [redacted] claim, it was [redacted] *Id.*

The timing of those settlements also contradicts what Wilson told this Court: in the cases resolved individually, "discovery revealed that a defendant or a third party used the number as a one-off placeholder." Wilson ECF No. 28 at 5; *see* Wilson ECF No. 29 ¶ 20 (swearing that "the information developed in the case showed that class treatment did not make sense"). That is not what happened. At least 27 of Wilson's filed cases resolved before any written discovery response could have come due. Watstein Decl. ¶ 9. Even if Wilson's account were true, it would make the abuse worse. It would mean they repeatedly confirmed accidental calls to a placeholder number but kept filing class actions to extract enormous premiums anyway. That is the *precise abuse* that Freeway premised its motion to deny certification on.

The abuse is made worse by what Wilson's engagement letters say about attorney's fees: that they were "based on the amount of time spent on the matter multiplied by our hourly rates." Wilson ECF No. 26-1 ¶ 7. HLF will not produce any document showing that the fees were in fact based on time spent. Ruley Decl. Ex. E (HLF's Nov. 2, 2026 Resp. to Req. 10). That's because they weren't, as publicly available data proves.

Take the [redacted] settlement. Even at $1,500 per call, a handful of calls is worth a few thousand dollars at trial. Wilson received [redacted]. His lawyers received [redacted]. Referral counsel in that case, Kaufman P.A., tells courts that Avi Kaufman's rate is $800 an hour. At that rate, the fee represents nearly [redacted] more than a year of full-time work for one lawyer, on an individual claim that settled [redacted] while that two-lawyer firm was litigating ***more than 250 other federal TCPA cases***. Watstein Decl. ¶¶ 7, 12–13 & Exs. A–B. Nothing in the record suggests anyone did that work. Freeway has subpoenaed referral counsel's time records. In response, Kaufman P.A. retained another AmLaw10 defense firm, deferred its response, and declined to have any dispute over the subpoena heard in this Court. Ruley Decl. ¶¶ 16, 19 & Ex. K.

The numbers for Paronich Law are worse. As class counsel, Anthony Paronich is almost always paid a percentage of the fund, not for his hours. Since November 2022, courts have awarded Paronich and his co-counsel about $34.8 million in class-action fees. Watstein Decl. ¶¶ 14–15 & Ex. C. In seven of those settlements, which produced $8.8 million in fees, the fee papers disclosed no hours for Paronich or his firm at all. *Id.* ¶ 15. Where they did disclose hours, Paronich typically claimed a few hundred per case, and co-counsel from other firms claimed their own. *Id.*, Ex. C.

Now apply the engagement letters' formula to Paronich's share of Wilson's settlements. Wilson's retainer gives Paronich Law 60% of counsel's fees. Wilson ECF No. 26-1 ¶ 5. For Wilson settlements reached in 2025 alone, that share comes to about [redacted]. At $800 an hour, the rate claimed for Paronich in four of his class settlements, that is about [redacted] hours. Watstein Decl. ¶ 19. Add the hours Paronich and his firm claimed in class cases that year, and the total reaches about [redacted] hours, close to a heavy full-time billing year. *Id.* ¶ 20 & Ex. E.

That leaves almost no time for the rest of the ***523 federal TCPA cases Paronich had pending in 2025***, *id.* ¶ 18, at a firm he stated had one attorney in December 2024, *Cornelius v. Deere Credit Servs., Inc.*, No. 4:24-cv-00025 (S.D. Ga.), ECF No. 30-1 ¶ 17, and two in March 2026, *Jackson v. Gen Digital Inc.*, No. 2:25-cv-00535 (D. Ariz.), ECF No. 24-3 ¶ 30. Give each of Paronich's roughly 465 other pending cases just 20 hours each, an impossibly low figure given that his 523 pending cases generated ***9,836 docket entries*** that year, and his 2025 tops [redacted] hours, [redacted]. Watstein Decl. ¶¶ 18, 20 & Exs. D–E. [redacted]. Yet that is what the engagement letters told Wilson.

HLF's overarching engagement letter also told Wilson that it had a power of attorney over his cases. Wilson ECF No. 33, Ex. 3 ¶ 7; *see* Wilson ECF No. 43 at 6 (HLF may act "as though Client were personally doing so"). Whether HLF and referral counsel used that to reject full-damages offers to Wilson so they could pursue millions for themselves or did it without contractual authority, HLF knew what it was doing was wrong. That is why, to get each settlement check, Wilson had to release his own lawyers from all claims, an unheard-of practice that appears specific to HLF and its three core referral firms. Watstein Decl. ¶ 4.

