Neal Katyal (*pro hac vice*)
**MILBANK LLP**
1101 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Matthew J. Laroche (*pro hac vice*)
Peter Farag (*pro hac vice*)
Isabelle Laskero (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Heidarpour Law Firm, PLLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION**

| | |
|---|---|
| *In re* SUBPOENA TO HEIDARPOUR LAW FIRM, PLLC.<br>__________________________________<br><br>CHET MICHAEL WILSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FREEWAY INSURANCE SERVICES OF AMERICA, LLC,<br><br>Defendant. | Case No.: 6:26-mc-00830-MC<br><br>Underlying action:<br><br>United States District Court for the District of Oregon Eugene Division<br><br>Case No. 6:25-cv-01869-MC |

**NON-PARTY HEIDARPOUR LAW FIRM, PLLC'S RESPONSE TO DEFENDANT'S NOTICE OF NEW EVIDENCE (ECF NO. 34)**

Since the August 19 hearing, non-party Heidarpour Law Firm, PLLC ("HLF") has taken the Court's concerns seriously and has done what the Court asked. HLF's counsel retained an outside forensics firm to collect data from HLF's computers and phones (which amounted to hundreds of thousands of documents), had a team of 16 attorneys review thousands of internal communications, documents, and forensic data, and communicated with nearly 70 settlement counterparties so that Mr. Wilson's settlement agreements could be produced under the process Freeway agreed to. HLF subsequently produced nearly 2,000 pages of documents, a 7,152-entry privilege log, and an index tying every document to each subpoena request. Declaration of Matthew Laroche ¶ 2, ECF No. 39 ("Laroche Decl."). HLF explained that production in a six-page cover letter, answered Freeway Insurance Services of America, LLC's ("Freeway") follow-up demands point by point in a subsequent twelve-page letter, repeatedly offered to confer about reasonable follow-up requests, and sought to bring the remaining disputes to the Court through the procedure the Court set. *Id.* ¶¶ 2, 6–7; Supplemental Declaration of Matthew Laroche ("Supp. Laroche Decl.") Exs. B, D.

Freeway's approach has not been constructive. HLF's September 23 production letter urged Freeway to confer with HLF before making new accusations to the Court—Freeway responded by claiming HLF's production was deficient for not including, among many other things, ***more than 880,000 communications involving Mr. Wilson***, and later filed this Notice of New Evidence without conferring about it. Supp. Laroche Decl. Ex. C at 5–6. HLF explained in a detailed October 14 letter why Freeway had not diligently reviewed HLF's production, was simply wrong that it was deficient, and encouraged further conferral—Freeway never responded to that letter and two days later served twenty-two new subpoenas, including a subpoena on HLF that seeks every document in its litigation file related to Mr. Wilson, far beyond the "very limited,"

"targeted" discovery Freeway told the Court it needed from HLF. Aug. 19 Hr'g Tr. at 13:8–10, 14:23–24, 15:10–11, 41:13–14, *Wilson v. Freeway Ins. Servs. of Am., LLC*, No. 6:25-cv-01869-MC (D. Or. Aug. 19, 2026) ("Aug. 19 Hr'g Tr."). HLF then tried to raise these issues with the Court through the Court's procedures—Freeway ran roughshod over that process by filing the Notice one hour after sending its position for the joint submission to the Court. None of this is appropriate or conducive to an orderly resolution of the issues that matter to the Court.

HLF wants to make several things clear at the outset about Freeway's Notice.

*First*, there is no evidence that HLF manufactured any opt-in, which HLF recognizes is one of the Court's primary concerns. ECF No. 42. That is because HLF did not do so. Freeway has not identified a single HLF device, account, IP address, or person connected to any opt-in. Laroche Decl. ¶ 2. The one IP address Freeway points to is, by its own account, Mr. Wilson's, and for the texts at issue in the case, Freeway itself attributed the claimed consent to an individual with no connection to HLF. ECF No. 40 at 2; Declaration of Andrew Heidarpour ¶ 6, ECF No. 1–1 ("Heidarpour Decl."). And even as to Mr. Wilson, Freeway misrepresents the purported IP address evidence as establishing that Mr. Wilson opted into the text messages in that case; at best, the evidence shows that Mr. Wilson engaged with the (unsolicited) text messages *after* receiving them. Freeway's vendor data comes from a single vendor, reflects small numbers, connects no submission to HLF, and does not support the claim that submissions "doubled" once HLF was engaged. And HLF's principal confirms under oath that HLF does not create or submit opt-ins or lead forms on anyone's behalf, and that no one at HLF or acting for it has ever fabricated an opt-in or manufactured a claim. Supplemental Declaration of Andrew Heidarpour ¶ 4 ("Supp. Heidarpour Decl.").

*Second*, Freeway points repeatedly to a decline in filings by what it calls "known HLF claimants," as if the decline confirmed its fraud theory. Watstein Decl. ¶ 30 & Ex. G. It does not. When a litigant accuses a law firm of fraud in public filings, repeats those accusations on social media, and takes them directly to the lawyers the firm works with, referrals will fall whether the accusations are true or not. On Freeway's reasoning, any accusation serious enough to drive business away would prove itself. What actually happened is that after Freeway's counsel raised his accusations directly with two of the firms that litigate HLF-referred matters, filings Freeway identified as being from "known HLF claimants" fell by a third, while filings for all other plaintiffs rose by a third. *Id.* ¶¶ 26, 29. Meanwhile, the people seeking HLF's help have not stopped calling. Between July 1 and November 10, 2026, HLF received more than 4,800 incoming calls and more than 1,100 written website inquiries from prospective clients, and those inquiries continue daily. Supp. Heidarpour Decl. ¶ 6. HLF has the clients and the claims to bring more cases; what it lacks is an environment in which it can do so. Supp. Heidarpour Decl. ¶ 7.

*Third*, Freeway's settlement narrative does not hold up. Freeway's original theory was that HLF, not Mr. Wilson, controlled his claims and signed agreements on his behalf under a power of attorney. The record refutes that, and Freeway no longer contends that is the case. Supp. Laroche Decl. Ex. B at 3–4; Notice at 22. Freeway's remaining theory, that the division of settlement proceeds between Mr. Wilson and his lawyers shows extortion, makes no sense. Whether a settlement was coerced turns on what the defendant agreed to pay, not on how that payment was divided afterward, and every defendant here was represented by counsel, including, in several settlements, Freeway's own counsel in this case. *Id.* at 5; Supp. Laroche Decl. ¶ 7. In any event, the allocation was disclosed in each settlement agreement, and HLF's fixed 30% share of the attorneys' fee component was agreed to in writing by Mr. Wilson. Supp. Laroche Decl. Ex. B at

4–5. Freeway was not a party to any of these settlements, and it has no basis to second-guess terms that represented parties negotiated, disclosed, and agreed to.