Heidarpour himself has admitted what he is doing is wrong, objecting under oath to fees far smaller than these. In a miscalculated letter attempting to create a false narrative, HLF's counsel blamed Richard J. Daschbach, a retired administrative judge, for the engagement agreement. They said that Heidarpour merely "worked" for Mr. Daschbach's firm, ironically called Legal Advocacy for Victims ("LAV"), and that the agreement couldn't possibly be improper because Mr. Daschbach used to be a judge. Ruley Decl. Ex. C, Req. 1 (quoting HLF's Sept. 23, 2026 letter). HLF's lawyers didn't realize that Heidarpour's own prior deposition contradicts this false

narrative. Under oath in 2016, Heidarpour described the firm as "a business that *I helped start* that was doing TCPA cases," and said he left because he "[d]idn't agree with the billing practices," including a contingency of "[a]nywhere from 45, 55 percent." Dep. of Andrew Heidarpour at 15–19, *Heidarpour v. Cent.* Payment, No. 4:15-cv-00139-CDL (M.D. Ga.), ECF No. 44. Confronted with that testimony, HLF's counsel now concedes that Heidarpour [redacted] Ruley Decl. Ex. E (HLF's Nov. 2, 2026 Resp. to Req. 1). Yet HLF and its referral counsel now keep more than 95% of what Wilson's claims bring in, and [redacted] of the largest one. The irony is almost unbelievable.

Heidarpour's testimony aside, the ethics rules speak for themselves, and they show these practices violated them, many times over. *See* Or. RPC 1.5(a) (barring "clearly excessive" fees); Or. RPC 1.8(h)(2) (barring settlement of malpractice exposure with an unrepresented client absent written advice to seek independent counsel); Or. RPC 1.8(i)(2) (allowing an interest in the client's claim only through "a reasonable contingent fee"); *In re Conduct of Gastineau*, 317 Or. 545, 550–51 (1993) (measuring a contingent fee's reasonableness by the work actually performed when the fee is collected); Wilson ECF No. 43 at 7–8; *see also Smith v. ExamWorks, LLC*, 2026 WL 2823260, at *9 & n.5 (D. Md. Sept. 21, 2026) (condemning a TCPA engagement letter that entitled counsel to the greater of 40% or their "reasonably incurred" hourly fees if the client settled individually, because hourly fees that "quickly eclipse any reasonable settlement offer" give counsel "a greater interest in the outcome of the litigation than the client," and noting that Oregon's Rule 1.5 imposes the same limit). Meanwhile, companies like Freeway paid the bill for all of this, with most simply caving to avoid the enormous expense Freeway has incurred bringing these issues to light.

## II. Despite Efforts to Block Discovery, the Evidence Shows That Litigation Fraud Runs Through HLF's Portfolio and Wilson's Own Claims

As Freeway has said from the beginning, Wilson's early claims may well have started with real, unwanted calls to the 999-9999 number he traded a car for. But once the model proved profitable, a different kind of claim began turning up. The opt-in appears to have come from the plaintiff or someone working with him. Then comes a demand from HLF, a referral to litigation counsel, and a quick exit once the defense starts digging (or total abandonment prior to litigation when the defendant raises the prospect of fraud at the outset).[2] Wilson ECF No. 19-1 ¶¶ 46–51. The Court saw the pattern at the hearing: "The history of dismissing cases when there's any pushback about what's going on here is -- I think, speaks for itself." Tr. 77:3–5. New evidence shows that pattern elsewhere in HLF's portfolio, in Wilson's own cases, and in a case before this Court brought through the same lawyers by Wilson's former roommate, who dismissed it after the Court allowed forensic evaluation of his devices and, less than two weeks before the dismissal, permitted the deposition of the purported lead submitter, Barnes's estranged mother, to proceed. That is all *in addition* to the evidence Freeway presented in its motion papers and without *any* of the fraud evidence Freeway has sought from HLF and referral counsel (because they have refused to produce it, as discussed below).

### A. A Federal Court Has Defaulted Two HLF Clients on Fraud Counterclaims

The latest example comes from Florida. Last month, a federal court entered default against two HLF clients on fraud counterclaims in a TCPA case. *Rashley v. Boost Health Ins., Inc.*, No. 1:25-cv-21690-KMW (S.D. Fla.), ECF Nos. 73, 75. The case started like Wilson's. Two men, Kyle

[2] This reality, proven by the very responses the undersigned sent to some of these demands, shows just how outrageous HLF's refusal to produce this correspondence is. *See infra* Part III.

Rashley and Nicholas Dungey, sued Boost over marketing texts they said they never asked for. Both were HLF regulars who allegedly didn't know each other.