*Finally*, much of the rest of the Notice either grossly mischaracterizes the record or raises complaints about topics HLF understood the parties were still actively addressing in good faith. Freeway says HLF made it "go to each defendant" for permission to obtain Mr. Wilson's settlement agreements, Notice at 3, 16, but HLF gave counterparties notice under a process Freeway agreed to in writing, and it has now produced every agreement. Laroche Decl. ¶ 3; Supp. Laroche Decl. ¶ 7 & Ex. K. Freeway faults HLF for not treating emails as "demand letter[s]," Notice at 18, but Freeway's own request asked for "letter[s]," and HLF produced them and offered to confer on any remaining category. Supp. Laroche Decl. Ex. A, Req. 12; *id.* Ex. D at 3–4. And Freeway presents HLF's confidentiality designations and privilege log as obstruction, even though Freeway never responded to HLF's October 14 letter about the privilege log and HLF left the parties' November 5 meet and confer understanding that they were still working to narrow disputes concerning the confidentiality designations. Supp. Laroche Decl. Ex. D at 11–13; *id.* ¶ 9. Freeway's purpose appears to be to muddy the waters, not raise "new evidence."

HLF remains committed to addressing the Court's concerns in a timely and orderly fashion. While the record does not support Freeway's accusations about HLF's conduct, HLF nonetheless remains willing to consider reasonable, targeted follow-up requests for information and documents. Supp. Laroche Decl. Ex. I at 3–4; *id.* ¶ 9. What HLF cannot do is answer a subpoena that seeks its entire litigation file and allow discovery to proceed against its other clients without limits, all while Freeway expands the scope of discovery each time its theories are disproved. The parties have fundamentally different views about the appropriate scope of any further discovery. HLF therefore respectfully reiterates its request for a status conference, to which Freeway does not

object, so that the Court can set the scope and limits of any further discovery of HLF, and it asks that the Court decline to make any findings about HLF's conduct on the present record. ECF No. 40 at 2.

## I. THE RECORD CONTAINS NO EVIDENCE THAT HLF MANUFACTURED OPT-INS

HLF's September 23 production directly addressed what HLF understood to be the core of Freeway's fraud theory—that HLF used ongoing access to Mr. Wilson's iCloud account to manufacture claims. The First Subpoena's requests targeted this issue. Supp. Laroche Decl. Ex. A, Reqs. 4–7. HLF's September 23 production and cover letter explained why Freeway's theory is wrong. In late October 2024, Mr. Wilson gave HLF his login credentials so that HLF could arrange a collection of his data for discovery. Supp. Laroche Decl. Ex. B at 2. HLF never signed into that account. *Id.* It gave the credentials to Computer Forensics Resources ("CFR"), which used them once, on November 18, 2024, to collect Mr. Wilson's text messages and voicemails. *Id.* (citing HLF_Freeway_0000015, 0001493).

HLF could not have altered what CFR collected, and the forensic record shows it did not. On November 29, 2024, CFR delivered the data to HLF on a thumb drive as a Magnet Axiom "portable case," a widely used forensic format that can be viewed but not modified. *Id.* HLF produced the file listing and folder structure for that drive, which show that no file was modified after it was delivered to HLF. *Id.* at 2–3 & n.2 (citing HLF_Freeway_0001488–0001495). Freeway suggests that HLF has not provided forensic data about the collection, Notice at 1, 19; Ruley Decl. Ex. B, but that is exactly what HLF produced.

Beyond that, HLF produced an extensive privilege log that undermines Freeway's fraud theory. The log reflects that HLF's work on Mr. Wilson's matters consisted of legal services:

investigating potential claims, evaluating their merit, advising Mr. Wilson on his options, and coordinating with co-counsel on litigation strategy. These are the ordinary activities of a law firm representing a client—not the activities of a firm manufacturing opt-ins.

The Notice does not dispute any of this. It does not identify a flaw in the collection, a modified file, or any instance in which HLF accessed the account. Instead, the Notice shifts to a new theory: that HLF must have manufactured opt-ins through another means. Its lead example is the MAH Group IP address, but that address belongs, by Freeway's own account, to Mr. Wilson, and Freeway identifies no HLF device, account, IP address, or person connected to that opt-in or any other. Laroche Decl. ¶ 2; ECF No. 40 at 7. Nor does the rest of the Notice fill that gap. *See infra* Parts I.A–D.

**A. The *MAH Group* IP Address Is Not New and Does Not Implicate HLF**

Freeway's "new evidence" about the MAH Group is not new. Freeway presented the *MAH Group* IP address to the Court at the August 19 hearing, and Mr. Wilson's counsel did not dispute that the address was associated with Mr. Wilson; he disputed only that it showed Mr. Wilson was the one who opted in. Aug. 19 Hr'g Tr. at 49. The only thing the Notice adds is that the same address appears in the SignNow audit logs for agreements Mr. Wilson signed with HLF. Notice Pt. II.B; Watstein Decl. ¶ 21. That Mr. Wilson signed documents from his own IP address tells the Court nothing new about the *MAH Group* opt-in. And for several reasons, the point does not show what Freeway says it does.

*First*, HLF's records show it learned of the *MAH Group* texts after they were sent and responded the way a law firm should. The claimed opt-in is dated January 1, 2025. *MAH Group*, ECF No. 40–5 at 4–6. HLF first learned of MAH Group's messages on January 3, 2025, when Mr. Wilson sent HLF screenshots of texts he had received. Supp. Heidarpour Decl. ¶ 5. On May

9, HLF sent MAH Group a cease-and-desist letter. *Id.* MAH Group did not stop: after receiving that letter, it sent Mr. Wilson approximately 130 additional texts, including after he filed the complaint against MAH Group. *Id.* Mr. Wilson signed the engagement letter for the matter on May 17, and litigation counsel filed the complaint on May 19. *Id.*; *MAH Group*, ECF No. 1. That sequence is the opposite of manufacturing an opt-in: a client reported messages he had received, and his lawyers then took steps to address them.