Boost could test that coincidence. It runs the website where consumers ask for those texts, so it had recordings of exactly what each visitor typed. *Id.* ECF No. 14 ¶¶ 5–7. The recordings show someone type in one of Dungey's phone numbers, read the consent language, erase the number, and replace it with the number Dungey later sued on, under the name "Thomas Murphy." *Id.* ¶¶ 27, 29. The same visitor entered a Los Angeles address, and when the site would not accept California, kept the street and changed the city and state to New Orleans. *Id.* ¶ 28. Five days later, someone went through the site as "John Renoylds" and submitted Rashley's contact information. *Id.* ¶ 75. Both visits were hidden behind a VPN. *Id.* ¶¶ 39, 85. HLF's Dana Oliver then sent Boost demands on both men's behalf, disclosing none of this. *Id.* ¶¶ 59, 107.

Both men later swore, in identical declarations filed by Avi Kaufman, HLF's referral counsel there and in several of Wilson's cases,[3] "I do not know my co-plaintiff, and I have never met or communicated with him." *Id.* ECF No. 63-1 ¶ 9; *see* HLF_Freeway_0000099–106, 0000267–274. That was false. Phone records already in plaintiffs' counsel's possession, which they had redacted, concealing who was called, showed ***sixty-five calls*** between the two men, and

[3] As a reminder of the cast of characters: HLF is Andrew Heidarpour's firm. Dana J. Oliver is the only other HLF lawyer, and his name appears on HLF's demand letters. HLF refers Wilson's claims for litigation principally to Anthony Paronich (Paronich Law, P.C.), Andrew Perrong (Perrong Law LLC), and Avi Kaufman (Kaufman P.A.). Paronich or Perrong represents Wilson in thirteen of the fourteen Wilson cases this Court is overseeing. *See* Wilson ECF No. 30. Kaufman has only *appeared* in one of the cases before this Court, *Wilson v. PacifiCorp*, No. 6:24-cv-01956 (D. Or.), but he likely represents Wilson in others before this Court, as referral counsel rarely appears until they have to (as Kaufman's belated appearance in PacifiCorp and HLF's habitual non-appearance in any cases shows). Kaufman has appeared for Wilson in at least eighteen federal cases nationwide, including Mia. Watstein Decl. Ex. B.

***fifty-one calls*** between Dungey and HLF in the three weeks ***before*** HLF says it took him on. *Id.* ECF No. 63 at 12–13.

The court then ordered the plaintiffs' phones forensically imaged. *Id.* ECF No. 41. One had been factory reset. The others had "significant amounts of information intentionally deleted – well after the commencement of the litigation." *Id.* ECF No. 47 at 2. Counsel withdrew, the plaintiffs stopped appearing, and the court defaulted them. *Id.* ECF Nos. 48, 55-2, 73, 75.

From the bench, Judge Williams indicated she would refer the lawyers involved to the Florida Bar's peer review process anyway, including Heidarpour and Oliver. The transcript of that hearing is not yet available, but, when asked for documents about any bar referral, HLF said it "is aware of the Court's remarks in *Rashley*, which speak for themselves." Ruley Decl. Ex. E (HLF's Nov. 2, 2026 Resp. to Req. 17).

### B. Wilson's Own Claims Show the Same Signs

Start with *Wilson v. MAH Group, Inc.*, No. 6:25-cv-00855-MC (D. Or.), which is pending before this Court and consolidated with this case for purposes of certification. MAH Group's texting vendor traced the sign-up for Wilson's number to a January 1, 2025 opt-in from IP address [redacted]. *MAH Group*, ECF No. 40-1 at 2. Wilson's lawyers have told three different stories about that address. First, a flat denial: "that is not our client's IP address." *MAH Group*, ECF No. 40-2 at 1. Then, in Wilson's discovery responses, an admission that the address was assigned to him on January 30, 2025. *MAH Group*, ECF No. 40-3 at 2. Then, at the hearing in this case, a third version: "Mr. Wilson clicked on a link, and we believe that's how they captured his IP address." Tr. 49:23–25. But the vendor captured the address at sign-up, before any text with a link reached Wilson. *MAH Group*, ECF No. 40-1 at 2.

HLF's production ends the debate. Wilson ***signed an HLF retainer from that same IP address*** on December 27, 2024, five days *before* the sign-up. He signed another from it on January

3, 2025, two days after. He even signed his retainer for the MAH Group claim from that address. Watstein Decl. ¶ 21. The sign-up came three months after HLF began representing Wilson. Wilson ECF No. 33, Ex. 3. At the hearing, the Court said it would "want to find out" whether Wilson was "willing to put his own number into a computer system." Tr. 53:7–11. HLF's own records provide the answer: he is, and he did.