*Second*, the *MAH Group* record does not establish that even Mr. Wilson submitted a fraudulent opt-in. The only IP address in the texting vendor's export appears in an undated field labeled "lastKnownIp," on a customer profile last updated on March 1, 2026, more than a year after the claimed opt-in, and created sometime in 2022, years before the claimed opt-in. *MAH Group*, ECF No. 40–5 at 4–6. The entries recording the January 1 subscription contain no IP address, and the record's "consents" field is empty. *Id.* The profile belongs to a "Taken Rosins" of Redmond, Washington, created in May 2022 and linked to six other telephone numbers. *Id.* Moreover, the same export shows texts being subscribed to and sent as early as October 2024, months before the claimed opt-in, with links in three messages marked "clicked." *Id.* Freeway argues the IP address was captured "at sign-up, before any text with a link reached Wilson," ECF No. 40 at 6, but the export shows linked texts being sent before January 1. The vendor's declaration, which is from its in-house lawyer, says without any explanation that IP collection occurs "at opt-in," but it says nothing about the "lastKnownIp" field or whether that field updates when a recipient clicks a link. *MAH Group*, ECF No. 40–5 at 3 ¶ 7. A recipient who clicks a link to find out who is texting him would leave exactly this record.

Mr. Wilson sought discovery on this issue by subpoenaing the vendor for the documentation and change history of the "lastKnownIp" field, but the case was stayed, along with

Mr. Wilson's other cases before this Court, before that subpoena was resolved. *MAH Group*, ECF No. 60. Freeway, by contrast, has not sought that information. Of the twenty-two subpoenas Freeway served after HLF's October 14 letter, including subpoenas to eighteen lead-generation, marketing, and messaging vendors, none was directed to MAH Group or its texting vendor. Laroche Decl. ¶ 5; Ruley Decl. ¶ 20. Freeway has the means to test whether the "lastKnownIp" entry reflects an opt-in or a click on a link. It has chosen instead to ask the Court to treat the question as answered.

### B. Freeway's Vendor Data Does Not Connect Any Opt-In to HLF or Support Opt-Ins Doubled When HLF Was Hired

The Notice's remaining "forensic" evidence is a single vendor's records. Freeway says that submissions using Mr. Wilson's number rose from about 0.75 per month before he retained HLF on October 4, 2024, to about 1.40 per month between that date and May 15, 2026, the day Freeway moved to deny class certification, and then fell back, and that Sara Taylor's number "shows the same thing on her own timeline." Notice at 14–15; Watstein Decl. ¶¶ 32-35 & Ex. I. Here, again, Freeway does not claim that any entry is linked to HLF, and none is. HLF does not create or submit opt-ins or lead forms for anyone, nor does it tell clients to opt in to generate claims. Supp. Heidarpour Decl. ¶ 4. In any event, Freeway grossly mischaracterizes and overstates the records for several reasons.

*First*, Freeway's "doubling" for Mr. Wilson depends entirely on where Freeway draws its lines. Freeway divides the data at October 4, 2024, the start of the fourth quarter, which has always been the busiest season for marketing sign-ups on Mr. Wilson's number. Before HLF was involved, roughly 35% of the submissions in Freeway's data (14 of 40) fell in the fourth quarter, and the fourth quarters of 2020 and 2021 each had five, the same number as the fourth quarter of

2024. Supp. Laroche Decl. ¶ 24 & Ex. N (summarizing Watstein Decl. Ex. I). Freeway's cutoff therefore places an ordinary holiday quarter at the front of the "HLF era," while counting the comparatively quiet stretch from 2023 through the third quarter of 2024 (zero to three submissions per quarter) in the baseline. *Id.* Moving the dividing line back by as little as three months shrinks the claimed increase to about 1.6 times; moving it to the start of 2024 shrinks it to about 1.4 times; and a 2023 dividing line leaves an increase of only about 1.1 times. *Id.* The "return to baseline" is equally an artifact of timing: Freeway's final period ends on October 30, 2026, before November and December, historically the busiest months on Mr. Wilson's number. Watstein Decl. ¶ 34; Supp. Laroche Decl. Ex. N. Freeway's "doubling" holds only for the dates Freeway picked. Under any other reasonable cutoff it largely disappears, and in no version does it connect a single opt-in to HLF.

*Second*, the data for the other HLF clients Freeway chose to subpoena does not support Freeway's theory. For Sara Taylor, Freeway measures from when she began filing suits, November 18, 2024, to when she stopped, August 29, 2025, and treats that window as the period she "was represented by HLF." Watstein Decl. ¶ 35; Notice at 14–15. Even on Freeway's own terms, the pattern does not hold. Her number first appears in the vendor's records in March 2024, leaving a "baseline" of six submissions over roughly eight months. *Id.*; Supp. Laroche Decl. Ex. N. And after she stopped filing, submissions did not fall back to that baseline. Her number was submitted twelve more times over the next fourteen months, a higher rate than before she ever filed. *Id.* If the submissions were being generated to create claims, they would not have continued for more than a year after the claims stopped. The third HLF client, Antwane Johnson, appears in the vendor's records exactly once. Watstein Decl. ¶ 33; Supp. Laroche Decl. Ex. N; Notice at 15 n.4.

*Third*, even if the numbers showed an increase after HLF was hired, they are too small to support any conclusion. Even using Freeway's misleading projection, Mr. Wilson's number would have been submitted about 14 times between October 2024 and May 2026 at its earlier rate; it was submitted 27 times. Watstein Decl. ¶ 34. Freeway's "doubling," in other words, is about thirteen additional entries over nineteen months, fewer than one a month, from one vendor. Even that small data set is incomplete: four of the 107 records contain no opt-in date at all, and Freeway simply dropped them. *Id.* ¶ 33. And for the third number Freeway subpoenaed, belonging to co-plaintiff Antwane Johnson, the records show a single submission in March 2024, and that he opted out the same day. *Id.*; Watstein Decl. Ex. I; *see also Morita v. S. Cal. Permanente Med. Grp.*, 541 F.2d 217, 220 (9th Cir. 1976) ("[S]tatistical evidence derived from an extremely small universe . . . has little predictive value and must be disregarded.") (quoting *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir. 1975)).