Next is *Wilson v. Mia Aesthetics Holdings, LLC*, No. 1:25-cv-24103 (S.D. Fla.). On July 5, 2025, someone filled out a Facebook and Instagram lead form for Mia, asked about liposuction, and agreed to receive promotional texts. *Mia* ECF No. 22-1 at 2 (Ruley Decl. Ex. O). The form listed Wilson's phone number, but a woman's name, a personal email address, and an Oregon ZIP code. *Id.* Mia's counsel located the woman. Ruley Decl. ¶ 24. She lives in Oregon, had no idea anyone had used her information, and denied filling out the form. *Id.* Mia then moved to stay class discovery, arguing that Wilson, "or someone on his behalf," had signed up for the messages and that he was "committing fraud on this Court." *Mia* ECF No. 22 at 3, 8–9.

Mia also pointed to another Wilson suit in the same district, against a different cosmetic surgery business, where the messages were directed to a different woman: "Either Plaintiff is involved in a scheme to invite solicitations from cosmetic surgery centers, or Plaintiff has the terrible luck of continually receiving cosmetic surgery solicitations directed at different unknown women, who both happened to input his personal phone number into plastic surgery centers' websites." *Id.* at 10 (citing *Wilson v. Icon Creative Consulting, Inc.*, No. 1:24-cv-25119-FAM (S.D. Fla.)). After the court stayed class discovery in response to these allegations, Wilson dropped the case. *See* Mia ECF Nos. 30, 31; Ruley Decl. Ex. P.

Then there is Chad Barnes, Wilson's former roommate. *Jet Quick* ECF No. 15 at 3. Within months of registering his number on the Do Not Call list, Barnes filed three TCPA class actions

through Wilson's lawyers, two of them in front of Your Honor, on the same template the lawyers use for Wilson. *Barnes v. Live Stream Tech. Servs. Inc.*, No. 6:25-cv-01469-MC; *Barnes v. Jet Quick, LLC*, No. 6:25-cv-02050-MC; *Barnes v. Modaramo Media, Inc.*, No. 2:25-cv-04537 (E.D.N.Y.). In *Jet Quick*, the defendant moved to compel arbitration based on an online sign-up that paired Barnes's phone number with another person. *Jet Quick*, ECF Nos. 10; 15 at 2–3. Barnes swore he never visited the site and blamed his estranged mother. *Id.* It is the same story Wilson tells: someone else typed in his number. Tr. 55:23–56:1.

This Court then allowed discovery, including "forensic evaluation of relevant technology." *Jet Quick*, ECF No. 16. HLF's Dana Oliver, the same HLF lawyer at the center of *Rashley*, moved to appear for Barnes. *Jet Quick*, ECF No. 20. Two days later, the Court allowed the defendant to depose Barnes's mother. *Jet Quick*, ECF No. 21. Less than two weeks after that, Barnes dismissed his claims with prejudice and walked away with nothing. *Jet Quick*, ECF Nos. 23–24.

Throughout that fight, Barnes and Wilson were talking. Wilson's phone records show no calls between the two men from January 9 through January 25, 2026. On January 26, the day the arbitration motion alleging litigation fraud was filed, they spoke twice. In the five weeks before Barnes filed his declaration blaming his mother, they spoke 26 times. In all, they spoke 47 times between January 26 and May 4. Watstein Decl. ¶ 23 & Ex. F. Yet Wilson told Freeway he has no documents reflecting any chat "in which TCPA claims or lawsuits . . . are discussed." Ruley Decl. Ex. G (Resp. to RFP No. 53). Maybe no written record exists. But forty-seven calls with a former roommate facing the same accusation, through the same lawyers based across the country, is something Wilson will have to explain under oath.

### C. HLF-Claimant Filings Fell Once Freeway Raised Fraud

HLF-claimant filings also fell sharply once the scheme drew scrutiny. In July and August 2025, Freeway's counsel raised its fraud concerns with two firms that file HLF-referred cases,

Paronich Law and Kazerouni Law Group. Watstein Decl. ¶ 26. In the past few weeks, Freeway's counsel reviewed every federal TCPA case HLF's referral counsel filed from January 2024 through October 2026 and identified the cases brought by known HLF claimants. Watstein Decl. ¶¶ 27–28. HLF-claimant filings more than doubled from early 2024 to a peak in the first half of 2025. *Id.* In the six months after July 1, 2025, they fell 33%, or 45% without Wilson's cases. After Freeway moved to deny class certification and the Court ruled, HLF-claimant filings fell to **about three per month.** In all, since Freeway brought the scheme to light and moved to deny class certification, and the Court ruled, HLF-claimant filings have fallen by ***almost ninety percent from their peak.*** *Id.* ¶ 30 & Ex. G. This chart shows the drop:



That is not what an innocent actor making tens of millions does in response to scrutiny.