***

Freeway says it could have sought data for "dozens of known HLF claimants" and chose three. Notice at 19. Of those three, one shows no pattern at all, one contradicts Freeway's theory, and the third depends entirely on where Freeway draws its lines. Freeway's rush to Court using this data also underscores why Freeway should confer with HLF before making new accusations based on documents it does not understand. Freeway sent the vendor data to HLF hours before it filed the Notice, which gave HLF no meaningful chance to review it, let alone discuss it, before Freeway presented it to the Court as evidence of fraud.

This is not the first time Freeway has done this. In June, Freeway received Mr. Wilson's engagement agreement from HLF and, within days and without raising any questions with HLF about the power of attorney provision, filed it in the underlying action to accuse HLF of controlling

Mr. Wilson's claims through that provision. ECF No. 38 at 10; *Wilson* ECF Nos. 19, 24. HLF's production has since shown that Mr. Wilson signed every agreement himself. Laroche Decl. Ex. A at 3–4. The vendor data follows the same pattern: Freeway receives a document, builds a serious accusation around it, and presents that accusation to the Court before HLF can respond. ECF No. 38 at 10–11. Had Freeway conferred first, the problems described above could have been addressed before they reached the Court.

### C. The Other Matters Freeway Cites Do Not Connect HLF to Any Opt-In

Unable to connect HLF to any opt-in, Freeway relies on a handful of cases it has selected from a much larger body of work as evidence of a pattern. HLF has handled approximately 4,000 matters over nine years in connection with unwanted telemarketing. The vast majority of those matters were resolved without litigation, often when the recipient of a cease-and-desist letter agreed to stop the calls or texts. Supp. Heidarpour Decl. ¶ 3; *see* Supp. Laroche Decl. Ex. B at 4–5. When HLF refers claims for litigation, most are resolved favorably for the client, and no court has found that HLF fabricated an opt-in. Supp. Heidarpour Decl. ¶ 3.[1] Freeway also contends that claims are almost always dropped when a defendant raises consent. Aug. 19 Hr'g Tr. at 18; ECF No. 40 at 1. That is not true, as *MAH Group* itself shows. *See supra* Part I.A.

Freeway points to three other matters, *Wilson v. Mia Aesthetics*, *Barnes v. Jet Quick*, and *Rashley v. Boost Health*, as evidence of a pattern. Notice Pt. II.A–B. But in none of them does

[1] Freeway also emphasizes that Ms. Heidarpour, a non-lawyer HLF employee, has a prior conviction. Notice at 2. This is not new information, and Freeway raised it months ago. *Wilson* ECF No. 19 at 11–12. HLF has never concealed her role. She provides secretarial services, assists with client intake, and at times communicates with clients, under Mr. Heidarpour's direction and supervision. Supp. Laroche Decl. Ex. B, App. A n.3; Ex. I, Resp. to Req. 6. That includes communicating with Mr. Wilson, which, like her other work, was in support of HLF's attorneys' representation of him. Freeway confirmed its understanding of her role in writing in June. *Id.* Moreover, no portion of any fee or settlement in any Wilson matter was paid or allocated to her, and Freeway identifies no evidence she submitted or created any opt-in. Supp. Laroche Decl. Ex. I, Resp. to Req. 16.

Freeway identify any evidence that HLF submitted, created, or arranged a submission. In *Mia*, the lead form listed Mr. Wilson's number but another person's name, email address, and ZIP code. Ruley Decl. Ex. O. In *Barnes*, a different plaintiff sued a different defendant over texts to a different telephone number, and the sign-up was attributed to Barnes's mother. Notice at 12. Freeway notes that an HLF lawyer moved to appear for Mr. Barnes after the Court allowed discovery into the sign-up. A lawyer who seeks to appear subjects himself to the Court's supervision, which is not the conduct of someone seeking to conceal his own role in a fabricated opt-in. *Id.* In *Rashley*, the court entered default against the two plaintiffs, and it made no findings against any of the lawyers. *Rashley*, ECF Nos. 73, 75. Freeway does not contend that HLF had any role in the website submissions or device issues it describes. Notice at 8–10. Freeway also points to phone records showing calls between HLF and one of the *Rashley* plaintiffs in the weeks before HLF took on his matter. *Id.* at 10. Communications between a law firm and a prospective or current client amount to the routine practice of law, not evidence that the firm fabricated anything. Counsel also withdrew in *Rashley*. *Rashley*, ECF No. 48.

### D. The Decline in Filings Reflects Freeway's Accusations, Not Fraud

Freeway argues that because filings by "known HLF claimants" fell after it raised its accusations, the accusations must be true. That does not logically follow. When a litigant accuses a law firm of fraud in public filings, repeats those claims on social media, and then takes those accusations directly to the lawyers the firm works with, the firm's referrals will fall whether the accusations are true or not. On Freeway's reasoning, any accusation serious enough to drive

business away would prove itself. And Freeway's own declaration shows why the filings actually fell.[2]

The decline tracks Freeway's outreach to the lawyers who file HLF-referred cases, not anything HLF did. In July and August 2025, Freeway's counsel contacted two of the firms that litigate matters HLF refers and raised his fraud accusations directly with them. Watstein Decl. ¶ 26. In the six months that followed, filings Freeway identified as being from "known HLF claimants" fell by a third, while filings for all other plaintiffs *rose* by a third. *Id.* ¶ 29. Filings fell further after Freeway moved to deny class certification in this case and after the Court stayed Mr. Wilson's other cases before it. *Id.* ¶ 30; Aug. 19 Hr'g Tr. at 78–79. Freeway's counsel also has not confined those accusations to the courtroom. On August 20, Freeway's counsel posted on LinkedIn that Mr. Wilson's lawyers had abused the class action mechanism "for personal profit." Supp. Laroche Decl. Ex. M. The audience for those statements includes the lawyers who litigate TCPA cases and the consumers who seek HLF's help. Given that HLF has been accused of fraud in court filings and then on social media by opposing counsel, it is unsurprising that referral counsel have told HLF they are disinclined to work with it while those accusations remain pending. Supp. Heidarpour Decl. ¶ 7.

Regardless, the people seeking HLF's help have not stopped calling. Between July 1 and November 10, 2026, HLF received more than 4,800 incoming calls and more than 1,100 written website inquiries from people seeking help with unwanted telemarketing calls and texts, roughly eight written requests for help every day. Supp. Heidarpour Decl. ¶ 6. HLF has evaluated many

---

[2] Freeway's "known HLF claimant" category is unclear. Because HLF does not appear as counsel of record in the cases Freeway counts, Freeway's counsel identified HLF claimants using criteria that include any plaintiff his firm's "investigation otherwise identified" as linked to HLF. Watstein Decl. ¶ 28. Freeway has not produced information showing who it identified.

of those matters and believes at least some present viable claims it would refer for litigation, but it has been unable to place them with litigation counsel in the environment Freeway's accusations have created. *Id.* ¶ 7. The numerous unsolicited requests for help that HLF receives daily also underscore that it has no reason to manufacture an opt-in.