### D. The Vendor Records Show Lead Submissions Using Wilson's Number Nearly Doubled Once He Retained HLF

On October 16, Freeway subpoenaed 18 lead-generation, text-messaging, and automated-marketing platforms for records tied to Wilson's number and the numbers of two co-plaintiffs, Sara Taylor and Antwane Johnson. Ruley Decl. ¶ 20. The only vendor that has produced so far provided anonymized records showing each time one of those numbers was signed up to receive a brand's marketing texts. Wilson's records go back to April 2020. Watstein Decl. ¶¶ 32–34 & Ex. I. Wilson's number was submitted 40 times between April 2020 and October 3, 2024, an average of about 9 times per year. Wilson signed the HLF retainer on October 4, 2024. Wilson ECF No. 33, Ex. 3. Over the next 19 months, until Freeway filed its motion on May 16, 2026, his number was submitted 27 times to various companies. That's nearly double the pre-HLF rate. In the five-and-a-half months since Freeway's motion, his number has been signed up four times, about the same rate it held before HLF. Watstein Decl. ¶ 34. This chart shows the rise and fall:

| Window | Opt-ins | Months | Rate |
|---|---|---|---|
| Before HLF (4/16/2020 – 10/3/2024) | 40 | 53.6 | 0.75/mo |
| HLF era (10/4/2024 – 5/15/2026) | 27 | 19.3 | 1.40/mo |
| After the motion (5/16/2026 – 10/30/2026) | 4 | 5.5 | 0.73/mo |

Sara Taylor sued alongside Wilson through the same counsel and was a prolific TCPA litigant in her own right. Her number shows the same thing on her own timeline. Taylor filed her first TCPA case on November 18, 2024, and her last, with Wilson, on August 29, 2025. *Taylor v. Gainsco Auto Ins. Agency*, No. 3:24-cv-2889 (N.D. Tex.); *Taylor & Wilson v. Savvy Ins. Sols.*, No. 1:25-cv-12393 (D. Mass.). Her number first appears in the vendor's records in March 2024. Before her first suit, it was submitted 6 times in about 8 months. During the 9 months that she was

represented by HLF, the rate doubled. After Freeway's counsel raised fraud and she stopped filing, opt-ins fell back to their pre-HLF baseline. Watstein Decl. ¶ 35.[4]

Strangers making typos have no way of knowing when a plaintiff retains HLF or stops filing suits. If these submissions came from other people's mistakes, the rate would not nearly double in the months each plaintiff retained HLF and then fall back once Freeway's counsel raised fraud allegations. But here, that happened with two plaintiffs.

### E. Wilson and HLF Have Repeatedly Misstated the Record to the Court and to Freeway

The record also contradicts much of what Wilson and HLF have told the Court and Freeway:

- HLF told this Court it simply "referred Mr. Wilson to other attorneys," and now says that "[f]or matters filed in court, HLF did not negotiate with opposing parties." ECF No. 1, Mem. at 2; Ruley Decl. Ex. E (HLF's Nov. 2, 2026 Resp. to Req. 3). But in *Rashley*, Heidarpour swore that "[e]ven when I refer a claim to another attorney, I continue to represent the clients and serve as a resource for the clients and the referral counsel as needed." *Rashley* ECF No. 55-2 ¶ 6. In *Rashley*, phone records showed fifty-one calls between Dungey and HLF in three weeks. *Rashley* ECF No. 63 at 12–13. Wilson's phone records show 498 calls and texts with HLF's main number in twelve months, 345 of them calls from HLF. Watstein Decl. ¶ 24 & Ex. H. Moreover, HLF's own engagement letters divide the fees among HLF and referral counsel by percentage. HLF says its "own share in those matters was a fixed percentage of the attorneys' fee component," and that component was ostensibly based on hours worked. Ruley Decl. Ex. E (HLF's Nov. 2, 2026 Resp. to Req. 10). HLF's statement to the Court about its "limited role" was false.

- HLF told the Court there was "no evidence of fraud." ECF No. 21 at 3. That's false too. Its own records tie the *MAH Group* sign-up to the IP address Wilson used to sign HLF's retainers. Wilson's phone records show him communicating dozens of times with another litigant accused of fraud before this Court, a litigant who dismissed his claim rather than face a device inspection Your Honor allowed. *See supra* Part II.B; Watstein Decl. ¶ 23 & Ex. F. And the one third-party production so far shows, for two HLF plaintiffs, that opt-ins nearly doubled during the period at issue and then fell. Watstein Decl. ¶¶ 34–35.

- HLF told Freeway that Heidarpour merely "worked" for Mr. Daschbach and that his engagement letter couldn't possibly be improper because it was drafted by a former judge. In reality, he helped start the firm, was a co-owner, testified that he left because he "didn't

[4] The records for Antwane Johnson only showed one submission.

feel comfortable with" its contingency of "[a]nywhere from 45, 55 percent," and HLF now keeps, with its referral counsel, up to [redacted] of a settlement. *See supra* Part I.