## II. FREEWAY'S ARGUMENTS ABOUT SETTLEMENT ARE WITHOUT MERIT

At the August 19 hearing, Freeway's settlement theory rested on the premise that HLF, not Mr. Wilson, controlled his claims and invoked the power-of-attorney provision in his 2024 engagement letter to sign agreements and decide settlements on his behalf. HLF has consistently said that premise is wrong, and the September 23 production confirms it. HLF produced SignNow audit logs showing that Mr. Wilson's own account received, reviewed, and signed every co-counsel engagement agreement and settlement agreement, from IP addresses distinct from HLF's. Supp. Laroche Decl. Ex. B at 3–4. HLF's 7,152-entry privilege log reflects hundreds of communications directly with Mr. Wilson about draft letters and complaints, case status, discovery, co-counsel arrangements, and settlement offers and counteroffers. *Id.* at 3. That includes Freeway's own January 12, 2026 settlement offer, which the log confirms was conveyed to Mr. Wilson and which he rejected. *Id.* at 3–4; *Wilson* ECF No. 29 ¶ 25.

Freeway no longer contends otherwise. What remains is Freeway's argument about the size of settlements that litigation counsel negotiated with represented defendants and that Mr. Wilson approved. Freeway, which was not a party to those agreements, offers no basis to treat negotiated terms as evidence of misconduct.

### A. Freeway Mischaracterizes HLF's Role

As an initial matter, Freeway continues to mischaracterize HLF's role in Mr. Wilson's cases. *First*, HLF's cease-and-desist letters were not the first step in an extraction "model." HLF's

letters did not threaten a class action lawsuit at all. They asked the sender to stop, and in the overwhelming majority of matters, that is where things ended. On a few occasions, HLF negotiated a pre-suit resolution, and Freeway does not claim anything was improper about those resolutions. Laroche Decl. Ex. A at 5.

*Second*, Freeway treats the division of roles between referring counsel and litigation counsel as evidence of misconduct. The relevant point is not which firm negotiated a particular settlement, but that Mr. Wilson approved the settlements and that the defendants negotiated through counsel. The division of responsibilities among his lawyers does not itself establish that any claim was manufactured or any settlement improperly obtained. Freeway asserts that HLF's description of its "limited role" was false because Mr. Heidarpour attested in another case that he "continue[s] to represent the clients" after a referral. Notice at 15 (quoting *Rashley*, ECF No. 55–2 ¶ 6). The two statements are consistent. HLF remains Mr. Wilson's lawyer after a referral, advising him and keeping him informed. This is what HLF told the Court already. Heidarpour Decl. ¶ 4 ("HLF may continue to provide limited assistance on litigated cases, such as help responding to discovery requests, but HLF is not in charge of the prosecution of those cases."). Freeway's phone records make the same point. Freeway counts 498 calls and texts between Mr. Wilson and HLF's main number over twelve months, and 20 calls with HLF attorney Dana Oliver. Notice at 15; Watstein Decl. ¶ 24 & Ex. H. This is consistent with the hundreds of communications with Mr. Wilson reflected on HLF's privilege log. Supp. Laroche Decl. Ex. B at 3. A lawyer who talks to his client is not a "shadow firm"; he is doing his job.

*Third*, Freeway has HLF's financial interest wrong. HLF's share was a fixed 30% of the attorneys' fee component, agreed in writing before any case settled, not the 95.7% "counsel" figure

Freeway puts at the center of its argument. The aggregate percentage attributed to counsel does not itself establish misconduct by HLF or litigation counsel.

### B. The Fee Arrangements Were Disclosed, Agreed, and Are Not the Question Before the Court

Freeway's settlement argument runs two distinct theories together. The first is that defendants paid too much: that the settlements carried an "extortion premium" many times the statutory damages. Notice at 1, 3–4. The second is that Mr. Wilson received too little of what was paid: that his lawyers kept roughly 96% of the total across the settlements. *Id.* at 1–3; Watstein Decl. ¶ 5. The first theory has nothing to do with how any settlement was divided, and in any event it is wrong. The second concerns a matter between Mr. Wilson and his lawyers, not Freeway.

*First*, Freeway offers no basis to conclude the settlement totals—negotiated by counsel, sometimes with the assistance of a mediator—amount to extortion. And whether a settlement was coerced certainly does not turn on how that payment was divided afterward. A defendant pays the same amount however it is allocated. Every settlement was negotiated with a represented counterparty, in many cases through mediation and in several cases with Freeway's own counsel. Supp. Laroche Decl. Ex. B at 5. Each defendant, represented by counsel, agreed to the amount it paid. Freeway was not a party to those agreements and cannot recast their terms after the fact. Notice at 7. Freeway's counsel here was also counsel in several of those settlements but does not claim that it raised any of these arguments at the time of those settlements.

*Second*, the allocation between Mr. Wilson and his counsel was disclosed and agreed to in writing. Each settlement agreement disclosed how the payment would be allocated between Mr. Wilson and his lawyers. Supp. Laroche Decl. Ex. B at 5. Mr. Wilson signed each co-counsel engagement agreement. *Id.* at 4–5. Oregon permits lawyers in different firms to divide a fee where

the client gives informed consent and the total fee is not clearly excessive, and it does not require that the division track each firm's work. Or. RPC 1.5(d)(1)–(2); *cf.* Or. RPC 1.5(d)(3) (requiring that a fee be divided "in proportion to the services performed" only where the division "is between a lawyer and an LP").