- Wilson swore that his individual resolutions followed "information developed in the case." Wilson ECF No. 29 ¶ 20. That's false too. Many of those cases settled for large sums shortly after appearance of the defendant, with no apparent discovery having taken place.

## III. Wilson and HLF Have Resisted Discovery at Every Step

At the hearing, the Court asked the obvious question: if Freeway has HLF wrong, "why didn't they cough up the discovery then?" Tr. 45:19–20. That question still has no good answer. Since the hearing, HLF, Wilson, and referral counsel have produced only what they could not avoid and stonewalled on everything else. For example:

***The settlement agreements.*** The Court ordered HLF to produce Wilson's settlement agreements. ECF No. 28. HLF did not do that. Instead, it went to each settling defendant and asked its position. Ruley Decl. ¶ 9. As the production later showed, most of the agreements required nothing of the kind. *Id.* ¶ 10. Every agreement HLF has produced permits disclosure under a court order, and none requires the other side's consent. *Id.* Some require no notice at all. *Id.* Even the strictest require nothing more than notice before HLF complies with the order. *Id.* HLF went well beyond any of that. It asked defendants who had no power to block the Court's order whether they objected to it, and several did. Then it left Freeway, which has already borne enormous expense in an effort to stop an eight-figure scheme that is abusing this Court's auspices, to track down any defendants who might have had an objection and ask each to stand down. *Id.* ¶ 11.

None ultimately pressed an objection. But it took weeks of work to get documents the Court had already ordered HLF to produce. Three agreements, from two defendants, are still missing, even though the Court ordered their production and neither defendant has objected. Their counsel told Freeway in September that he would advise them not to fight production. Watstein Decl. ¶ 10. Counsel for those defendants has told Freeway that the three settlements total [redacted]

[redacted] but Freeway *still* does not have the agreements. *Id.* ¶ 11. The other holdout that Freeway finally obtained after saying it would go to the Court imminently was the other of the largest agreements: the one paying counsel [redacted]. *Id.* ¶ 7.

***Where Wilson's post-HLF claims came from.*** Freeway has said from the start that the problems appear to begin after a client's relationship with HLF began, and that's now corroborated by third-party data and multiple new examples of fraud. So it matters how each of Wilson's claims reached HLF after Wilson first engaged HLF. Wilson wrote publicly that he "just gave her tech guy my iCloud and they stay on top of it," referring to his HLF lawyer, and he confirmed at his deposition that HLF's "tech guy" has his iCloud login. Wilson ECF No. 19 at 8; Wilson Dep. 69:5–12. In discovery, though, [redacted]. Ruley Decl. Ex. G (Resp. to Interrog. No. 20). HLF agrees.

After that date, it says, new claims reached HLF because Wilson [redacted]" Ruley Decl. Ex. B (HLF's Oct. 14, 2026 letter) at 11. That covers most of the portfolio, and the place where fraud is most likely to lie. Of the [redacted] demand letters HLF produced (itself incomplete, as explained below), [redacted] concern messages sent [redacted], including *MAH Group* and *Mia*, the two cases noted above with indicia of fraud. They also include the post-retention stock-alerts claim Freeway described in its motion, where the only reason to put a number in the sign-up form was to receive texts. Wilson ECF No. 19 at 14; Wilson ECF No. 19-1 ¶ 50. Watstein Decl. ¶ 3. And the third-party data discussed above shows this is the time that opt-ins ramped up: when represented by HLF.

For three of every four claims, the first record should be Wilson's own message passing the claim to HLF. Those messages would show when each claim surfaced, what Wilson sent, and whether he was flagging texts from companies he had no reason to hear from. ***Yet HLF has neither***

***produced nor logged them.*** Watstein Decl. ¶ 3. Wilson has not either: his privilege log lists [redacted] Ruley Decl. ¶ 14. And as of November 2, HLF confirmed it "will not" search for, produce, or log these communications. Ruley Decl. Ex. E (HLF's Nov. 2, 2026 R&O), Gen. Obj. 1 & Resps. to Reqs. 4, 11. The documents most likely to show whether the opt-ins behind them were manufactured are the exact ones HLF and Wilson refuse to produce.

***Pre-suit demands.*** HLF failed to produce at least 24 demands until Freeway identified them, which Freeway could do only because it knew about some demands from its own investigation. It also refused to produce the potentially hundreds of demands sent by email on the theory that an email is not a "demand letter." Ruley Decl. Ex. B at 3–4. That too-cute-by-half position forced Freeway to serve another subpoena asking for "demand emails." That is not the position of a party with nothing to hide. And it is especially telling given demands that were dropped after a defendant identified an opt-in are the most likely to be fraudulent.