Freeway's principal authority confirms that these questions belong elsewhere. In *Smith v. ExamWorks, LLC*, the client never learned of a settlement offer, and the court declined to impose sanctions, leaving the fee agreement to "an ethics inquiry." 2026 WL 2823260, at *9–10 & n.6 (D. Md. Sept. 21, 2026). Here, Mr. Wilson received and rejected Freeway's offer himself, *Wilson* ECF No. 29 ¶ 25, and was consulted about and approved the other settlements, Supp. Laroche Decl. Ex. B at 3–5. Whether any fee arrangement was proper is a different question from whether HLF manufactured opt-ins. ECF No. 42. It is beyond the scope of this subpoena proceeding, and it could not fairly be decided on a Notice that presents only Freeway's side.[3]

Freeway's theory would also require the Court to reopen final, negotiated settlements at the request of a stranger to them. Each settlement was negotiated by represented parties and signed by Mr. Wilson to resolve litigated matters. Supp. Laroche Decl. Ex. B at 5. Freeway released nothing and paid nothing under those agreements, and the parties who did have not asked anyone to revisit them. And Freeway's premise, that any fee not justified by the hours worked on a particular matter is an "extortion premium," Notice at 1, 4, is unfounded and would require a matter-by-matter reconstruction of the legal work behind nearly 70 settlements. Laroche Decl. ¶

[3] Freeway also points out that the settlement statements include a release by Mr. Wilson of claims against his counsel, and it suggests the release is inconsistent with Oregon Rule of Professional Conduct 1.8(h)(2). Notice at 6–7; Watstein Decl. ¶ 4. Like Freeway's other fee arguments, this concerns the relationship between Mr. Wilson and his own lawyers. Freeway was not a party to it, and whatever Freeway's view of the provision, it has no bearing on whether HLF manufactured opt-ins.

2; *see* Supp. Laroche Decl. Ex. E, Reqs. 6, 10. That exercise would impose an extraordinary burden on a non-party, Fed. R. Civ. P. 45(d)(1), and it would not shed any light on whether an opt-in was manufactured. ECF No. 42; *see infra* Part IV.

## III. FREEWAY'S DESCRIPTION OF THE DISCOVERY RECORD IS INCORRECT

Freeway contends that HLF has "stonewalled" and "produced only what [it] could not avoid." Notice at 16–22. This is not true. HLF produced more than what the August 24 Order required and provided two detailed letters explaining its production and offering to confer. Instead of conferring about what additional discovery was necessary, Freeway served twenty-two subpoenas, including a subpoena on HLF that sought every document in HLF's litigation file for Mr. Wilson and much more.[4] When the parties conferred about the Second Subpoena, HLF said (again) that it would be willing to discuss targeted follow-up requests but that if Freeway's view of appropriate discovery was substantially broader than that, then the parties should raise the issue with the Court. Supp. Laroche Decl. ¶ 9. Far from stonewalling, HLF was trying to raise issues with the Court in an orderly fashion, which is exactly what the Court encouraged the parties to do during the August 19 hearing. Aug. 19 Hr'g Tr. at 80:9–81:2.

***HLF Produced Every Settlement Agreement Under the Process Freeway Agreed to.*** Freeway says HLF made it "go to each defendant" for permission, which is not true. Notice at 3, 16. Every one of Mr. Wilson's settlement agreements contains a negotiated confidentiality or

---

[4] Freeway claims HLF promised the Court "financial records" and now refuses to search for time and fee records. ECF No. 40 at 3. What HLF said was that its production would include "financial records and settlement documentation that will allow the Court to evaluate the economics of these arrangements," in a paragraph describing HLF's fixed 30% share of the attorneys' fee component. ECF No. 33 at 5. HLF produced exactly that: every settlement agreement reflecting amounts paid to Mr. Wilson and his counsel, as well as the co-counsel agreements setting out referral and litigation counsel's share. Laroche Decl. ¶¶ 2–4. HLF never promised timesheets. *See* ECF No. 33 at 6.

notice provision. HLF gave the counterparties notice, under a process Freeway agreed to in writing on September 18. Freeway confirmed it would "not assert that HLF did not fulfill its production obligations by withholding those agreements while the objecting parties confer with Freeway." Supp. Laroche Decl. ¶ 6; Supp. Laroche Decl. Ex. B, App. A n.4. For the handful of counterparties that objected, HLF produced those agreements once the counterparty confirmed it withdrew its objection, and it has now produced all of them. Supp. Laroche Decl. ¶ 7 & Ex. K.

Freeway now says the agreements "permit[] disclosure under a court order" and that HLF "created the objections" by notifying the counterparties. ECF No. 40 at 6–7. But Freeway's own declarant acknowledges that some agreements required notice before HLF complied with any order. Notice at 16; Ruley Decl. ¶ 10. The August 24 Order enforced the First Subpoena; it did not address the counterparties' contractual rights or direct HLF to produce their agreements without notice. *See* ECF No. 28. HLF told the Court on September 14 that it had begun notifying the settling parties. ECF No. 33 at 6. On September 18, Freeway agreed in writing to that process. Laroche Decl. ¶ 3. HLF followed that process, and every agreement has now been produced. Supp. Laroche Decl. ¶ 4 & Ex. K.

***Freeway's Complaints About Documents Are Misplaced***. Of everything Freeway demands, it identifies only two categories as bearing on whether any opt-in was manufactured: the messages through which Mr. Wilson's post-November 2024 claims reached HLF, and pre-suit demand correspondence. Notice at 17–18. HLF has addressed both.

As to the first, HLF has never concealed how Mr. Wilson communicated potential claims. CFR collected Mr. Wilson's messages once, on November 18, 2024, and no one at HLF or acting on its behalf accessed his iCloud account before or after that collection. After that date, Mr. Wilson sent HLF copies of messages he received. Supp. Laroche Decl. Ex. D at 3, 11. Mr. Wilson's

sworn interrogatory response says the same. Ruley Decl. Ex. G. As to the second, Freeway faults HLF for treating an email as something other than a "demand letter." Notice at 18. But Freeway drafted the request, and it asked for "each *letter* you sent out on Wilson's behalf." Supp. Laroche Decl. Ex. A, Req. 12 (emphasis added). HLF produced those letters, the three emails Freeway identified, and it offered to confer on any remaining category. Supp. Laroche Decl. Ex. D at 3–4; Ruley Decl. ¶ 4.