HLF's November 2 response goes further. After forcing Freeway to serve a second subpoena, HLF said it will not produce *any* correspondence *from* companies that received these demand letters, including those that accused HLF and Wilson of fraudulent claims. Watstein Decl. ¶ 25; Ruley Decl. Ex. E (HLF's Nov. 2, 2026 Resp. to Req. 2). According to HLF, that is outside the scope of discovery this Court envisioned. When Freeway's counsel asked HLF's counsel what, in their view, the Court had in mind when it ordered "robust discovery to determine exactly what is going on with the Heidarpour Law Firm," they had no answer. Tr. 78:23–25; Watstein Decl. ¶ 25. Wilson has taken the same position on the same documents, limiting his production to responses received in this case. Ruley Decl. Ex. H (Oct. 29, 2026 letter). So, Freeway must spend yet more resources bringing this issue to the Court.

***Blanket confidentiality.*** HLF designated nearly its entire production confidential, including hundreds of demand letters *it sent to adversaries*. That's despite the fact that HLF produced the same categories of documents and many more, without any protective order, in *Robertson*, and those documents have sat on this Court's public docket since August 12. Wilson ECF No. 42-1. Wilson himself filed his Freeway fee agreement publicly to argue adequacy. Wilson ECF No. 26-1. HLF's designations would keep all of it out of public view. And HLF has announced its intention to ask the Court to rule that the protective order bar Freeway from using anything marked confidential in any other proceeding to insulate itself from its own wrongdoing. Ruley Decl. ¶ 8 & Ex. F.

***The vendor subpoenas.*** On October 16, Freeway subpoenaed eighteen lead-generation and text messaging vendors for records of web-form submissions using Wilson's number and the numbers of two co-plaintiffs who sued alongside him through the same HLF counsel. Ruley Decl. ¶ 20. As shown above, those records can show when each number was submitted on lead forms and, depending on the vendor, who submitted it and from where. Indeed, records that have been produced already show that the lead submissions doubled after HLF became involved and dropped back to baseline after Freeway identified potential fraud. Watstein Decl. ¶¶ 32–35. That is exactly the kind of forensic data HLF promised the Court. Many of those vendors, familiar with the HLF scheme, were enthusiastic about producing those records. Freeway could have asked for far more. It sought data for only three of dozens of known HLF claimants: Wilson and two co-plaintiffs.

What did HLF's counsel do about this limited "forensic data" that it told the Court would exonerate it, and that does not even belong to it? They demanded that Freeway withdraw the subpoenas or strip out the co-plaintiffs' numbers, and hold compliance in abeyance "while we work through these issues, including as necessary through Court intervention." When Freeway

refused, they said they would go to the Court. Ruley Decl. ¶¶ 21–23 & Exs. L–N. Of course, a law firm that represents no party or lawyer of record in this litigation can't ask the Court to block a third-party subpoena that seeks records that don't even belong to its client, implicate no privilege, and that, according to HLF, would only exonerate its client.

***The responses to Freeway's discovery.*** HLF's October 14 letter said that much of what Freeway sought on October 2 fell outside the first subpoena. Ruley Decl. Ex. B. Freeway disagrees, but to avoid unnecessary disputes, it served a second subpoena.

For eighteen of the nineteen requests, HLF said it "will not" search for or produce anything; for the last, it said it has no documents. *Id.* Ex. E at 3–4. That's despite eleven of the nineteen requests seek only documents "sufficient to" show discrete facts. *Id.* Ex. E at 1. HLF's refusal covers the messages Wilson sent HLF, HLF's communications with the companies that received its demands, why cases were dropped, HLF's litigation hold, and any document supporting the engagement letters' promise that fees are "based on the amount of time spent on the matter." *Id.*, Resps. to Reqs. 2, 9–13. HLF's stated reason, repeated request after request, is that the documents have "no bearing" on the case. *Id.*

That position cannot be taken seriously. How Wilson's claims reached HLF, what the targets of HLF's demands said about fraud, and what the lawyers did for their fees are the exact questions this Court ordered "robust discovery" to answer. Tr. 78:23–25. And the documents HLF could not avoid producing have already shown why they matter: an opt-in traced to the same IP address Wilson used to sign HLF's retainers, multiple other cases with indicia of fraud arising after the HLF relationship arose, opt-ins doubling after retaining HLF and then falling back to baseline after fraud allegations, [redacted] paid on an individual claim worth [redacted], and fees supposedly tied to hours that, on public records alone, no lawyer could have worked.