Notably, HLF told Freeway repeatedly that it would consider targeted follow-up requests, but Freeway has not engaged. In its September 23 letter, HLF said it would be willing to discuss producing additional materials and encouraged Freeway to confer. Supp. Laroche Decl. Ex. B at 1, 5–6. In its October 14 letter, HLF offered to discuss the demand-letter and email issue, and any remaining category. Supp. Laroche Decl. Ex. D at 3–4, 12. In its November 2 responses to the Second Subpoena, HLF stated that it "remains willing to confer on reasonable, targeted requests." Supp. Laroche Decl. Ex. I at 3–4. And at the November 5 meet and confer, HLF explained that if Freeway could identify a limited set of specific documents that would resolve its concerns (giving the example of pre-suit demand emails), HLF would consider producing them. Supp. Laroche Decl. ¶ 9. Freeway has never meaningfully responded and, as far as HLF is aware, still believes it is entitled to the full scope of the Second Subpoena.[5]

[5] Freeway also asserts that, at the parties' November 2 meet and confer, HLF's counsel could not identify what the Court had in mind when it ordered "robust discovery," or what discovery would bear on whether fraud occurred. Notice at 18; Watstein Decl. ¶ 25. That is not an accurate account of the conference. When Freeway's counsel asked, HLF's counsel explained that the discovery HLF had already provided was robust. Supp. Laroche Decl. ¶ 8. This includes retaining an outside forensics firm, having a team of attorneys review thousands of documents, preparing a 7,152-entry privilege log, working through every request in the First Subpoena, and producing nearly 2,000 pages with an index tying each document to each request.

***HLF's Response to the Second Subpoena Was Reasonable.*** The Second Subpoena was inappropriate and far exceeds the bounds of reasonable discovery. Freeway told the Court that the discovery it needed was "very limited" and "targeted." Aug. 19 Hr'g Tr. at 13:8–10, 14:23–24, 15:10–11. The Court sustained the First Subpoena because its requests sought only documents "sufficient to identify" discrete facts. ECF No. 28 at 5–6. The Second Subpoena dispenses with any pretense of targeted discovery and asks for HLF's litigation file outright. It demands "[a]ll Communications" and "[a]ll Documents" across every TCPA matter involving Mr. Wilson since 2023; a "complete export or log" of HLF's communications with its client and co-counsel, "whether or not" privileged; HLF's timesheets and personnel and compensation records; and records of a different law firm dating to 2012. ECF No. 38 at 5; Supp. Laroche Decl. Ex. E. Request 19 goes further, demanding "[a]ll other Documents" Freeway sought in its October 2 email, which HLF had already addressed point by point. Supp. Laroche Decl. Ex. E, Req. 19. Freeway served the Second Subpoena two days after HLF's October 14 letter, without responding to it or conferring about it. If Freeway believed HLF's production was deficient, the proper course was to confer and, if necessary, present that dispute to the Court. It was not proper to serve a new subpoena seeking the same materials and more. Supp. Laroche Decl. Ex. I at 2, 33–34; *see* Fed. R. Civ. P. 45(d)(1).

HLF nonetheless responded in good faith. Its November 2 responses did not simply object. For each request, HLF identified by Bates number the documents already produced that address the subject. Supp. Laroche Decl. Ex. I at 16–17, 19, 22–23, 30–31, 33. HLF also answered the factual questions underlying Freeway's requests:

- No one at HLF has ever signed a document in Mr. Wilson's name or invoked the power of attorney (a question HLF has now answered multiple times). *Id.* at 18–19.

- Messages Mr. Wilson received after November 18, 2024 reached HLF because he sent them himself. *Id.* at 26.
- Ms. Heidarpour's compensation is not tied to any Wilson matter. *Id.* at 20.
- No portion of any fee or settlement was allocated to a non-lawyer. *Id.* at 31.
- HLF is preserving documents as the Court ordered. *Id.* at 28.

HLF offered to confer on its preservation practices, on how it searched for documents, and on any "reasonable, targeted requests." *Id.* at 3, 28–29. HLF also told Freeway that the most appropriate way to resolve the Second Subpoena's scope was to present it to the Court, and the next day it sent Freeway a draft joint email to do exactly that. *Id.* at 4; Supp. Laroche Decl. Ex. J; Laroche Decl. ¶ 7.

***Confidentiality and Privilege Log Discussions Are Ongoing.*** Freeway's complaints about HLF's confidentiality designations and privilege log are misleading and premature. The parties were still conferring on both issues when Freeway filed the Notice. HLF designated documents under the interim protective order, proposed targeted redactions on October 14, and offered to confer, and its proposed use restriction tracks this District's form protective order. Supp. Laroche Decl. Ex. D at 12–13. As to the privilege log, HLF's October 14 letter explained how the log was constructed and why it ends on May 20, 2026. It also explained why the log satisfies Rule 45(e)(2)(A)(ii): it identifies, for each of its 7,152 entries, the date, the sending account, every recipient, the subject line, and the privilege asserted. Supp. Laroche Decl. Ex. D at 11–12. Freeway never responded.[6] When the parties conferred on November 5, they discussed the

[6] Freeway accuses HLF of "[t]elling the Court that a sick child was cover for delay in resolving the vendor subpoena issue." ECF No. 40 at 8. HLF said no such thing. HLF did not mention the vendor subpoenas or the reason for the cancellation, and it acknowledged the family illness in writing. *See* Ruley Supp. Decl.

confidentiality designations, and HLF left that conference understanding that the parties would continue working to resolve them. Supp. Laroche Decl. ¶ 9. The next day, without warning, Freeway filed the Notice, presenting both issues to the Court as evidence of obstruction. Laroche Decl. ¶ 8.

Freeway cannot fairly tell the Court that HLF has not engaged when Freeway failed to respond to HLF's position and left a meet and confer with the issues still open.

***Vendor Subpoenas***. Freeway says HLF tried to "block" its vendor subpoenas and manufactured urgency. Notice at 20; ECF No. 40 at 3–4. HLF did neither. It did not move to quash any subpoena but asked only that compliance be held in abeyance as to the two telephone numbers belonging to HLF clients other than Mr. Wilson, while the parties brought the scope of that discovery to the Court through the procedure the Court established. Supp. Laroche Decl. Ex. F; ECF No. 38 at 5–6. HLF first made that request on October 22. It repeated the request at the November 2 conference and in the draft joint email it sent on November 3, and it told Freeway that nothing about the issue needed to be urgent if Freeway agreed to that limited pause. Supp. Laroche Decl. ¶ 8 & Exs. F, J; Laroche Decl. ¶¶ 6–7. The Court has now ruled on that request. ECF No. 42.