HLF will tell the Court it has produced "nearly 2,000 pages of documents, a 7[redacted]-entry privilege log, an index identifying the documents responsive to each request, and a detailed letter addressing each of Freeway's accusations." Ruley Decl. Ex. E (HLF's Nov. 2, 2026 R&O) at 2. Volume is not compliance. More than 1,200 of those pages are form engagement agreements, signature audit logs, and settlement papers. *See id.* at 15–16 (citing HLF_Freeway_0000091–800 and HLF_Freeway_0001496–2014). Those documents prove the model; they show nothing about where the claims came from, what defendants said in response to hundreds of abandoned demands, and what the lawyers actually did for the enormous fees they took under a non-fee-shifting statute on the representation that those fees were based on their actual work.

Referral counsel have done the same. Freeway subpoenaed Wilson's three litigation firms, Perrong Law, Paronich Law, and Kaufman P.A., for, among other things, their time records in Wilson's matters, which could be redacted for privilege. Those records would show whether the fees track "the amount of time spent on the matter," as the engagement letters promise. Ruley Decl. ¶ 16. Each firm has retained elite outside counsel. *Id.* Two of the three have responded, and both refuse to produce anything. Paronich Law objected to every request and agreed to produce nothing. Perrong Law objected to the subpoena "in its entirety" and "will not produce documents." *Id.* Exs. I–J. And even though the initial subpoena to HLF was transferred to this Court, Kaufman P.A. has told Freeway it does "not agree to have any motion concerning this subpoena heard in the District of Oregon." *Id.* Ex. K (Oct. 29, 2026 email).

Wilson has taken the same approach. He withheld everything in response to requests for the consent records other defendants gave him, his communications with Farideh Heidarpour, the online posts that include his number, the names and email addresses he uses, and the payments he personally received. Ruley Decl. Ex. H (Oct. 29, 2026 letter). He limited his production of

responses to his pre-suit demands to this case alone. *Id.* His privilege log includes emails but omits every text message and attachment. *Id.*

Wilson's counsel took the opposite view of discovery when they were the ones serving it. Before Wilson moved to dismiss his own case, Wilson ECF No. 20 at 1, his counsel demanded voluminous class discovery, including records of every call and text Freeway and its vendors sent over four years, along with every consent record and every complaint. Ruley Decl. ¶ 27 & Ex. Q (Pl.'s First Set of Discovery to Def., Feb. 21, 2026), Req. for Produc. Nos. 5, 16–17. Class discovery in cases counsel never meant to certify is what produced nearly $8 million in payments on Wilson's claims alone. Watstein Decl. ¶¶ 4–5, 11. Yet now that this Court has ordered discovery into their conduct, HLF, referral counsel, and Wilson claim burden. One set of rules applies to the companies they target, and another to them.

These refusals have made discovery far more expensive than it needed to be. Take the signatures on Wilson's engagement agreements. Freeway asked HLF repeatedly, since its initial conferrals in this case, to state whether Wilson signed the retainer agreement for this case or whether HLF did under its POA. For months HLF and Wilson's counsel refused to answer, resulting in enormous expense to put the issue to rest. A straight answer from HLF would have spared all of it.

## IV. Next Steps and Timeline

Freeway will present its discovery disputes with Wilson and HLF by status report, as the Court directed. Tr. 80:9–81:2. Freeway has asked referral counsel to have those disputes heard in this Court. They have thus far refused. *Supra* Part III; Ruley Decl. ¶ 19 & Ex. K. So Freeway will ask the Court to order referral counsel, all of whom represent Wilson in the consolidated cases, to appear and produce the requested documents. The alternative is exactly the delay, cost, and waste

they want to try to push Freeway to give up: separate motions in other districts, each followed by a request that the court there transfer the dispute here anyway. *See* Fed. R. Civ. P. 45(f).

Once the Court resolves those disputes (or other courts resolve them, as necessary), Freeway will seek to depose Wilson, HLF, and a small number of other HLF clients who sued alongside Wilson or in coordination with him. Freeway also intends to seek a forensic inspection of Wilson's devices. Once this discovery is complete, which Freeway anticipates will be by January if it can get quick compliance with discovery, Freeway will move for sanctions.

Dated: November 6, 2026.

*/s/ Ryan D. Watstein*
Ryan D. Watstein (*Pro Hac Vice*)
ryan@wtlaw.com
James M. Ruley (*Pro Hac Vice*)
jruley@wtlaw.com
Rebecca Rhym (*Pro Hac Vice*)
rrhym@wtlaw.com
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: (404) 782-0695

Timothy J. Fransen, OSB No. 073938
tfransen@cosgravelaw.com
**COSGRAVE VERGEER KESTER LLP**
900 SW Fifth Avenue, 24th Floor
Portland, Oregon 97204
Telephone: (503) 323-9000

*Attorneys for Defendant Freeway Insurance Services of America, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 6, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan D. Watstein*
Ryan D. Watstein