What remains is the question HLF has sought to put before the Court from the start: the scope of any further discovery into HLF's other clients. Those individuals are not parties here. Their telephone numbers, contact information, and dealings with their lawyers implicate privacy and confidentiality interests that HLF has a duty to protect. Freeway has already said it intends to

---

Ex. 2. HLF explained that Freeway cancelled the October 29 conference saying it needed more time to provide its position on HLF's production, Supp. Laroche Decl. Ex. H, and that Freeway never sent that position. Instead, Freeway was preparing the Notice, which it never said to HLF and which by its own account Freeway "had been working on for weeks." ECF No. 40 at 3–4.

depose "a small number of other HLF clients" and has described its interest as reaching "dozens" of HLF claimants. Notice at 19, 23. HLF respectfully submits that it should have an opportunity to be heard on this issue rather than have Freeway expand discovery subpoena by subpoena.

## IV. THE COURT SHOULD SET THE SCOPE OF ANY FURTHER DISCOVERY

The Court has made clear that it wants to understand "exactly what is going on with the Heidarpour Law Firm and this litigation." Aug. 19 Hr'g Tr. at 78:23–25; ECF No. 42. HLF has every reason to answer that question, and it is committed to doing so. The record shows no manufactured opt-ins and no "shadow firm," only a law firm doing legal work for its client. *See supra* Parts I–II. While HLF does not believe additional discovery is necessary from HLF, it has repeatedly stated its openness to responding to reasonable follow-up requests for additional information and documents. The scope and limits of any additional discovery should be set by the Court, not by Freeway's successive subpoenas.

In this respect, HLF wishes to make three points.

*First*, a non-party should not be required to produce discovery of this scope when it is disconnected from any claim or defense in the action. A party serving a subpoena on a non-party "must take reasonable steps to avoid imposing undue burden or expense," Fed. R. Civ. P. 45(d)(1), and all discovery must be "relevant to any party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1); *see Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980) (while discovery "should not be unnecessarily restricted," the "'necessary' restriction may be broader when a nonparty is the target of discovery"). The only merits question in this action is whether Freeway had consent to contact the Subject Number, and the Court has denied class certification. Supp. Laroche Decl. Ex. I at 5. The Court has also identified the question it wants answered as to HLF: whether opt-ins behind HLF-referred claims were

manufactured. ECF No. 42. The Second Subpoena is not tied to either. It seeks effectively every document in HLF's possession concerning Mr. Wilson since 2023, a log of every call and text between HLF and its client, HLF's timesheets and personnel files, and records of a different law firm going back to 2012. Supp. Laroche Decl. Ex. E, Reqs. 1, 2, 4, 6, 10. Much of that material is privileged, and much of the rest is available from Mr. Wilson or the vendors Freeway has already subpoenaed. Supp. Laroche Decl. Ex. I at 5–7. Rules 26 and 45 do not justify imposing that type of burden on a non-party.

*Second*, discovery reaching HLF's other clients raises distinct concerns. Those individuals are not parties to this action, have not been heard, and have their own privacy and confidentiality interests in their telephone numbers, contact information, and dealings with their lawyers. HLF owes them duties of confidentiality. *See* Or. RPC 1.6. Freeway has already subpoenaed records for two of those clients and says it intends to depose "a small number of other HLF clients," while describing its interest as reaching "dozens" of HLF claimants. Notice at 19, 23; Supp. Laroche Decl. Ex. F. Without limits, every HLF client becomes a potential target of discovery. HLF does not believe that discovery about other clients is appropriate, *see Dart*, 649 F.2d at 649 (limits on nonparty discovery protect third parties "from harassment, inconvenience, or disclosure of confidential documents" (citation omitted)), though it recognizes that the Court has found at least some information about other HLF clients relevant. ECF No. 42. Any such discovery should therefore be defined by the Court before it proceeds.

*Finally*, discovery cannot become a fishing expedition, and that is what this has become. *See Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) (district courts "need not condone the use of discovery to engage in 'fishing expedition[s]'"). Freeway's theories shift each time discovery disproves them. Freeway first said HLF had ongoing access to Mr. Wilson's iCloud

account and was manufacturing claims from it. HLF showed that its forensic vendor collected the account once, on November 18, 2024, and that no one at HLF ever accessed it. Supp. Laroche Decl. Ex. B at 2. Freeway now says the problem lies in how Mr. Wilson's later messages reached HLF. Notice at 17–18. Freeway next said HLF invoked a power of attorney to sign agreements and control Mr. Wilson's claims. HLF produced audit logs showing that Mr. Wilson signed every agreement himself. Supp. Laroche Decl. Ex. B at 4. Freeway now treats that issue as "put . . . to rest" and argues instead that the provision was wrong whether HLF "used" it or not. Notice at 6, 22. When HLF explained where that provision came from, Freeway responded with a request for fourteen years of another firm's records, aimed at impeaching a single sentence in a letter from counsel. Supp. Laroche Decl. Ex. E, Req. 1.[7] Each time, the answer prompts a new accusation and a broader demand, so that HLF must disprove every theory Freeway can devise. ECF No. 38 at 10–11. Freeway has also said what it is after: it has "flagged [its] intent" to "potentially [file] a civil action against HLF." Ruley Decl. Ex. F (Sept. 15, 2026 email). This is inappropriate. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978) ("[W]hen the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied.").

None of this requires the Court to resolve Freeway's accusations now. It requires only that the Court, rather than Freeway, decide what further discovery of a non-party is warranted, and that

---

[7] Freeway calls HLF's explanation of that provision a "false narrative," claiming HLF said Mr. Heidarpour "merely 'worked'" at Mr. Daschbach's firm and that the agreement "couldn't possibly be improper because Mr. Daschbach used to be a judge." Notice at 5–6. HLF said neither. Its letter explained that Mr. Heidarpour worked at that firm before he was licensed and that HLF continued to use the engagement letter Mr. Daschbach had drafted. Laroche Decl. Ex. A at 3. Mr. Heidarpour's 2016 testimony that he helped start the firm, held an interest in it, and disagreed with its fee percentages is consistent with that explanation. Supp. Laroche Decl. Ex. I, Resp. to Req. 1.

it do so on a full record. HLF therefore respectfully requests that the Court (i) address the scope and limits of any further discovery of HLF at the status conference HLF has requested, to which Freeway does not object, ECF No. 40 at 2; and (ii) decline to make any findings concerning HLF's conduct on the present record.

DATED: November 16, 2026

Respectfully submitted,

*/s/ Neal Katyal*

Neal Katyal (*pro hac vice*)
**MILBANK LLP**
1101 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-835-7500

Matthew J. Laroche (*pro hac vice*)
Peter Farag (*pro hac vice*)
Isabelle Laskero (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000

*Attorneys for Heidarpour Law Firm, PLLC*